IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

WILLIAM LOCKWOOD,

        Plaintiff

    v.

PACIFIC USA, LTD., PACIFIC CYCLE, LLC
and TOYS "R" US – DELAWARE, INC.

        Defendants.

Civil Action No.

WMN-02-CV-2068

## DEFENDANTS' OPPOSITION
## TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

        Defendants herein, by and through their undersigned counsel, respectfully request this Court to DENY Plaintiff's Motion for Partial Summary Judgment. In support thereof, the Defendants state that there exists a genuine dispute of material fact such that the plaintiff is not entitled to judgment as a matter of law. Further grounds in support of the Defendants' Opposition are set forth in the accompanying memorandum, which is incorporated herein.

        Respectfully submitted,

_____
Bruce R. Parker
Federal Bar No. 00028
Michele R. Kendus
Federal Bar No. 26586
Venable, Baetjer and Howard, LLP
Two Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201-2978
(410) 244-7400

Attorneys for Defendants
Pacific Cycle, LLC

_____
Daniel J. Moore
Federal Bar No. 00111
Moore & Jackson, LLC
305 Washington Avenue, Suite 401
Towson, Maryland 21204
(410) 583-5241

Attorneys for Defendant
Toys "R" Us – Delaware, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| WILLIAM LOCKWOOD, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL ACTION NO. |
| | * | WMN-02-CV-2068 |
| PACIFIC USA, LTD, ET AL. | * | |
| Defendants | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PACIFIC CYCLE'S AND TOYS "R" US' MEMORANDUM IN SUPPORT OF THEIR
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants, Pacific Cycle, LLC ("Pacific Cycle") and Toys "R" Us – Delaware, Inc. ("Toys "R"

Us"), by and through their undersigned attorneys hereby file this Memorandum in Support of their

Opposition to Plaintiff's Motion for Partial Summary Judgment, and state as follows:

**I.    STATEMENT OF FACTS**

This products liability case arises out of an accident that occurred on June 7, 1999, allegedly due

to the malfunction of a bicycle known as the Pacific Cycle "Strike" mountain bike ("the Bicycle").

Plaintiff alleges that the Bicycle was manufactured by Pacific Cycle and sold to him by the defendant,

Toys "R" Us". Pl. Compl. ¶ 9.  Plaintiff bought the Bicycle in May 1997, some two years prior to the

accident.  *See* deposition of William Lockwood (December 9, 2002)(hereinafter "Plaintiff's depo."),

relevant portions attached hereto as Ex. 1, at 86-87.

The plaintiff identified the Bicycle component that allegedly malfunctioned, causing the

accident, as an "S/R Duo Track 7006" suspension fork.  Pl. Compl. ¶ 10.  The SR Duo Track 7006

suspension fork is a component designed and manufactured by third-party plaintiff, SR Suntour, Inc. ("Suntour"). Pacific Cycle did not manufacture the Bicycle, which was manufactured in China by the China Bicycles Company, Ltd. *See* deposition of Anita Van Amber (January 16, 2003)("Van Amber depo."), relevant portions attached hereto as Ex. 2, at 20-21. Pacific Cycle commissioned the manufacture of the Bicycle to fill an order for Defendant Toys "R" Us. The China Bicycles Company then ordered the component parts from various manufacturers, including SR Suntour, Inc., and assembled the Bicycle to ship to Toys "R" Us. Ex. 2, Van Amber depo. at 27, 84.

The plaintiff filed expert reports on August 29, 2002, including the report of a metallurgical engineering consultant, Robert Hinton (attached as Ex. E to Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment (hereinafter "Plaintiff's Memorandum")); a general bicycle safety and accident reconstruction expert, John Schubert (attached as Ex. C to Plaintiff's Memorandum); and an engineering expert, James Green (attached as Ex. B to Plaintiff's Memorandum). Plaintiff's experts contend that the alleged SR Duo Track 7006 suspension fork failure was the cause of the plaintiff's accident. Two of Plaintiff's experts opine that the fork component was defectively designed, while the other expert offers the conflicting theory that the fork was not properly manufactured.

Pacific Cycle filed its expert reports on January 30, 2003 in accordance with the extended deadline consented to by the plaintiff and approved by this Court. Pacific Cycle's expert engineering consultant, David Mitchell, provided a report ("Mitchell report", attached hereto as Ex. 3), in which he opines there was no design defect of the SR Duo Track 7006 fork, and that the separation of the steerer tube from the fork crown may have been from the "manner of use" of this particular bike. He further opines that a manufacturing defect could not be identified due to the post-accident condition of the fork and because of the unavailability of certain information.

During the two years prior to the accident, the plaintiff testified that he rode the Bicycle approximately three times per week for four and one-half months during the first summer. Ex. 1,

BA2DOCS/#210330

Plaintiff's depo. at 57, 90. He testified that he would ride around his neighborhood for approximately 15 to 20 minutes traveling a distance of about one-mile. Ex. 1, Plaintiff's depo. at 58-59. Plaintiff frequently performed a bicycle-jumping stunt known as a "bunnyhop", and was attempting such a stunt at the time of the accident. Ex. 1, Plaintiff's depo. at 120-21, *see also* deposition of Jesse Wolcott (December 17, 2002)(hereinafter "Wolcott depo."), relevant portions attached hereto as Ex. 4, at 31-32, 83-84.

The plaintiff also testified that after using the Bicycle during the first summer that he owned it, he put it in the garage for the winter. Ex. 1, Plaintiff's depo. at 64-65, 89. In August 1998 he and his mother had a "safety check" performed at a bicycle shop known as "Bike Line". Ex.1, Plaintiff's depo. at 64, 89. Although Plaintiff testified unequivocally that the "safety check" was done as soon as he took the Bicycle out of the garage before riding it for the summer, he also testified that he was sure he rode it during June and July of 1998. Ex. 1, Plaintiff's depo. at 88-90.

During the alleged "safety check" Bike Line replaced two tires, a wheel spoke rim, a front free wheel, two sets of brakes, a seat, a kickstand, and a water-bottle holder. Ex.1, Plaintiff's depo. at 71-74. The seat, cup holder, and kickstand were all replaced because they had been previously broken by the plaintiff or were worn out. Ex.1, Plaintiff's depo. at 72, 81. The plaintiff also testified that one of the reasons he took the Bicycle to Bike Line is that the handlebars "wiggled". Ex.1, Plaintiff's depo. at 85. He advised his mother of the wiggling handlebar, and she brought it to the attention of the Bike Line shop. Ex.1, Plaintiff's depo. at 92. The total cost of repairs made to the Bicycle at Bike Line were nearly equivalent to the initial purchase price of the Bicycle. *See* deposition of Dianne Saunders (December 9, 2002) (hereinafter "Saunders depo."), relevant portions attached hereto as Ex. 5, at 36-37. In addition, about three months prior to the accident, Plaintiff replaced the pedals on the Bicycle on his own. Ex.1, Plaintiff's depo. at 66-67.

3

In his responses to written discovery, Plaintiff indicates that the bike had fallen to the ground on numerous occasions because of the broken kickstand. *See* Plaintiff's Answers to Interrogatories propounded by Toys "R" Us, Answer No. 7, attached hereto as Ex. 6. Upon inspection by Mr. Mitchell, the Bicycle was noted to have sustained "notable wear and tear in the form of scratches, scrapes, severe chain wear, and displacement of the handlebar within the stem clamp." Ex. 3, Mitchell Report at 2. Additionally, Mr. Mitchell questioned alterations to the Bicycle due to a mismatch between the front and rear tires and rims. Ex. 3, Mitchell Report at 1.

## II.    **LEGAL ANALYSIS**

Simply stated, Plaintiff's recitation of the facts and the law is incomplete and his motion must be rejected. The essence of Plaintiff's erroneous argument is that merely because the incident occurred, this Court should decide as a matter of law that the product at issue reached him in a defective condition. However, the seller is not an insurer, as absolute liability is not imposed on the seller for any injury resulting from the use of the product. *Jensen v. American Motors Corp., Inc.,* 50 Md. App. 226, 232, 437 A.2d 242, 245 (1981). The plaintiff may not base recovery solely on any presumption that might arise from the happening of the accident. *Id.*; *see also International Motors Maryland Cas. Co. v. Therm-O-Disc,* 137 F.3d 780, 786 (4th Cir. 1998). Instead, Plaintiff must present proof that a defect existed at the time the product left Defendants' control and that the product was in substantially the same condition at the time of sale as it was two years later when the alleged incident occurred. Here, serious disputes of fact, material to the essential elements to be proven by the plaintiff, exist as to whether the Bicycle was defective at the time it was sold and whether the Bicycle was in substantially the same condition at the time of the incident two years later.

4

A.    **Summary Judgment Standard**

Summary judgment is appropriate only when the moving party shows that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. If there is a genuine dispute as to any material fact, then summary judgment should not be granted. *Pippin v. Potomac Elec. Power Co.*, 132 F.Supp.2d 379, 387-88 (D.Md. 2001); *see also Klein v. Sears, Roebuck and Co.*, 92 Md. App. 477, 483, 608 A.2d 1276, 1279 (1992). In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the nonmoving party on the evidence before it. *See Id.; Perini Corp. v Perini Construction, Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). In evaluating a motion for summary judgment the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Pippin*, 132 F.Supp.2d at 386; *Klein*, 92 Md. App. at 483, 608 A.2d at 1279. "Even where the underlying facts are undisputed, if those facts are susceptible [to] more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact." *Klein*, 92 Md. App. at 483-484, 608 A.2d at 1279 (*quoting Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138, 265 A.2d 256 (1970)).

B.    **Plaintiff's Burden of Proof**

Maryland has adopted the standard set forth in Section 402A of the Restatement (Second) of Torts. *Phipps v. General Motors Corporation*, 278 Md. 337, 340, 363 A.2d 955, 957 (1976). In order to support a claim under a strict liability theory, the plaintiff must demonstrate that: (1) the product was in a defective condition at the time it left the possession or control of the seller; (2) it was unreasonably dangerous to the user or consumer; (3) the defect was a cause of the injuries; and (4) the product was expected to and did reach the consumer without substantial change in its condition. *Id.* at 344, 363 A.2d at 958. For the seller to be liable under Section 402A, the product must be both in a defective condition and unreasonably dangerous *at the time it is placed on the market by the seller* and be in the

5

substantially same condition at the time of the incident. *Id.* (emphasis added). Section 402A is only applicable to those situations where the product is in a defective condition at the time it leaves the seller's control. Similarly, to sustain a claim for breach of implied warranty, the plaintiff must prove that a product was defective such that it was not suitable for its intended use at the time it left the possession or control of the defendant. *Jensen,* 50 Md. App. at 234, 437 A.2d at 247 (1981)(holding that regardless of the theory in a products liability case, the plaintiff must prove the existence of a defect); *Sheeskin v. Giant Food, Inc.*, 20 Md. App. 611, 631-32, 318 A.2d 874, 886-87 (1974), aff'd, 273 Md. 592, 332 A.2d 1 (1975).

Thus, it is Plaintiff's burden to establish that the alleged defect is attributable to Defendants, that it existed at the time of the sale, and that at the time of the incident the Bicycle was in substantially the same condition. *See Jensen*, 50 Md. App. at 232, 437 A.2d at 245; *see also Phipps*, 278 Md. at 344, 363 A.2d 959. Factual disputes remain as to these critical elements such that the Plaintiff has not met his burden as a matter of law. It is not even clear what the alleged defective condition was at the time of the incident as Plaintiff does not delineate whether it was a manufacturing defect or a design defect that led to his alleged injuries.

### C.    A Question of Fact Exists as to Whether the Product was Defective at the Time of Sale

A genuine issue of fact exists as to whether the Bicycle was in a defective condition at the time it left the possession of Defendants. Plaintiff speciously proclaims that the evidence is not in dispute that the Bicycle was defective at the time of sale. *See* Plaintiff's Memorandum at p.5. To the contrary, a material question exists as to this specific issue.

The Bicycle was allegedly purchased by Plaintiff's mother sometime in late May, 1997. Ex. 1, Plaintiff's depo. at 86-87. According to Plaintiff's testimony, he rode the Bicycle approximately three times per week for four and one-half months. Ex. 1, Plaintiff's depo. at 57, 90. When he rode the

Bicycle Plaintiff would ride for approximately 15 to 20 minutes traveling a distance of about one mile. Ex. 1, Plaintiff's depo. at 58-59. He then stored the Bicycle in his garage for the winter. Ex. 1, Plaintiff's depo. at 64-65, 89.

After the winter storage, Plaintiff and his mother brought the Bicycle to the Bike Line bicycle repair shop for what he terms a "safety-check." Ex. 1, Plaintiff's depo. at 63-64, 88. During this alleged "safety check", Bike Line performed significant repairs and/or modifications to the Bicycle, replacing two tires, a wheel rim, a front free wheel, two sets of brakes, a seat, a kickstand, and a water-bottle holder. Ex. 1, Plaintiff's depo. at 72-73. In his responses to written discovery, Plaintiff indicates that because of the broken kickstand the bike had fallen to the ground on numerous occasions. *See* Ex. 6. Plaintiff all but conceded that the work done at Bike Line was actually to repair damaged components when he testified that the seat, cup holder and kickstand were all replaced because they had been broken or were worn, and that the handlebars "wiggled". Ex. 1, Plaintiff's depo. at 72, 81, 85-86. Incredulously, the total cost of work purportedly done as routine maintenance at Bike Line was nearly equivalent to the initial purchase price of the Bicycle. Ex. 5, Saunders depo. at 36 – 37. In addition, about three months prior to the incident, Plaintiff replaced the pedals on the Bicycle. Ex. 1, Plaintiff's depo. at 66 – 68.

Despite having replaced the pedals, brake pads, the wheels and the tires, and only riding approximately three miles per week, Plaintiff's own expert opines that the Bicycle showed signs that it was "well worn". Specifically, the most-worn parts of the bike were the recently replaced tires, the pedals and the braking surfaces on the front wheel. Also, the newly replaced wheel rims were out of true. *See* Exhibit C to Plaintiff's Memorandum.

In addition, at the time of the incident, Plaintiff was stunting the bike in a manner specifically warned against by Pacific Cycle. Plaintiff testified that at the time of the incident he was performing a

7

maneuver known as a "bunnyhop", and had repeatedly performed this stunt during the two years he owned the Bicycle. Ex. 1, Plaintiff's depo. at 120-21; *see also* Ex. 4, Wolcott depo. at 31-32, 83-84. This stunt requires the rider to pull up on the handle bars and simultaneously lift both tires of the bicycle off the ground. The bicycle then pounds back to the ground with great force.

Such repeated misuse, in conjunction with the extent of work and modifications done to the Bicycle, creates a reasonable and material question of fact as to whether the Bicycle was in a defective condition at the time it left Defendants' control, and whether it was in substantially the same condition when the incident occurred two years later. Taken in the light most favorable to the nonmoving party, these facts lead to the conclusion that the Bicycle was not in the same condition at the time of the incident as when it left the control of Defendants. The evidence shows that the Bicycle had been modified, previously damaged, misused and subject to trick riding.

**D.    Conflicting Expert Opinion Raises a Question of Fact**

To support his motion for partial summary judgment Plaintiff's Memorandum attaches his retained experts' opinions, and then merely states that Defendant's expert agrees with their conclusions. This absolutely false interpretation of the evidence obfuscates a critical factual dispute. Defendant's expert, Dave Mitchell, P.E., reaches an entirely different conclusion than Plaintiff's experts.

It is axiomatic that a defect may arise from the manufacture or the design of any product. A plaintiff may prove a product has a manufacturing defect simply by showing that the product fails to conform to the manufacturer's specifications. *Singleton v. International Harvester Company,* 685 F.2d 112, 114-15 (4th Cir. 1981). A plaintiff may prove a design defect when a particular product is manufactured as intended by the manufacturer, but that the design is such that the product is both in a defective condition and unreasonably dangerous. *Klein,* 92 Md. App. at 485, 608 A.2d at 1280; *Phipps,* 278 Md. at 344, 363 A.2d 959. In other words, in a case alleging a manufacturing defect the focus is on

8

the conduct of the manufacturer. *Klein,* 92 Md. App. at 485, 608 A.2d at 1280. By contrast, in a design defect case, the inquiry focuses on the product itself. *Id.*

It is not clear what type of defect Plaintiff alleges. Rather than asserting a specific defect and meeting his burden of proving its existence at the time of sale, Plaintiff merely throws out several unsupported theories and hopes that one is accepted.

Plaintiff attaches three experts' opinions to his motion. The first, the opinion of James M. Green, P.E., concludes that the subject steerer tube is designed to be welded into the fork crown. This particular product, he contends, was not welded. Therefore, Mr. Green opines that a manufacturing defect caused Plaintiff's alleged injuries. *See* Exhibit B to Plaintiff's Memorandum; *see also* Plaintiff's Memorandum at p. 4. Neither Mr. Green nor Plaintiff has provided any bases for the conclusion that the product at issue was designed to be welded into place. Mr. Green's conclusion that this product had a manufacturing defect is based on the erroneous assumption of Suntour's intended design. In fact, this fork was not designed to be welded, but instead utilized the equally accepted method of a mechanical bond fit. *See* affidavit of Naoji Tanaka ("Tanaka affidavit") attached hereto as Exhibit 7. Because a reliable expert opinion must be based upon fact or other specialized knowledge, and not on speculation, the Court and trier of fact cannot rely upon Mr. Green's opinions, which are based upon incorrect assumptions, surmise and conjecture. *See Cooper v. Smith & Nephew Inc.* 259 F.3d 194 (4th Cir. 2001). Even if considered, rather than providing any clarification, Mr. Green's erroneous assumptions merely raise a genuine issue of material fact.

Plaintiff's second expert, John Schubert, concludes that this product was designed improperly because it did not use a construction method that he has observed on other suspension fork assemblies. *See* Exhibit C to Plaintiff's Memorandum. Similarly, Plaintiff's third expert, Robert Hinton, opines that the design was defective because of the insufficiency of materials utilized for the construction of the fork, and because of its failure to utilize a safety or retightening device. *See* Exhibit E to Plaintiff's

9

Memorandum. Mr. Hinton does not discuss the availability, desirability, feasibility or usefulness of the inclusion of a safety or retightening device. Thus, these two experts retained by Plaintiff assert that the product was defectively designed, which is an entirely different theory than that asserted by the first expert retained by Plaintiff.

When asserting a design defect claim, the plaintiff must establish that the manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market. *See Klein*, 92 Md. App. at 485, 608 A.2d at 1280. In light of the fact that Suntour has distributed eight million forks of similar design without receiving notice of any prior failures, it is clear that the design, production and distribution of this product was reasonable. *See* Ex. 7, Tanaka Affidavit. Furthermore, Pacific Cycle has sold thousands of Pacific "Strike" mountain bikes and received no prior complaints related to the SR Suntour Duo Track 7006 fork.

Through his motion Plaintiff baldly, and erroneously, asserts that Defendant's expert, Dave Mitchell, P.E., agrees with Plaintiff's experts' conclusions that the design was defective. (Which expert or experts Plaintiff is referring to is unclear.) To the contrary, Dave Mitchell opines that the SR Suntour DuoTrack 7006 suspension fork at issue in this matter is not defectively designed. *See* Ex. 3, Mitchell Report. Dave Mitchell is expected to testify that based upon an inspection of the components, in particular the front fork, the Bicycle was properly designed and assembled in accordance with accepted engineering practice. Further, the Bicycle violated no known applicable codes or standards. The Suntour fork on this bike has not been the subject of any recalls by any bicycle distributor or the Consumer Product Safety Commission. In addition, Dave Mitchell notes that this model or type of fork has not displayed a history of fork failures. *See* Ex. 3, Mitchell Report. Thus, in large part he concludes that the manner of use, or misuse, ultimately led to the fork separation.

Mr. Mitchell will further opine that the specific SR Suntour DuoTrack 7006 fork installed on the Bicycle appears to have differed from other virtually identical Suntour forks in a manner that permitted

10

the fork separation. While the plaintiff may argue that this suggests a manufacturing defect or glitch of some kind, Mr. Mitchell states that the specific strength of the mechanical joint binding the fork cannot be analyzed empirically due to the separation and consequential damage. Furthermore, without knowing the specific dimensions and tolerances intended by Suntour – which have not been provided – no specific deviation from the manufacturer's intended design may be identified at this time. Any contrary conclusion that there is a manufacturing defect, rather than a defect created by misuse and/or modification of the Bicycle, is based upon surmise and conjecture and cannot be relied upon.

The factual dispute that is created by the contradictory expert witness opinions raises a serious material dispute as to the existence of any defective condition of the Bicycle at the time it left Defendants' control. Furthermore, because more than one permissible inference is raised by the available evidence, this dispute cannot be resolved in favor of Plaintiff as a matter of law. Instead, the issue must be put to the trier of fact. Therefore, viewing the evidence in the light most favorable to the non-moving parties, the plaintiff has not met his burden to prove a defect which Defendants are responsible for, and he is certainly not entitled to summary judgment.

## III.   CONCLUSION

Plaintiff's motion for Partial Summary Judgment must be denied. Discovery is still proceeding as to Third-Party Defendant Suntour, Inc. Certain essential facts peculiarly within the ken of Suntour will resolve some of the material issues of fact that exist, either in Plaintiff's favor or in Defendants' favor. Nonetheless, at this juncture, the evidentiary record is replete with disputes of material facts that

BA2DOCS/#210330

go to the very elements of Plaintiff's strict liability and implied warranty claims.  Therefore, the

Defendants respectfully request this Court deny Plaintiff's Motion for Partial Summary Judgment.

Respectfully submitted,

_Bruce R. Parker_

Bruce R. Parker
Federal Bar No. 00028
Michele R. Kendus
Federal Bar No. 26586
Venable, Baetjer and Howard, LLP
Two Hopkins Plaza, Suite 1800
Baltimore, Maryland  21201-2978
(410) 244-7400

Attorneys for Defendants
Pacific Cycle, LLC

_Daniel Moore (wlc)_

Daniel J. Moore
Federal Bar No. 00111
Moore & Jackson, LLC
305 Washington Avenue, Suite 401
Towson, Maryland  21204
(410) 583-5241

Attorneys for Defendant
Toys "R" Us – Delaware, Inc.

12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

WILLIAM LOCKWOOD,

Plaintiff

v.

PACIFIC USA, LTD., PACIFIC CYCLE, LLC
and TOYS "R" US – DELAWARE, INC.

Defendants.

Civil Action No.

WMN-02-CV-2068

**ORDER**

Having considered Plaintiff's Motion for Partial Summary Judgment and the Defendants'

Opposition thereto, IT IS HEREBY

ORDERED that Plaintiff's Motion is DENIED.


Date: _____

_____
William M. Nickerson
Senior United States District Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____14th_____ day of March 2003, a copy of the foregoing

Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Memorandum in Support

thereof and Proposed Order was mailed first class, postage prepaid to:

Michael Patrick Smith, Esquire
Israelson, Salsbury, Clements & Bekman, LLC
300 W. Pratt Street, Suite 450
Baltimore, Maryland 21201

Edward J. Lopata, Esquire
Scott A. Thomas, Esquire
Tydings & Rosenberg LLP
100 E. Pratt Street, 26th Floor
Baltimore, Maryland 21202

_____
Michele R. Kendus

14

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
2
   WILLIAM LOCKWOOD          *      CIVIL ACTION WMN-02-2068
3            Plaintiff
                             *
4      vs.                          Baltimore, Maryland
                             *
5  PACIFIC USA, LTD, et al.
             Defendants      *      December 13, 2002
6
                   *      *      *      *      *
7

8              Deposition of WILLIAM LOCKWOOD, a witness

9  of lawful age, taken on behalf of the Defendant,

10 Pacific USA, Ltd., in the above-entitled cause, pending

11 in the District Court of the United States for the

12 District of Maryland, before Dawn L. Venker, a Notary

13 Public in and for Baltimore County, Maryland, at 300 W.

14 Pratt Street, Suite 450, Baltimore, Maryland 21201, on

15 the 9th day of December, 2002.

16

17                 *      *      *      *      *

18

19

20                                      ┌─────────────────┐
                                        │   DEFENDANT'S    │
                                        │    EXHIBIT       │
21 REPORTED BY:  Dawn L. Venker         │       1          │
                                        └─────────────────┘
```

GORE BROTHERS Reporting & Video Co., Inc.          Towson Reporting Company
410-837-3027                                           410-828-4148

1    Toys R Us to get a bike before you bought the Strike?

2         A      I don't remember.  I don't think so, but

3    I'm not a hundred percent positive on that.

4         Q      It may have been a surprise?  Your mom

5    said, "Happy birthday.  Let's go buy a new bike"?

6         A      Usually she would say, "Let's go

7    somewhere," and then, you know, we look around.  I mean

8    I would know what I'm going to get for birthday,

9    Christmas.  She had me pick it out so this way she knew

10   it would be the right size and that I liked it.

11        Q      Do you know anybody who owns a Pacific

12   bike?

13        A      No.

14        Q      Had you ever known anybody else who owned a

15   Strike?

16        A      No.  I never paid attention to other

17   people's bikes.

18        Q      How frequently did you use this bike?

19        A      I would say about three, four times a week.

20        Q      How far would you go?

21        A      Not far.  I would usually ride around the

58

1    same area.

2         Q    Tell me about the area you would ride

3    around in.

4         A    In the court. It was a small court.

5    Probably not even a quarter mile. Not even close to

6    that. I mean just around the neighborhood. Altogether

7    where I would ride, if we do one circle, probably about

8    a a mile.

9         Q    When you say one court around the

10   neighborhood, was it a residential neighborhood?

11        A    Yes.

12        Q    With houses?

13        A    Yes.

14        Q    So when you say you ride around the

15   neighborhood, you ride around the streets of that

16   neighborhood?

17        A    Yes.

18        Q    So the court you are talking about, I'm not

19   clear what you mean by court.

20        A    There was a court there. Sometimes I ride

21   around the court if I didn't really feel like going

1    anywhere.  I just felt like riding my bike.  If I felt

2    like just riding out, just go around my neighborhood.

3         Q    When you say "court," you mean like

4    cul-de-sac?

5         A    Court as in the court the house was in, or

6    drive, if you will.  I don't know --

7         Q    A street?

8         A    Yeah.

9         Q    You would ride around on the street?

10        A    Yeah.  It did just basically a square.

11   We've always just called it the court.

12        Q    How long would you be out there riding

13   around the court, on average?

14        A    Court, maybe fifteen, twenty minutes.

15        Q    What types of things would you be doing?

16        A    Just riding.

17        Q    Just going around in a circle?

18        A    Maybe go up and down the curbs, but those

19   were rounded curbs.  They were small.  They weren't the

20   ninety-degree high-angle curbs.

21        Q    So you tried to do like wheelies off the

```
1        A    Yes.

2        Q    Every time?

3        A    Yep.

4        Q    When did you stop wearing your helmet?

5        A    Maybe a month or two before.

6        Q    Before the incident?

7        A    Correct.

8        Q    Did you ever ride the bike at night?

9        A    Yes, but rare.  I did have a headlight for

10   that.

11       Q    So every time you would ride at night you

12   put your headlight on?

13       A    Yes.

14       Q    Did you ever have any prior incidents with

15   this bike?  Any type of prior accident or anything?

16       A    No.

17       Q    Any other type of incidents with this bike

18   at all?

19       A    No.

20       Q    Ever have any repairs to this bike?

21       A    Did not have repairs.  We had a safety
```

64

1    inspection.  They replaced the tires, and they took out

2    the plastic cup holder and put a metal one in and just

3    did a safety inspection on it.

4        Q    Do you know exactly what they did?

5        A    I don't know exactly what they did, no.  It

6    was -- the company was BikeLine.

7        Q    Why did you do that?

8        A    Just safety because it was sitting in the

9    garage all winter, and we have them do a safety check

10   on it.  That's all.

11       Q    Where did you store the bike when you

12   weren't riding it?

13       A    In the garage.

14       Q    Where in your garage?

15       A    If you would walk in the garage, it would

16   be -- I either put it on the left or right side.

17       Q    Would you hang it up on a hook or anything?

18       A    No.

19       Q    Would you turn it upside down and hang it

20   up from the ceiling at all?

21       A    No.

1       Q       Would you store cars in the garage as well?

2       A       Sometimes we would.

3       Q       So would the bike be between the car and

4    wall for example?

5       A       No.  Usually the car was far enough where

6    it wouldn't even interfere with the bike at all.

7       Q       Where would the bike be in relation to the

8    wall?

9       A       It would be against the wall.

10      Q       And where would you park your cars?

11      A       They would be in the garage, but I mean it

12   wouldn't even interfere with the bike at all.

13      Q       How close was the car to the bike?

14      A       I would be able to walk past without

15   touching them.

16      Q       Was it a two-car garage, or one-car?

17      A       One-car.

18      Q       Was the bike just leaning up against the

19   wall?

20      A       Yes.

21      Q       Did you have a kickstand for it?

66

1       A       The kickstand broke on it.

2       Q       When did that happen?

3       A       Maybe about two weeks to a month after I

4   had it, and during the inspection, BikeLine did replace

5   that too.

6       Q       After the kickstand broke, did you take it

7   back to Toys R Us to try to get the kickstand replaced?

8       A       No.

9       Q       How did it break?

10      A       The spring broke.

11      Q       You just put it down one day, and it didn't

12  work?

13      A       Yeah.

14      Q       Did you ever fall off this bike before the

15  incident?

16      A       No.

17      Q       Did you ever have any problems with the

18  pedals at all?

19      A       No.  But I did take them off and put

20  different pedals on.  They had more grip to them.

21      Q       When did you do that?

1          A     Three months before the incident.  They had

2     better grip.  Every now and then my feet would like

3     maybe slip off.

4          Q     Did that ever cause you to lose control of

5     the bike?

6          A     No.

7          Q     What kind of pedals were on there before

8     you replaced them?

9          A     Factory.

10         Q     Plastic or metal?

11         A     Plastic.

12         Q     Reflectors were in them?

13         A     Yes.

14         Q     And when you replaced them, what did you

15     put on?

16         A     They were aluminum pedals, and they had

17     reflectors on them.

18         Q     Where did you get those reflectors?

19         A     They came on the pedals.

20         Q     Where did you get the pedals?

21         A     I believe it was BikeLine, but I might be

1    wrong.  I really don't recall.

2        Q      How long was this after you had purchased

3    the bike that you had to replace the pedals?

4            MR. SMITH:  I think you are asking when he

5    replaced the pedals already.

6            MR. BROTMAN:  He said three months prior to

7    the incident.  I'm trying to get in relation now to the

8    time frame from when he purchased the bike.

9        A      I don't know.  Maybe nine months.

10       Q      Nine months after you purchased the bike

11   you replaced the pedals?

12       A      Yes.

13       Q      When you noticed your foot was slipping off

14   the original factory pedals, did you call up Pacific

15   Cycle and say, "I have a problem here"?

16       A      No.

17       Q      Did you call Toys R Us at all and say,

18   "There is a problem with these"?

19       A      I was planning on getting new ones.

20       Q      Why were you planning on getting new ones?

21       A      Because the new ones had better grip.

1          A      Yes.

2          Q      Those had pretty good grip?

3          A      Yes.

4          Q      So your foot wasn't slipping off of those

5      at all?

6          A      Correct.

7          Q      Did you replace any other components or

8      parts on the bike?

9          A      We had a cup holder replaced.  The

10     kickstand.  Those two were done with the safety

11     inspection.  They replaced the front and rear tire with

12     new ones.

13         Q      Why did they change the tires?

14         A      I mean just something to have done.  Part

15     of safety.  Only reason you get your tires changed on

16     your car.  May not be bald, but you do it just to be

17     safe.

18         Q      Were they getting -- was the grip getting

19     low?

20         A      It wasn't low as you could barely see it.

21     It was still plenty of grip on there.  We were just

1    doing it for safety reasons.

2         Q    Did you ever have any problems with the

3    wheels or tires slipping?

4         A    No.

5         Q    Did you change anything else?

6         A    I believe they did change the seat because

7    it started wearing in the back.  The back of the seat.

8    I don't know what the material is.  Started wearing

9    out.  The plastic.

10        Q    Was that on the top part of the seat?

11        A    The top part of the seat.  Started wearing

12   out the hard plastic from the bottom.  We just had the

13   seat replaced.

14        Q    Like the part you were sitting on was kind

15   of getting worn out?

16        A    Right.

17        Q    Did that ever affect any of your riding at

18   all?

19        A    No.

20        Q    Any other components that were changed?

21        A    The front free wheel.  The rear spoke rim.

1      Q     You say front free wheel.  What is that?

2      A    I'm not a hundred percent positive on.  I

3 know that is what they fixed.  I believe that is

4 because the front wheel had a quick release for -- you

5 know, throw it up on a bike rack on your car.  So I do

6 believe that would be what is the free wheel part of

7 that.  I put new brakes on.

8      Q     Front or back?

9      A    Both.

10     Q    When was all this done in relation to when

11 you purchased the bike?

12     A    It was after winter.  I mean it was not

13 that far at all before the incident.  It was right

14 after winter.  I mean I never rode it in the winter.

15 It is too cold.  Then we had the safety inspection on

16 it.  I don't remember the relationship time.  A lot of

17 that area is just a blur.

18     Q    So the front free wheel, you think that is

19 related to the quick release somehow?

20     A    I believe so, but I'm not a hundred percent

21 on that.

74

```
1        Q       You said they changed the spoke rim?

2        A       Yes.

3        Q       What is a spoke rim?

4        A       Just the rim with the spokes in it.

5        Q       Front or the back?

6        A       Back.  Because I believe the free wheel is

7    the front rim.  I don't think it did say anything on

8    there about that.

9        Q       On where?

10       A       On the receipt.

11       Q       Have you looked at that receipt recently.

12               (Lockwood Deposition Exhibit Number 1 was

13   marked by the reporter.)

14       A       Dirt Master --

15       Q       Why don't you take a look at what we just

16   marked as Exhibit Number 1.  Tell me what that is.

17       A       That is a receipt from the safety

18   inspection from BikeLine -- BikeTime.

19       Q       When was that the first time you saw this?

20       A       Today.

21       Q       So you saw it in preparation for your
```

1      A      No.

2      Q      No specific reason you changed the rims?

3      A      No.

4      Q      No specific reason you changed the bottle

5  holder or cup holder?

6      A      That was broken.

7      Q      How did that break?

8      A      It was plastic.  It just broke.  It was a

9  horrible cup holder.  It didn't hold anything.

10      Q      Break from putting the bottle in and out?

11  Did it break from the bike falling over?

12      A      It would have to break from the bottle

13  going in and out.  I would usually get it when I was

14  riding.

15      Q      What about the kickstand?  Any reason you

16  had the kickstand replaced?

17      A      That broke.

18      Q      Would that hold the bike up at all?

19      A      Yes.

20      Q      Before you had it replaced, did the

21  kickstand work at all?

1    A    Just a little, yes.

2    Q    When did you first notice that?

3    A    I don't remember the time that I noticed

4    it.  I just remember that, and that is when I said

5    something to my mom.  That's when we got the safety

6    inspection done.

7    Q    You noticed that before the safety

8    inspection was done?

9    A    Right.  I actually didn't think anything of

10   it really.  Didn't think it was something that was a

11   big deal.

12   Q    Describe that shake or shimmy to me a

13   little bit.  What did you feel?

14   A    That it would move slightly.

15   Q    When you say "move slightly," would they

16   move left to right, or turn by themselves?

17   A    Front to back.  I mean only if you -- you

18   didn't have to use much effort at all.  Just a little.

19   Go little bit forward and back.

20   Q    So the handlebars would actually move

21   towards the front of the bike and then towards the back

86

1    of the bike when you put a little pressure?

2        A       Basically, if you put three-fourths of an

3    inch pipe inside of an inch pipe, it would -- I mean

4    actually not even that much.  Just moved just a notch.

5        Q       Move front to back or left to right?

6        A       Front to back.

7        Q       Wouldn't shift left to right at all?

8        A       No.

9        Q       That's the reason you think you went to

10   have a safety inspection done?

11       A       Yes.  And just because the seat needed to

12   be replaced.  Cup holder.

13               MR. SMITH:  Do you want to take a break?

14   Been going about an hour and a half.

15               (A recess was taken.)

16       Q       You purchased this bike in May of -- it was

17   1997?

18       A       '98.  '99 possibly.  I don't know the exact

19   date.  I can't remember it.  5-22-97 and between June

20   1st, 1997.

21       Q       Sometime in late May of '97?

1          A       Right.

2          Q       Then in August of 1998 you had these --

3     what you are calling a safety inspection done, right?

4          A       Correct.

5          Q       Approximately one year later?

6          A       Correct.

7          Q       Did you ride the bike all through June of

8     '97?

9          A       Yeah.  I still rode the bike.

10         Q       I'm talking about the year you purchased

11    the bike.  That June, you rode it all that June?

12         A       Right.

13         Q       All that July?

14         A       Right.

15         Q       Did you ride it that August?

16         A       I mean when it started getting cold, I

17    didn't ride it.

18         Q       Approximately when would you stop riding

19    the bike?

20         A       I don't know the approximate date.  When it

21    would start getting cold out, I wouldn't.

88

```
1        Q      So September, October?

2        A      Yes.

3        Q      So you were riding the bike June, July

4   August, September, October of 1997, correct?

5        A      Not all the way through October.  Once it

6   got cold, I stopped.

7        Q      So about four and a half months?  Is that

8   fair to say?

9        A      Yes.

10       Q      You put it away for the winter?

11       A      Correct.

12       Q      And after the wintertime, you say you took

13  it right out, and you brought it over for your safety

14  inspection, correct?

15       A      Correct.

16       Q      Do you normally ride during the summertime?

17       A      Yes.

18       Q      Did you ride -- do you know if you rode in

19  June or July of the following year '98?

20       A      I'm sure I did.  I mean I rode the bike all

21  the time.
```

1      Q      Did you ride the bike the summer before you

2    brought it to get the inspection done or the work done?

3      A      Yes.

4      Q      So you rode it several times before that?

5      A      Yes.

6      Q      So -- maybe I misunderstand you.  You put

7    the bike away for the winter?

8      A      Correct.

9      Q      And then you took it out, and you brought

10   it right over to get the work done?

11     A      Correct.

12     Q      Or did you ride it after you took it --

13     A      We took it to get the safety inspection

14   first.

15     Q      Why don't you take a look at that invoice

16   again, Exhibit Number 1.  See the date there at all?

17     A      Okay.

18     Q      What is that date?

19     A      8-29.

20     Q      1998?

21     A      Yes.

1          Q     Did you ride it at all June or July before

you had the inspection done?

3          A     I honestly don't recall.  I really don't.

4          Q     To your recollection, you took it after the

5     winter and brought it right over to get this work done?

6          A     Yes.  We did have it inspected because I

7     noticed about the handlebar, the seat needed to be

8     done.

9          Q     When did you notice the handlebar?

10         A     I don't know the exact date.

11         Q     Was it before --

12         A     A lot of that time is really a blur to me.

13         Q     Was it before you put it away for the

14    winter?

15         A     I don't remember.  I really don't.

16         Q     So you rode the bike for about four and a

17    half months.  You put it away for the winter, and you

18    took it out and brought it out and took it over to

19    BikeLIne to have the work done?

20         A     Right.

21         Q     After four and a half months of riding it,

1          A      No.  I mean the chain gets dirty, but that

2    is normal.

3          Q      Do you know why they changed the free

4    wheel?

5          A      I do not.

6          Q      When you went there, did you tell them

7    about the handlebars coming loose?

8          A      I told my mom about it.  My mom talked to

9    them.  I don't honestly know what was said.

10         Q      Do you remember what your mom paid for the

11   bike when she first purchased it?

12         A      No.

13         Q      Do you know what she usually paid for

14   bikes, approximately?

15         A      No.  When you are younger, 20 bucks is like

16   100 bucks.  Nowadays it is nothing.

17         Q      Other than the forks, was there any other

18   problems that you had, or anything that was changed --

19   did any of that in any way cause the incident or affect

20   the bike at all during the time of the incident?  In

21   other words, did you have a problems with the tires at

120

```
1         A       Yes.   That was about the extent of my

2     tricks that I knew how to do.

3         Q       Kind of similar to the Ollie you were

4     talking about earlier, right, where you try to lift the

5     front wheel and then try to lift the back wheel

6     simultaneously?

7         A       Correct.

8         Q       Would you jump off the curb to do that?

9         A       No.

10        Q       How would do you it?

11        A       On a skateboard, yes.  On a bike, just do

12    it on regular flat ground.

13        Q       So what would you do?

14        A       You pull up the front wheel, and at the

15    same time you are pulling it up, once it is in the air,

16    you kind of push it down.  You have to shift your body

17    weight, and it basically forces the back wheel to come

18    up also.

19        Q       How high off the ground would you get the

20    front wheel?

21        A       Two inches.
```

1    Q    How high would you get the back wheel?

2    A    About the same.  They were about the same

3  because basically when you do it, your front and back

4  wheel are at equal level pretty much the whole time.

5    Q    Did you ever fall off the bike while trying

6  to do a bunny hop?

7    A    Before the incident, no.

8    Q    What do you mean before the incident, no?

9    A    At the incident, I was told -- I honestly

10  don't remember the thing.  I don't remember that point

11  of impact so to speak.  From what I was told, I was

12  doing a bunny hop, and the front wheel came out.  And

13  that's when everything else happened.

14    Q    Who told you that?

15    A    Jesse Wilcott.

16    Q    We'll get back to that.  So you -- other

17  than the incident, you had never fallen off the bike

18  while doing a bunny hop or anything?

19    A    No.

20    Q    When you bump up those curbs, you ever --

21    A    No.

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
2

3    WILLIAM LOCKWOOD,

4              Plaintiff          Civil Action No.

5    vs.                          WMN-02-CV-2068

6    PACIFIC USA, LTD., et al

7              Defendants

8    _____/

9          The deposition of ANITA VAN AMBER was held

10   on Thursday, January 16, 2003, commencing at 1:30

11   p.m., at the Law Offices of Venable, Baetjer & Howard,

12   Two Hopkins Plaza, Suite 1800, Baltimore, Maryland

13   21201-2978, before Susan A. Kambouris, Notary Public.

14

15   APPEARANCES:

16              JASON C. BUCKEL, ESQUIRE and
                MICHAEL P. SMITH, ESQUIRE
17                  On behalf of the Plaintiff

18              MICHELE R. KENDUS, ESQUIRE
                    On behalf of the Defendants

19

20

21   REPORTED BY:  Susan A. Kambouris

DEFENDANT'S
EXHIBIT
2
PENGAD-Bayonne, N.J.

1    how did that bike get assembled and/or manufactured,

2    and what role did Pacific Cycles have in that process?

3             MS. KENDUS:  I will object because you are

4    not asking the question specific to a particular bike.

5             MR. BUCKEL:  I did.  I asked specific to

6    the Pacific Strike Mountain Bike.

7             MS. KENDUS:  Okay.  I didn't hear that.

8             MR. BUCKEL:  I can ask generally if we

9    don't go through.  I am not trying to be cute or

10   difficult about it.

11        Q      What, exactly, does Pacific Cycles do?

12   There are bicycles that are purchased that are called

13   Pacific Cycles.  I gather from your Answers to

14   Interrogatories and the answers right now your

15   company's contention is you don't make those bicycles.

16   I am trying to figure out who does and what you guys

17   do with respect to that particular bike?

18        A      Sure.  We do not manufacture the bicycles.

19   Basically, we would work with -- in this particular

20   case, a department store buyer who would, perhaps,

21   request a certain bicycle, a boy's basic, for example,

1    in a certain color, with certain decals, and, perhaps,

2    a certain price.  We would take that information and

3    put a specification sheet together listing the various

4    components of the bicycle that would be faxed to

5    the -- or a factory in China.  They would build a

6    sample bicycle, perhaps request to use a different

7    component that was listed on the Specification Sheet,

8    send us a sample.  We would show that to the Buyer.

9    If he or she approves it, we would go into production

10   with the factory.  We would place an order with the

11   factory and the factory would produce the bicycles.

12        Q      The particular -- the subject bicycle

13   today, this Pacific USA Strike Bicycle that Mr.

14   Lockwood or Mr. Lockwood's family bought, and he was

15   riding, and it fell apart and he got hurt, do you have

16   any idea where that was actually assembled or

17   manufactured?

18        A      It is my understanding it was at China

19   Bicycle Company.

20        Q      China Bicycle Company?

21        A      Correct.

1       A       No.

2       Q       Pacific Cycle, or someone at Pacific

3  Cycles, or a team of people at Pacific Cycles, they

4  decide how the bike is going to be made in terms of

5  component parts and things like that are identified on

6  the Spec Sheet?

7       A       Correct.

8       Q       They send the Spec Sheet to, in this case,

9  the China Bicycle Company, who works with Pacific

10  Cycles to turn that Spec Sheet into an actual bike?

11       A       Correct.

12       Q       Then they ship the bikes back to you in

13  Wisconsin?

14       A       No.

15       Q       They may ship them direct to the end user

16  or distributor?

17       A       They may, yes.

18       Q       Now, on that sheet, the Spec Sheet, as I

19  read it, when we get down -- it is kind of in the

20  middle of the first section on it, it says, "Fork:

21  Suntour SR-7006, clear shock boots."  Do you see where

84

1    way, Pacific Strike Bicycles?

2         A       Did they or do they?

3         Q       Did they?  This particular subject bike,

4    did Toys-R-Us assemble it in any way?

5         A       I don't know.

6         Q       Do you know how when the bike gets shipped

7    from China, under what you have previously told me, to

8    Toys-R-Us or whatever the end-use seller is, do you

9    know how the bikes get shipped?  What I mean by that

10   is, do they get shipped in pieces that have to be put

11   together or shipped as one whole bike you can pick up

12   and ride?

13        A       The bikes are shipped and a certain

14   percent assembled.  For example, in order for it to

15   fit in a box, the front tire would not be on the

16   bicycles, but, perhaps, strapped to the side of the

17   frame, or the handle bar assembly might be strapped to

18   the side of the frame.  The pedals probably would not

19   be on the bicycle in order to fit in the box.

20        Q       Okay.  Do you know whether when the Strike

21   Bicycle was shipped from China to Toys-R-Us, the



**MET Ltd**
**PO Box 3310**
**Duluth, GA 30096-0057**

January 29, 2003

Michele R. Kendus, Esq.
Venable, Baetjer & Howard, Esqs.
2 Hopkins Plaza, Suite 1800
Baltimore, MD 21201-2971

Re: *William Lockwood vs. Pacific Cycle, et al*
    *KD&W File No. 014494.0006*
    *Our File No. 22.1005*

Dear Ms. Kendus:

In accordance with your request, the writer has reviewed file material pertinent to the captioned matter. This material included the transcript of Plaintiff's oral deposition testimony, technical reports prepared by Mr. James Green, Dr. Robert Hinton and Mr. John Schubert; an invoice from the Bike Line bicycle shop, and related technical material. In addition, on 10/18/2002 the writer traveled to the office of the Plaintiff's Attorney and inspected the bicycle reportedly involved in the captioned 6/7/1999 accident. During this inspection, photographs were taken with prints previously provided to you for information and general reference.

The subject bicycle was identified as a red/black fade color, men's style mountain bike. Further, it displayed the following identifying markings.

|  |  |
|---|---|
| Head Tube: | *Pacific* |
| Top Tube: | *Strike* |
| Down Tube: | *Pacific USA* |
| Fork Blade: | *SR DuoTrack 7006* |
| Bottom Bracket: | *C5J0496* |

Date codes observed on the bicycle were consistent with many components and the bicycle itself having been built in 1995.

In addition, components added to the frame to complete the bicycle included the following. The 21-speed drive train was comprised of black steel/polymer pedals affixed to a 3-piece crank serving to drive a triple chain ring joined to the 7-speed freewheel by a roller chain. Gear selection was accomplished by handlebar mounted grip actuated index shifters serving to operate the front and rear SIS derailleurs through cable control. Mountain tread, tires of the 26" by 2.1" (front) and 26" by 1.9" (rear) size were mounted on alloy rims with Schraeder valved tubes. The observed mismatch of the front and rear tires and rims was noted as very unusual, leading the writer to question that bicycle alteration. Bicycle braking

---

E-mail: dave@metltd.com
Internet: www.metltd.com
N: 34° 01.486'
W: 84° 11.850'



DEFENDANT'S
EXHIBIT
3

Phone: (678) 475-9000
Fax: (678) 475-9112
Ship to: 5535 State Bridge Rd.
Alpharetta, GA 30022

ꕰ**ЄT** Lᴛᴅ

was accomplished with Shimano Altus® cantilever style brakes actuated through cables by handlebar mounted levers.  Black saddle and handlebar grips with bar end levers were provided.  The bicycle was fitted with accessories that included a cable lock, water bottle bracket and tire inflator holder.

It is the writer's understanding that while riding the bicycle in the company of a friend, Mr. Lockwood was repeatedly performing "bunny hop" maneuvers over manhole covers when, on one occasion, the front fork separated and he fell to the ground.  The injuries resulting serve as the basis for the captioned claim.

The inspection proceedings disclosed the bicycle to have sustained notable wear and tear in the form of scratches, scrapes, severe chain wear, displacement of the handlebar within the stem clamp, and other physical damage.  The bicycle remained serviceable; but for the separation that occurred between the front fork crown and the steerer tube.  That separation permitted the fork crown and all components below it (fork blades, front wheel, front brakes, etc.) to detach from the remainder of the bicycle.

It should be noted that the involved fork was manufactured as a standard, catalog item and not built especially for the involved Pacific "Strike" bicycle by the following company.

SR Suntour, Inc.
No. 7, Hsing-Yeh Road
Fu-Hsing Industrial Dist.
Changhua Hsien 506
Taiwan, R.O.C.
Tel.: 886-4-7697881
Fax:  886-4-7694028

Scrutiny of the front fork revealed that it had been built with a mechanical connection utilized to join the steel steerer tube to the aluminum alloy crown. There are many materials utilized in modern fork construction including steel and steel alloys, aluminum alloys, and composite materials.  The fork crown and steerer tube may be built of the same material or, more commonly, they may differ. Indeed, either component may be built from any of the foregoing materials.  The crown and steerer tube may be joined by welding, brazing, adhesive bonding or a mechanical fit.  The joining of the two portions, if accomplished mechanically, may be a press fit, a thermal bond or joined by additional mechanical devices. Experience in joining the variety of materials to build a successful fork has been gained over the decades of modern fork manufacture.  Indeed, fork manufacture has become so specialized that it is common for modern forks to be built by companies that specialize in the manufacture of those components and do not build entire bicycles.  Correspondingly, bicycle manufacturers have come to rely on specialized forks, such as the suspension fork at issue in this case, and do not build forks specific to their bicycles.  Such is the case with the SR SunTour DuoTrack 7006 fork that separated on Mr. Lockwood's bicycle.  It was a standard, off-the-

**MET LTD**

shelf fork that happened to be incorporated as a component by the bicycle manufacturer. That same principle also applied to the saddle, handlebar, pedals, brakes, chain, derailleurs, wheels, tires, tubes, cranks and other components of Mr. Lockwood's bicycle.

Based upon the file material reviewed, the 10/18/2002 bicycle inspection and the foregoing understandings, it is the writer's opinion that the subject bicycle was properly designed and assembled in accordance with accepted engineering practice. Further, the bicycle violated no known applicable codes or standards. It should be noted that there is no specific test required of every bicycle. Rather, a bicycle design must be tested to confirm that applicable requirements are met through destructive testing of prototypes. In addition, the fork tests required for bicycles do not test the fork crown/steerer tube joint strength.

It is the writer's further opinion that the specific SR SunTour DuoTrack 7006 fork installed on Mr. Lockwood's bicycle differed from other, virtually identical, forks in a manner that permitted the observed fork separation. The specific strength of the mechanical joint holding Mr. Lockwood's fork together cannot be assessed at this juncture due to the separation and consequential damage. Accordingly, the efficacy of the steerer tube/crown joint cannot be evaluated in the post-accident condition resulting in a specific opinion as to any defect or deficiency in that fork. Without knowing the specific dimensions and tolerances intended by the fork manufacturer, no specific deviation from the manufacturer's intended design may be identified at this time.

It is additionally the writer's opinion that the SR SunTour DuoTrack 7006 fork has not been the subject of safety recalls; nor has it displayed a history of fork failures or fork crown/steerer tube joint separations. Accordingly, the involved fork is not typical of that fork model. It is the writer's opinion that conditions related to the manner of use and/or the specific manufacturing procedures related to this fork ultimately led to the fork separation.

It is the writer's concluding opinion that the fork on Mr. Lockwood's bicycle was different than other DuoTrack 7006 forks and that difference, in conjunction with the manner of use, directly led to the fork crown /steerer tube separation. The propensity for that separation to occur was, in the writer's opinion, beyond the ability of the bicycle manufacturer to mitigate or control.

The foregoing opinions are expressed to a reasonable degree of engineering probability and may be augmented or modified based upon additional investigation or discovery.

Re: Lockwood vs. Pacific, et al
January 29, 2003
Page 4

**MET Ltd**

Kindly feel free to contact the writer if additional information or discussion is
required.

Sincerely,

David A. Mitchell, P. E.
Engineering Consultant

cc:  Kenn Brotman, Esq.

Jesse Wolcott

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3    WILLIAM LOCKWOOD          :

4            Plaintiff        :

5    vs.                      : Civil Action

6    PACIFIC USA, LTD.,       : No. WMN-02-CV-2068

7    et al.                   :

8            Defendants       : Pages 1-97

9                    ----------

10

11

12

              Deposition of JESSE WOLCOTT

13              Bel Air, Maryland

14           Tuesday, December 17, 2002

15

16

17

18   Reported by: Kathleen P. Thompson, Notary Public

19

20              ORIGINAL

21

DEFENDANT'S
EXHIBIT
4

Jesse Wolcott

1    neighborhood?

2        A.    No.    I went to skate parks in New

3    Jersey, Pennsylvania, Ocean City, Florida, all

4    kinds of places.

5        Q.    Did he ever go with you?

6        A.    Yes, but he would just kind of ride

7    around in the skate park.    He wouldn't attempt

8    anything big.    Like I said, riding up and down

9    the ramps, that's pretty much it.

10        Q.    Did he stop to watch you a lot?

11        A.    We'd pretty much do our own thing.

12        Q.    Okay.    How about with the bikes, what

13    did you see Bill do with the bikes as far as

14    tricks?

15        A.    Bill didn't really use his bike.    I

16    explained on the phone to you, I know, he had a

17    mountain bike and you can't really do anything

18    with it because it's so heavy.    And he had a

19    mountain bike with front shocks which makes it

20    even worse because those things weigh a ton.    So

21    the most he could do was do a little bunny hop

Jesse Wolcott

Page 32

1    or do a wheelie or ride off of a curb.  And not

2    even a big wheelie because you can't get the

3    bike up, it's too big.

4          Now, I had the trick bike and I was

5    doing all the crazy stuff while he was riding

6    along.

7    Q.    Did you only know Bill to ever have one

8    bike?

9    A.    As far as I can remember he had the

10   Pacific, which is only two years, but, I'm

11   almost positive he had the Pacific the whole

12   time.

13   Q.    You don't remember any bikes prior to

14   the Pacific?

15   A.    No.

16   Q.    Okay.  What kind of tricks would you do

17   on your bike?

18   A.    Grinding, ramps, rails.

19   Q.    You rode on the rails?

20   A.    Yeah.

21   Q.    Wow.

Jesse Wolcott

1     Q.    How did you know he was going to

2     jump it?

3     A.    He had been jumping it.

4     Q.    He had been jumping it?

5     A.    He had been jumping manhole covers.

6     Like I said, he never quite cleared it,

7     always about an inch behind, his back wheel

8     would touch down right at the end of the

9     manhole cover.

10    Q.    So you knew this particular cover

11    was coming up?

12    A.    No.  You can see them on the road.

13    There's several of them on St. Francis Road

14    and there's several of them, it's like a line

15    going down the road.  And he had jumped one

16    or two of them.  So I figured he was going to

17    jump this one too, and I watched him.  That's

18    why I was pretty much in back of him, I was

19    watching him do it, I know how to jump things

20    and I can usually give people tips.

21    Q.    Is that why you were in back of him,

Jesse Wolcott

Page 84

1    giving him tips?

2            MR. SMITH:  Objection.

3       A.   Not consciously.  If that makes any

4    sense.  I was observing.  He didn't ask me

5    to.  There was none of that.  I was just kind

6    of doing it, that's what I did.

7       Q.   Okay.  How high from, is this

8    manhole cover level with the pavement?

9       A.   Yes.

10      Q.   So he's just popping his bike up

11   over it?

12      A.   Pretty much.

13      Q.   And he had been doing that all the

14   way down the street?

15      A.   Not every time, there was a lot of

16   manhole covers, though.

17      Q.   Did you watch every time he did it?

18      A.   Yeah.

19      Q.   Yeah?

20      A.   Yeah.

21      Q.   So your memory is that you actually

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM LOCKWOOD            *       CIVIL ACTION WMN-02-2068
            Plaintiff
                           *
    vs.                            Baltimore, Maryland
                           *
PACIFIC USA, LTD,  et al.
            Defendants     *       December 13, 2002

                    *       *       *       *       *

        Deposition of DIANNE SAUNDERS, a witness of

lawful age, taken on behalf of the Defendant, Pacific

USA, Ltd., in the above-entitled cause, wherein,

pending in the District Court of the United States for

the District of Maryland, before Dawn L. Venker, a

Notary Public in and for Baltimore County, Maryland, at

300 W. Pratt Street, Suite 450, Baltimore, Maryland

21201, on the 9th day of December, 2002.


                    *       *       *       *       *




REPORTED BY:  Dawn L. Venker

DEFENDANT'S
EXHIBIT
5

36

1    know.

2        Q    That was the front wheel or back wheel?

3        A    I don't know.  I don't remember anymore.

4        Q    Were there any problems with any of the

5    components before he changed them?

6        A    No.  There wasn't anything wrong with them.

7    He is just spoiled.

8        Q    So he was never involved in any kind of

9    incident that required any kind of change or repair?

10       A    No.

11       Q    Do you recall what you initially paid for

12    the bike?

13       A    I would say probably somewhere between 149

14    and 189.  Somewhere in that range because I remember

15    thinking that the cost of BikeLine I probably should

16    have just bought him a new one.

17       Q    My next question was why did you spend so

18    much to repair -- you spent $125 to repair a $150 bike.

19       A    I didn't know it was going to be that much

20    I really wasn't planning on buying a seat and changing

21    this and doing all that.  When we went in, I just

1    really wanted them to check it and make sure it was

2    safe because I know I wasn't buying him another one.

3    That he would have to have this one for a while.

4         Q    At this point in time, do you know how long

5    you had owned the bike?

6         A    Yeah.  We bought the bike in May, and this

7    was October or August or something like that.  I don't

8    remember.  What was the date on here?

9         Q    August 29th.

10        A    Yeah.  So it would be end of summer I had

11   it checked out, but actually it was a year later

12   because I got his bike in I think -- I guess it was

13   '97.  I don't remember.

14        Q    I think the interrogatory response

15   indicated it was '97 that you purchased the bike.

16        A    I thought it was '97.  Right.  It would

17   have had to have been because -- right.

18        Q    Did you get the safety inspection done

19   right before he was going to ride it for the season?

20        A    It was actually the end of the season, and

21   I knew it was going to be going in the garage for the

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WILLIAM LOCKWOOD                    *

    Plaintiff                    *

v.                                 *    Civil Action No. WMN-02-CV-2068

PACIFIC USA, LTD., et al.           *

    Defendants              *

       *     *     *     *     *     *     *     *     *     *

### ANSWERS TO INTERROGATORIES

    Plaintiff, William Lockwood, by his attorneys, Michael P. Smith and Salsbury, Clements, Bekman, Marder & Adkins, LLC, in answer to the Interrogatories propounded to him by the Defendant, Toys "R" Us-Delaware, Inc., states as follows:

    A. The information supplied in these Answers is not based solely on the knowledge of the executing party, but includes the knowledge of the party's agents, representatives and attorney, unless privileged.

    B. The word usage and sentence structure is that of the attorney and does not purport to be the exact language of the executing party.

    1.    State your full name, address, date of birth, present marital status, and social security number.

    **ANSWER:**    William Thomas Lockwood; address: 14 Silver Fox Court, Cockeysville, MD 21030; DOB: 05/28/83; single; SSN: 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.

    2.    State the date the bicycle referred to in the Complaint was purchased, who purchased it, where it was purchased, and whether the bicycle was assembled when purchased.



DEFENDANT'S
EXHIBIT
6

**ANSWER:**    Plaintiff purchased the Pacific Cycle USA "Strike" mountain bike, Serial Number C5J04096, sometime between 05/22/97 and 06/01/97 at the Toys "R" Us store in Bel Air, Maryland. The Bicycle was assembled when purchased.

3.    State the name, address and telephone number of the individual who assembled the bicycle and when the bicycle was assembled.

**ANSWER:**    The Bicycle was assembled when purchased. Plaintiff is without knowledge or information as to whom exactly, other than an agent or employee of the Defendant Toys "R" Us - Delaware, Inc. ("Toys 'R' Us") assembled the Bicycle.

4.    State whether the you inspected the bicycle prior to purchase, and if so, when you inspected it, and the results of your inspection.

**ANSWER:**    Prior to the purchase, the Plaintiff only saw a display model. He did not see the assembled bicycle until after the purchase when he returned to the store to pick up the bicycle. At that time, he saw no apparent defects.

5.    Identify with particularity whether any verbal or written instructions, warranties, or warnings were provided with the bicycle.

**ANSWER:**    Any written instructions, warranties, or warnings provided with the bicycle were set forth in the Owner's Manual provided to Plaintiff after the purchase of the Bicycle. The Manual was attached to the bicycle handle bar. Plaintiff did not receive any additional verbal instructions, warranties, or warnings.

6.    State in detail any repairs, changes or modifications made to the bicycle, including the nature of the work, the date performed and by whom, subsequent to purchase and prior to the alleged occurrence on June 7, 1999.

2

**ANSWER:**    The Bicycle was inspected on 08/29/98 by the Bike Line of Bel Air, who also put on new tires, a front wheel, replaced a rim, replaced the seat and cup holder.

7.    State the number of times you rode the bicycle prior to the occurrence on June 7, 1999, and whether you experienced any mechanical or other difficulties with the bicycle prior to the occurrence.

**ANSWER:**    Plaintiff estimates that he rode the bicycle three (3) times a week, weather permitting.  He had the front wheel replaced.  The kick stand failed on numerous occasions, causing the bike to fall.

8.    Give concise statement of the facts as to how you contend the occurrence took place.

**ANSWER:**    The Plaintiff has no recall of the incident.  It occurred on June 7, 1999, when he was riding a Pacific Cycle USA "Strike" mountain bike which had been manufactured by the Defendant, Pacific USA, and sold by Defendant, Toys "R" Us to the Plaintiff.

Plaintiff understands that while he was carefully and prudently riding the Bicycle, the S/R DuoTrack 7006 suspension fork separated at the point where the steering tube was inserted into the fork crown, causing William to lose control of the bicycle and to fall forward onto his face, severely injuring it, fracturing multiple teeth and inflicting other serious injuries.

9.    State the names, addresses and telephone numbers of all eyewitnesses to the occurrence, and state their location at the time of the occurrence.

**ANSWER:**    The following persons or entities witnessed, were present at, or have direct or indirect knowledge of the Incident: (a) Plaintiff, (b) Jesse Wolcott, 2042 Brandy Drive, Forest Hill, Maryland 21050, who was riding his bicycle with the Plaintiff, (c) the ambulance

3

personnel identified in the Ambulance Report, and (d) persons living in the vicinity of the place

of the Incident (St Francis Drive).

10.    State the names, addresses, and telephone numbers of all persons who arrived at

the scene within one hour after the occurrence.

**ANSWER:**    See Answer to Interrogatory Number 9.

11.    State the precise facts upon which you base your contention that the occurrence

was caused or contributed to by the negligence of this Defendant.

**ANSWER:**    As discovery is still ongoing, Plaintiff contends that the Defendants were

negligent in the following particulars:

a.    in designing, manufacturing and providing a piece of equipment of such

construction that it could fail during normal foreseeable use;

b.    in failing to provide proper and clear warning of the dangers that the

suspension fork might suddenly and unexpectedly separate from the bicycle, causing the rider to

lose control and to fall;

c.    in manufacturing and providing a mountain bike that had a suspension

fork that was improperly manufactured, and capable of separation;

d.    in failing to use available design and engineering skill or knowledge to

produce a suspension fork that would not separate;

e.    in failing to provide adequate operating instructions and warnings to users

of the product even though Defendants knew or should have known that such warnings were

necessary for the safe use of the product;

f.    in failing to adequately inspect and test the product for safety prior to

4

offering it for sale;

g.    in failing to discover that the product was dangerously defective, improperly designed and manufactured, inadequately tested and inspected, entirely unfit for duty and unsafe for use, constituting a hazard to the user;

h.    in other respects to be proved at trial.

This Answer may be supplemented with expert testimony. <u>See</u> Reports signed by John D. Schubert, Robert W. Hinton, Ph.D., and James Green, P.E., DEE. and produced to the Defendants on or about August 29, 2002.

12.    If you have ever pleaded guilty to or been convicted of any crime ( other than minor traffic violations), state the nature, place and date of same, the court docket reference and whether you were represented by counsel.

**ANSWER:**    The Plaintiff has not.

13.    State the names, addresses and telephone numbers of all persons who investigated the cause and circumstances of the occurrence.

**ANSWER:**    My attorney Michael P. Smith, Salsbury, Clements, Bekman, Marder & Adkins, along with their agents, servants and employees.

14.    State the names, addresses and telephone numbers of all persons from whom you have signed or recorded statements, attaching to your answer a copy of any such statement in your control given by this Defendant, or any agent thereof.

**ANSWER:**    Jesse Wolcott, 2042 Brandy Drive, Forest Hill, Maryland 21050.

15.    State whether you have in your possession or control photographs, objects, plats or diagrams of the scene of the occurrence, the bicycle, or personal injuries sustained by you,

5

and, if so, identify and describe them.

**ANSWER:**    Plaintiff has in his possession or control the following photographs,

objects, plats or diagrams of the scene of the occurrence, the bicycle, or personal injuries

sustained by you (a) photographs taken by Michael Bonicker and presently in the possession of

Plaintiff's counsel of the Bicycle and of Plaintiff; (b) photographs by James Green, P.E., DEE.

contained in his Report produced to the Defendants on or about August 29, 2002; (c) slides

presently in the possession of Plaintiff's counsel taken by Michele Shermak, M.D. of Plaintiff's

injuries; and (d)  photographs of Plaintiff in the Plaintiff's possession

16.    State whether the bicycle was repaired following the occurrence, and if so, who

performed the repairs and the nature of the work done.

**ANSWER:**    The Bicycle was not repaired following the occurrence.

17.    State the current location of the bicycle.

**ANSWER:**    The Bicycle is presently in the office of Michael Smith, 300 W. Pratt

Street, Suite 450, Baltimore, Maryland 21201.

18.    State the content of, date made, and the person to whom this Defendant or anyone

on this Defendant's behalf made any statement which you contend constitutes an admission with

respect to any of the issues raised in this case.

**ANSWER:**    Plaintiff makes no such contention regarding admissions at this time.

19.    . If you contend that a person not a party to this action acted in such a manner as to

cause or contribute to the occurrence, give a concise statement of the facts upon which you rely.

**ANSWER:**    Plaintiff makes no such contention at this time.

20.    State with precision the nature and location of all bodily injuries suffered by you

6

as a the result of the occurrence here involved, indicating which of such injuries, if any, are permanent in nature.

**ANSWER:**    The Plaintiff sustained bilateral LeFort facial fractures as well as a complex mandibular symphyseal fractures with cortical bone loss and the loss of teeth nos. 8, 9, 22 - 27 (his upper and lower jaws were fractured, teeth broken or lost). Plaintiff's tongue was sliced, and his nose was broken.  Defendant is also referred to the medical records, detailing these injuires.

Plaintiff has permanent nerve damage in his face; he has TMJ; he suffers from headaches and jaw pains; he experiences pains in his ribs, back, knees, arms, wrists and elbows; and he has distorted vision in his right eye.

Plaintiff will supplement this answer as to permanency through the reports of his treating health care providers.

21.    State whether you were hospitalized as a result of the occurrence here involved and, if so, state the name and address of the hospital, dates of hospitalization, the nature and scope of treatment received, and the names and addresses of the doctors rendering same.

**ANSWER:**    (1) Johns Hopkins Bayview Medical Center. Admitted 06/07/00-06/15/99 for treatment of injuries sustained as a result of this occurrence, 06/30/99-07/01/99 for re-alignment of mandibular fracture, 07/13/99 - 07/13/99 for debridement of gingival wound, 08/10/99 for arch bar removal. Also seen through the clinic in 1999. (2)  GBMC. Admitted 4/6/00 for extraction of wisdom teeth and bone graft to mandible. (3)  Defendant is also referred to the medical records, regarding dates of hospitalization, the nature and scope of treatment received, and the names and addresses of the doctors rendering same.

22.    State the names, addresses and telephone numbers of all doctors or physicians who have examined or treated you as a result of the occurrence here involved, the dates of said examination or treatment and the nature and purpose therefor.

**ANSWER:**    Other than those names in Answer to Interrogator Number 21:

Michael Linnan, DDS. Treated 09/28/99 - 04/17/01. Seen for repair of broken teeth

HomeCall. Received home care in 1999.

Michael Schwartz, DDS. Seen for evaluation and treatment of maxilla and mandible 1999 to the present

Richard Bombach, M.D. Seen for pre-op physical 10/22/99 & 03/29/00.

Charles Mann M.D.

Dr. Goldman (psychologist)

23.    State whether you have ever had or suffered from any disease, sickness, infirmity (other than of a routine nature) or personal injury other than sustained in the occurrence here involved. If so, describe the disease, infirmity, injury, etc. and state how and when received, and the name and address of the person causing the same, and the doctors or hospitals which examined or treated you therefor.

**ANSWER:**    Plaintiff has not.

24.    State the names, addresses, and telephone numbers of all health care providers who have seen, examined, and or treated you during the three years prior to the occurrence, and state the dates and reasons for the examination or treatment.

**ANSWER:**    Alan Davick, M.D., 2324 Joppa Rd., Joppa Green, Ste. 220, Lutherville, MD 21093. (General check-ups)

8

Clarence Gehris, M.D., 2112 Belair Rd., Fallston, MD 21047   (Allergies)

25.    State the names and addresses of all physicians and / or other experts whom you

propose to call as witnesses and state the nature of their specialty; the subject matter on which

each expert is expected to testify; the substance of the facts and opinions to which the expert is

expected to testify; and the grounds for each opinion. Attach to your answers copies of all written

reports received from same and copy of a current curriculum vitae.

**ANSWER:**    The Defendant is referred to Plaintiff's Rule 26(a)(2) Expert Witness

Disclosures in accordance with the Scheduling Order on or about August 29, 2002.

26.    Itemize in detail all expenses and monetary losses or damages resulting from the

occurrence.

**ANSWER:**    No answer is required to this Interrogatory as only 25 interrogatories are

permitted under Fed. R. Civ. P. 33(a).

27.    State the name, address and telephone number of any person not otherwise

mentioned in answer to these Interrogatories who has personal knowledge of facts material to this

case.

**ANSWER:**    No answer is required to this Interrogatory as only 25 interrogatories are

permitted under Fed. R. Civ. P. 33(a).

28..    State whether you have ever been involved as a complaining party in any other

claim for personal injuries or property damage. If so,, state the date of each claim, the place

where it occurred, nature of the claim and the names and addresses of the other parties.

**ANSWER:**    No answer is required to this Interrogatory as only 25 interrogatories are

permitted under Fed. R. Civ. P. 33(a).

9

29.    State the names, addresses and telephone numbers of all your employers for the past ten years, if any, the nature, dates and average weekly wages of each employment and the reasons for termination thereof, together with the dates and wages of any employment losses as a result of this occurrence.

**ANSWER:**    No answer is required to this Interrogatory as only 25 interrogatories are permitted under Fed. R. Civ. P. 33(a).

30.    State the amount of earned income reported by you each year on your federal income tax returns for the last five years.

**ANSWER:**    No answer is required to this Interrogatory as only 25 interrogatories are permitted under Fed. R. Civ. P. 33(a).

31.    State whether you are presently under the care of a doctor, physician, or other health care provider or are receiving medical health attention or treatment from any person and, if so, state the name, address and telephone number of same and date of the last visit for treatment and / or examination.

**ANSWER:**    No answer is required to this Interrogatory as only 25 interrogatories are permitted under Fed. R. Civ. P. 33(a).

32.    State the nature, amount and time of consumption of any alcoholic beverages, medications, or drugs consumed or taken by you within an eight hour period prior to the occurrence, the address of the place where you consumed any such alcoholic beverages, medications, or drugs, and the name, address and telephone number of any person or persons who were with you at the time of any consumption.

**ANSWER:**    No answer is required to this Interrogatory as only 25 interrogatories are

permitted under Fed. R. Civ. P. 33(a).

11

I DO SOLEMNLY DECLARE AND AFFIRM under the penalties of perjury that the

contents of the aforegoing Answers to Interrogatories are true and correct to the best of my

knowledge, information and belief.

WILLIAM LOCKWOOD

PAUL D. BEKMAN
MICHAEL P. SMITH
SALSBURY, CLEMENTS, BEKMAN,
    MARDER & ADKINS, L.L.C.
300 W. Pratt Street
Suite 450
Baltimore, Maryland 21201
(410) 539-6633

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WILLIAM LOCKWOOD                          *

    Plaintiff                              *

v.                                        *         Civil Action No. WMN-02-CV-2068

PACIFIC USA, LTD., et al.                 *

    Defendants                           *

     *    *    *    *    *    *    *    *    *    *

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of October, 2002, a copy of the

aforegoing Answers to Interrogatories propounded to Plaintiff, William Lockwood, by

Defendant, Toys "R" Us-Delaware, were mailed first class, postage prepaid

Michele R. Kendus
Venable, Baetjer & Howard, LLP
1800 Mercantile Bank & Trust Bldg.
Two Hopkins Plaza
Baltimore, MD 21201-2978
Attorneys for Defendant, Pacific USA, LTD
 and Pacific Cycle, LLC


Dan Moore
Moore & Jackson, LLC
305 Washinton Avenue, Ste. 401
Towson, MD 21204
Attorneys for Defendant, Toys "R" US-Delaware, Inc.


MICHAEL P. SMITH

03/13/2003  09:39   3687376452        USUL CORP              PAGE  02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

WILLIAM LOCKWOOD,

Plaintiff

v.

PACIFIC USA, LTD., PACIFIC CYCLE, LLC
and TOYS "R" US – DELAWARE, INC,

Defendants.

Civil Action No.

WMN-02-CV-2068

## AFFIDAVIT OF NAOJI TANAKA

I, NAOJI TANAKA, the undersigned, do solemnly affirm that:

1. I am over 18 years of age, fully competent to testify as a witness, and have first-hand knowledge of the matters set forth in this affidavit.

2. I currently am employed by SR Suntour, Inc. (SR Suntour) in the position of engineering development, which I have held since 1995.

3. As engineering development I am responsible for production of the various bicycle forks manufactured by SR Suntour.

4. The SR Suntour Duo Track 7006 model fork used in the Pacific Cycle Strike Mountain Bike that is the subject of this litigation was designed and manufactured using a mechanical bond fit to secure the steel steerer tube to the aluminum alloy fork crown.

5. At the relevant time it was, and it still is within the industry standard to design a fork using a mechanical bond fit to secure a steel steerer tube into a aluminum alloy fork crown. This is one of multiple acceptable designs for a bicycle fork component.

1

DEFENDANT'S EXHIBIT 7

6.  SR Suntour has manufactured ___8,000,000___ forks using the same mechanical bond fit as that used for the SR Suntour Duo Track 7006 model, and none have been the subject of safety recall or demonstrated a history of fork failure or fork crown/steerer tube joint separations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   __Mar 14 - 2003__
              [date]

__Naoji Yamaoka__
[name]

2