## CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM LOCKWOOD,

    Plaintiff,

    vs.

PACIFIC CYCLE, LLC and     : Civil Action
TOYS "R" US-DELAWARE, INC.,     : No. WMN-02-CV-2068

    Defendants/
    Third-Party Plaintiffs,

    vs.

SR SUNTOUR, INC. and
SR SUNTOUR, USA,

    Third-Party Defendants.

    Deposition of ANDREW W. BLACKWOOD, Ph.D., taken on Wednesday, April 16, 2003, commencing at the hour of 9:00 a.m. at 100 East Pratt Street, 26th Floor, Baltimore, Maryland, before George W. Tudor, Notary Public.

APPEARANCES:

    MICHAEL P. SMITH, ESQUIRE
    Salsbury Clements Bekman Marder & Adkins, LLC
    300 West Pratt Street, Suite 450
    Baltimore, Maryland 21201
      On behalf of the Plaintiff

    EDWARD J. LOPATA, ESQUIRE
    Tydings and Rosenberg, LLP
    100 East Pratt Street, 26th Floor
    Baltimore, Maryland 21202
      On behalf of the Defendant/3rd-Party Plaintiff

Tudor Reporting Service
Columbia, Maryland
301.362.0825

PLAINTIFF'S EXHIBIT 2

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF MARYLAND

 3  WILLIAM LOCKWOOD,              :
                                   :
 4      Plaintiff,                 :
                                   :
 5      vs.                        :
                                   :
 6  PACIFIC CYCLE, LLC and         : Civil Action
    TOYS "R" US-DELAWARE, INC.,    : No. WMN-02-CV-2068
 7                                 :
    Defendants/                    :
 8  Third-Party Plaintiffs,        :
                                   :
 9      vs.                        :
                                   :
10  SR SUNTOUR, INC. and           :
    SR SUNTOUR, USA,               :
11                                 :
    Third-Party Defendants.        :
12  _____:
```

13      Deposition of ANDREW W. BLACKWOOD, Ph.D., taken
    on Wednesday, April 16, 2003, commencing at the hour
14  of 9:00 a.m. at 100 East Pratt Street, 26th Floor,
    Baltimore, Maryland, before George W. Tudor, Notary
15  Public.

16  APPEARANCES:

17      MICHAEL P. SMITH, ESQUIRE
        Salsbury Clements Bekman Marder & Adkins, LLC
18      300 West Pratt Street, Suite 450
        Baltimore, Maryland 21201
19          On behalf of the Plaintiff

20      EDWARD J. LOPATA, ESQUIRE
        Tydings and Rosenberg, LLP
21      100 East Pratt Street, 26th Floor
        Baltimore, Maryland 21202
22          On behalf of the Defendant/3rd-Party Plaintiff

Page 2

 1                      I N D E X

 2  EXAMINATION BY                          PAGE

 3  MR. SMITH:                               3

 4  MR. LOPATA:                             75

 5  MR. SMITH:                              75

 6  EXHIBIT   DESCRIPTION                   PAGE

 7  No. 1    Preliminary Expert Disclosure of

 8           Third-Party Defendant            4

Page 3

 1  Whereupon,
 2          ANDREW W. BLACKWOOD, Ph.D.,
 3  having been duly sworn by the Notary Public, was
 4  examined and testified as follows:
 5      (Whereupon, Preliminary Expert Disclosure
 6      of Third-Party Defendant SR Suntour, Inc.
 7      marked Blackwood Deposition Exhibit No. 1.)
 8      EXAMINATION BY MR. SMITH:
 9      Q. I have had marked as Deposition Exhibit
10  No. 1 a 17-page document that's entitled Preliminary
11  Expert Disclosure of Third-Party Defendants SR
12  Suntour, Inc., and SR Suntour U.S.A., which we will
13  speak about in a little while, but my first question
14  is, you're identified on this discovery as being with
15  Kaufman Forensic Sciences, Inc. Is that who you're
16  with?
17      A. Kaufman Forensic Sciences is an
18  organization that finds expert witnesses for
19  attorneys.
20      Q. Okay. You're really with Structure Probe?
21      A. I work for a company called Structure

Page 4

 1  Probe, and I have been retained through Structure
 2  Probe by Kaufman Forensic Sciences to work for
 3  Tydings and Rosenberg with regard to this matter.
 4      Q. Okay, great.
 5          Could you give me your name and your
 6  business address?
 7      A. My name is Andrew Blackwood. Business
 8  address is Structure Probe, Incorporated. Our street
 9  address is 569 East Gay Street, West Chester,
10  Pennsylvania. Our mailing address is Post Office Box
11  656, West Chester, Pennsylvania.
12      Q. And according to the CV that's contained
13  somewhere in here in Exhibit 1, you have a Bachelor's
14  of Engineering in metallurgy?
15      A. Bachelor in Metallurgical Engineering, yes,
16  sir.
17      Q. And a Ph.D. in materials engineering?
18      A. Yes, sir.
19      Q. And you got them whenever it says you got
20  them.
21      A. Yes.
```

Page 5

1  Q. And your work history is set forth in the
2 printout.
3  A. Yes, sir.
4  Q. In the last five years, what percent or
5 portion of your time is spent working as an expert
6 for individuals involved in litigation?
7  A. It's a difficult question to answer
8 precisely. First of all, is an individual a firm,
9 because a great deal of our litigation-related work
10 is intellectual property disputes between
11 corporations.
12      Actually, the bulk of my time is spent in
13 the last five years on our supply business, which is
14 supplies. We sell laboratory supplies for electron
15 microscopy. It has nothing to do with our analytical
16 services business or our independent laboratory.
17      Of the work that we do for our clients,
18 perhaps a quarter of it is related to litigation, and
19 of that litigation, perhaps half is related to
20 personal injury, product liability kind of claims and
21 the other half is related to intellectual property

Page 6

1 disputes.
2  Q. Now, in response, you said "we," and my
3 question is more directed toward you, Andrew
4 Blackwood. Is that also true of you, about a quarter
5 of your time is spent doing work as an expert for
6 parties involved in litigation, whether it be
7 personal injury or intellectual property disputes?
8  A. In the last five years, it's been
9 substantially less than that.
10  Q. Less than ten percent?
11  A. Probably.
12  Q. Again, looking at what was produced as part
13 of Deposition Exhibit No. 1, it indicated cases in
14 which you had given depositions and cases in which
15 you had testified at trial, and it appeared to
16 indicate that the last time you testified at
17 deposition or trial was in the year 2000. Would that
18 be correct?
19  A. To the best of my recollection, that is
20 correct.
21  Q. Have you ever done any work before for a

Page 7

1 company known as SR Suntour?
2  A. Not that I recall.
3  Q. Have you ever done any work in the past for
4 Pacific Cycle?
5  A. Not that I recall.
6  Q. Have you ever been employed as an expert,
7 either in a personal injury case, a products
8 liability case, an intellectual property case, by the
9 firm of Tydings and Rosenberg?
10  A. Not that I recall.
11  Q. If you had to sort of estimate how much of
12 your time is spent working for the plaintiff and how
13 much of your time is working for the defendant in
14 products liability cases, what would it be?
15  A. It's about fifty-fifty.
16  Q. Do you have any training or experience in
17 bicycle design?
18  A. Specifically, no.
19  Q. Any training or experience in bicycle
20 manufacturing?
21  A. No.

Page 8

1  Q. Do you have personal knowledge of the
2 industry standards relating to the design of
3 bicycles?
4  A. Only as I have picked up bits and pieces of
5 the standards while working on specific bicycle
6 component failures.
7  Q. In this case and in other cases.
8  A. Yes, sir.
9  Q. Do you have any experience or training in
10 the industry standards that relate to bicycle
11 manufacturing?
12  A. No, sir.
13  Q. Do you have any training or experience in
14 designing a bicycle fork?
15  A. No, sir.
16  Q. In manufacturing a bicycle fork?
17  A. No, sir.
18  Q. In your past, in any type of work that you
19 have done for any company that you have ever been
20 employed with, have you ever done any testing,
21 failures testing, integrity testing, any type of

Page 9

1 testing on a bicycle fork?
2   A. There is one previous case that I recall,
3 and I don't recall precisely what the component was.
4 It was a component of the steering assembly, but I
5 don't recall whether it was the fork side or the
6 handlebar side. But there has been one case
7 previously.
8   Q. There is a case that's indicated in the
9 ones that are listed in your list of cases that are
10 attached to Exhibit 1 that is called Eichfield versus
11 Huffy Corporation. Is that the case you're --
12  A. No, sir.
13  Q. That's the one that deals with the failure
14 of a bicycle handlebar?
15  A. Yes, sir. That was actually the handlebar.
16  Q. The case that you have a recollection of,
17 did it precede at least 1991, in which you have what
18 appears to be a partial listing of deposition and
19 trial experience?
20  A. I don't recall precisely when it occurred.
21 I think it was after 1991, but I'm not sure. It

Page 10

1 never went as far as deposition. I don't know why.
2 It was simply a component that was submitted that we
3 analyzed. I don't even recall whether we submitted a
4 report on it.
5   Q. On this component that was submitted, were
6 you employed to do work to perform a failure analysis
7 on the component?
8   A. Yes, sir.
9   Q. Do you remember what your failure analysis
10 consisted of in that case?
11  A. The component was machined from a solid
12 piece of material, whatever it was, and it had failed
13 by fatigue. It was an aftermarket component for a
14 stunt or jumping type bicycle.
15  Q. And what sort of testing or analysis did
16 you do in that other case with respect to that
17 component?
18  A. I don't recall the details. It was some
19 sort of nondestructive microscopic examination, but I
20 don't recall what we did.
21  Q. Are you aware of or familiar with

Page 11

1 publications in the industry relating to bicycle
2 design or bicycle manufacturing?
3   A. I'm trying to understand the sense of the
4 question. I do not read the bicycle design
5 literature, if that's what you mean.
6   Q. What sort of literature do you review on a
7 what I'll call a regular or routine basis?
8   A. I subscribe to about 200 trade publications
9 in general -- which impact on materials science from
10 different directions, and I scan them as I have a
11 chance, and I'm about two years behind in that
12 process.
13  Q. And you're hoping that you see something
14 that relates to something you're doing at the time.
15 At least the way the mind works.
16  A. Yes. Yes. Which seldom happens, but
17 lightning does strike.
18  Q. In your work with Structure Probe,
19 approximately what percentage of your time is spent
20 engaged in failures analysis?
21  A. Recently, it's been something like five

Page 12

1 percent.
2   Q. And by recently, you mean --
3   A. In the last five years.
4   Q. Okay. Other than the one case that we
5 already talked about that's in the past that dealt
6 with a bicycle component and this case, put those two
7 cases aside, have you been involved in any other
8 cases where you performed a failure analysis to a
9 bicycle or a bicycle component?
10  A. We have talked about two previous cases.
11  Q. Yes. The handlebars --
12  A. The handlebar and the front steering
13 assembly component.
14  Q. -- and this case.
15  A. There have probably been a few others.
16 None have come to mind.
17  Q. Is there a generally-accepted methodology
18 when you go about performing a failures analysis with
19 respect to any component or broken component that
20 you're trying to analyze?
21  A. There is a general agreement on the ground

Page 13

rules. The sequence of events, there is less agreement, and the precise approach really -- I think people who do a lot of failure analysis will say we design the protocol for the experiment, for the specific component.

Q. And that's because you really don't know what you have to do until you gather the facts together and decide what you have to do.

A. Well, the first step is to figure out what needs to be done, and that's actually the toughest part.

Q. You said there is general agreement as to the ground rules. What are the ground rules with respect to failures analysis?

A. Not to do anything destructive unless there is a clear agreement that destructive testing is to be done is the overriding ground rule.

Q. Is there any other ground rule?

A. Well, the other general statement I would make is that there is a general agreement on the relationship between fractographic features and modes

Page 14

of fracture, that if you have a number of people with a background like mine look at the microscopic evidence, they will generally come to the same conclusion as to what type of fracture occurred.

Q. Now, when you do a failures analysis of a broken part or component, you're trying to determine the cause of the failure; would that be correct?

A. Yes.

Q. And sometimes the cause might be in the wrong materials were used with respect to the part.

A. Material selection is certainly a possible -- it is a possible contributing factor, yes.

Q. And a cause may be the way the materials were processed together.

A. Yes.

Q. And the failure may have to do with the design of the component.

A. Yes.

Q. And the failure may have to do with whether the use to which the component was put was outside

Page 15

its normal and expected or intended use.

A. Yes.

Q. When were you contacted in this case?

A. I'm not sure, exactly. I think it was somewhere in February, but I'm not sure exactly when.

Q. Okay. How were you contacted?

A. I was contacted by Larry Kaufman of Kaufman Forensic Sciences and we talked about whether I might be able to help in this failure of a bicycle component case.

Q. Now, when you're working with Kaufman Forensics, I take it that first someone calls you to find out whether you would be willing to take part.

A. Yes, sir.

Q. Because if you're not willing to take part, that's the end of it.

A. Yes, sir.

Q. And if you are willing to take part, what is your understanding of what happens next, generally?

A. Then there is an agreement between Kaufman

Page 16

Forensic Sciences and -- generally a law firm, and then I -- that typically, in my case at least, that agreement is that we will have a preliminary conversation about the case, about what the attorney knows about the case and decide whether I am potentially qualified to be of assistance in the particular aspect of the matter that's of interest to the attorney.

Q. Who initiates the first contact between the attorney and you?

A. My recollection is that every time I have done this through Kaufman, the attorney has called me, with my prior agreement.

Q. Prior to your deciding whether or not to take part in something that Mr. Kaufman has asked you about, does Mr. Kaufman provide you with any materials from the prospective client?

A. He may give me a very brief verbal summary of what he understands the issue to be. I have received no written materials related to any case that's come through him.

Page 17

1  Q. Okay. On a yearly basis in the last five
2 years, how many cases do you look at that originate
3 through Mr. Kaufman?
4  A. One.
5  Q. One per year, or one total?
6  A. One per year. There have been six or eight
7 cases, of which half were one phone call and went no
8 farther.
9  Q. Who is the first person from Tydings and
10 Rosenberg with whom you spoke about this case?
11  A. I'm not sure who was the first. I think it
12 was Mr. Lopata, but I'm not sure.
13  Q. What was the first written contact between
14 you and this firm?
15  A. About a week ago I received -- no, it must
16 be more than a week ago; maybe two weeks ago -- I
17 received some background material on the case.
18  Q. Prior to receiving the background material,
19 had you been provided anything else other than
20 information over the phone?       --
21  A. Not that I recall.

Page 18

1  Q. What materials have you been provided in
2 this case by counsel?
3  A. Through noon yesterday, I have a pile of
4 paper which includes deposition transcripts,
5 pleadings, reports, credentials of experts,
6 affidavits, directions to Baltimore. I think that's
7 everything that's in the pile.
8      I can go through the pile and read them
9 off, but --
10  Q. Why don't you do that. Why don't you just
11 go through and read off what you have.
12  A. Okay. Deposition of Robert Hinton. That's
13 an E-mailed transcript.
14  Q. You just have to say what the deposition
15 is. That's fine. You don't have to say the form it
16 came in.
17  A. I'm trying to emphasize that I do not have
18 an official deposition transcript; I have a
19 preliminary e-mail copy.
20      Deposition of John Schubert; same thing,
21 it's a preliminary copy.

Page 19

1      An invoice from Bike Time/Snow Time for
2 repair of the bicycle. A report of James Green.
3 Directions to the offices of Tydings and Rosenberg.
4 Deposition notice for today. Reports of James Green,
5 John Schubert and Robert Hinton and David Mitchell.
6 Plaintiff's motion for summary judgment, attached to
7 which as Exhibit 1 is an owner's manual for a Pacific
8 Cycle bicycle.
9      Answers to interrogatories from William
10 Lockwood. Plaintiff's Memorandum in Opposition to
11 Defendant's Motion for Partial Summary Judgment.
12 Affidavit of Diane Saunders. Letter from MAMSI
13 Insurance related to Mr. Lockwood's injuries.
14      Opposition of third-party defendants SR
15 Suntour, Inc., and SR Suntour U.S.A. to plaintiff's
16 motion for partial summary judgment, which includes
17 the affidavit of Edward Lopata.
18      I would note that these came without the
19 attachments to which the body of the document refers.
20      Deposition of Diane Saunders. Deposition
21 of William Lockwood. Deposition of Jesse Wolcott.

Page 20

1 Deposition of Anita Van Amber. That does have
2 attachments.
3      Defendant's Opposition to Plaintiff's
4 Motion for Partial Summary Judgment, signed by Bruce
5 Parker and Daniel Moore.
6      Plaintiff's Reply to Defendant's Memorandum
7 in Opposition to Plaintiff's Motion for Partial
8 Summary Judgement, and Motion to Strike Affidavit of
9 Naoji Tanaka, signed by Paul Bekman and Michael
10 Smith.
11      Copies of two different Pacific Cycle
12 owner's manuals, one of which I think we have already
13 referred to. Copy of the affidavit of Naoji Tanaka.
14 Deposition of James Green. Again, that's a
15 preliminary copy.
16      I believe that's everything in the file.
17  Q. Were you provided with any information --
18  A. Could I make one addition to that?
19  Q. Sure.
20  A. I also received electronically a set of
21 photographs. I don't know who took the photographs,

Page 21

1 but they were taken in a back yard kind of setting.
2 They are photographs of the bicycle.
3     MR. SMITH: Are those the ones on the CD
4 ROM?
5     MR. LOPATA: You will have to ask about
6 them.
7   Q. You didn't get a CD ROM?
8   A. No, I got an e-mail, which came from
9 whatever it came from. I don't know.
10   Q. Did you receive any other information from
11 any source with respect to this case that you have
12 utilized in some fashion in forming your opinions
13 that is not contained within the file that you have
14 gone through or the e-mail photographs?
15   A. I went and looked at the bicycle.
16   Q. And you looked at the bicycle. Other than
17 that.
18   A. Not that I recall.
19   Q. Is there any information that you have
20 requested, but not yet been provided? --
21   A. I have asked Mr. Thomas for information

Page 22

1 related to the details of the manufacturing process
2 used by SR Suntour, and as of five o'clock last night
3 I guess is the last time we talked about it, I do not
4 have the requested information. Basically, the
5 request is just, "I need information." I have not
6 asked specific questions. That's the only thing I
7 recall that has not been provided.
8   Q. How much time have you spent on this case
9 prior to the beginning of your deposition today?
10   A. With or without driving here this morning?
11   Q. It doesn't make any difference whether you
12 include that or not. That's another two hours,
13 right?
14   A. Yeah, it's -- about a day and a half.
15   Q. Have you discussed this case or the facts
16 of this case with anyone other than someone at
17 Tydings and Rosenberg?
18   A. I have discussed them with two people. One
19 is a colleague of mine, Gene Rodek, who is an avid
20 recreational rider, Boy Scout cycling merit badge
21 counselor, and we have talked about some of the --

Page 23

1 he's also my technical hands.
2   Q. His last name, again, is --
3   A. Rodek, R-O-D-E-K. And we have talked about
4 it in general, and when we examined the bicycle,
5 Mr. Thomas brought somebody along whose name escapes
6 me.
7   Q. A copying person.
8   A. Yeah. And again we talked about the
9 bicycle in terms of an experienced bicycle rider
10 looking at the bicycle.
11   Q. What have you and Mr. Rodek discussed
12 generally about this case?
13   A. I'm not sure exactly what all we have
14 discussed. It has included the schedule, in and out
15 of the office; this is the second day in a two-week
16 period that I'm out of the office, and I'm seldom out
17 of the office; the frustrations of traveling to
18 Baltimore; glorious view from the offices of Tydings
19 and Rosenberg, and the evidence of my observations of
20 the bicycle. Clearly we have not done any laboratory
21 work on it. We probably discussed whether laboratory

Page 24

1 work would be forthcoming, and it certainly wasn't on
2 the schedule in which we had been working.
3     We probably didn't discuss much more of it,
4 and he read the draft of my report, had his usual
5 comments on a couple of sentences which were a little
6 convoluted, and he questioned whether the correct
7 technical term is steerer tube, S-T-E-E-R-E-R, which
8 is the term I have used, because I have picked it up
9 from the records, but I'll still trying to figure out
10 what the correct technical term is for that
11 component.
12   Q. Have you reviewed any technical literature
13 or engineering literature in connection with this
14 case?
15   A. Outside the materials which are part of the
16 file, no, sir.
17   Q. Am I correct that you have performed no
18 materials testing in this case?
19   A. I did a physical examination of the bicycle
20 under available light, available room light in an
21 office.

Page 25

1  Q. And other than a visual inspection -- and
2 by visual, I'm not meaning to imply it doesn't mean
3 anything; I'm just looking for a way to classify
4 it -- visual inspection, you haven't done any other
5 testing on the materials used in the component parts
6 that are at issue in this case.
7  A. That's correct.
8  Q. And would that also be true that you
9 haven't done any metallurgical testing to the
10 component parts that are at issue in this case?
11  A. Beyond the same understanding that --
12  Q. Yes.
13  A. -- visual examination is a very important
14 part of what we do.
15  Q. I understand that.
16  A. That's correct.
17  Q. And your visual examination didn't consist
18 of any microscopic testing or analysis?
19  A. No, I did not bring a microscope.
20  Q. What is the American Council of Independent
21 Laboratories?

Page 26

1  A. Some call it a professional association,
2 some call it a trade association. Historically, it's
3 an organization of independent laboratories. Within
4 the last several years, perhaps the last five, it has
5 become much more a trade association for
6 laboratories, including both independent laboratories
7 and laboratories which are organized as not-for-
8 profit corporations.
9  Q. That's fine. I just wanted to get a
10 general idea.
11      Would you consider that what you did in
12 this case was to perform a failures analysis of the
13 fork of the subject bicycle?
14  A. I would call it a nondestructive failure
15 analysis, and if I were doing one of my bound
16 reports, I would say the title would be something
17 like Preliminary Metallurgical Failure Analysis
18 Investigation of Bicycle Crown Fork Assembly, or
19 something like that.
20  Q. That's fine. What is your understanding of
21 the normal and expected uses of a mountain bike?

Page 27

1  A. My understanding is that a mountain bicycle
2 is used for off-road riding on dirt, hilly, rocky,
3 things like that, terrain, going uphill and downhill.
4 It's distinguished from a number of other types of
5 bicycle by being particularly designed for stability
6 in off-road situations.
7  Q. Is it your understanding that a normal and
8 expected use of a mountain bike would also be on city
9 roads and sidewalks?
10  A. That's less clear to me. There are two
11 distinctions. You recall Eichfield versus Huffy. In
12 there, Huffy's position was that a mountain-type
13 bicycle was not necessarily a mountain bicycle. I
14 had difficulty with this position, but that was their
15 position, and they made a distinction between bicycle
16 that look like mountain bicycles and real mountain
17 bicycles. So that's been part of my thinking process
18 in this whole matter.
19      Certainly you ride down the road to get to
20 an off-road trail, so that part of the use would be
21 use on pavement, yes.

Page 28

1  Q. Based on your review of the record that you
2 have, do you have any understanding as to what type
3 of mountain bike Pacific intended the Strike bicycle
4 to be?
5  A. The bicycle, from the record, is designed
6 to meet two objectives. One, it is designed to look
7 like a mountain type bicycle, and second, it is
8 designed to sell for approximately $150 at Toys "R"
9 Us.
10      That appears to have been carried out
11 within a climate that also says that the bicycle will
12 meet applicable regulations because it's going to be
13 sold in commerce in the U.S.
14  Q. Well, is the bike marketed as a mountain
15 bike?
16  A. I'm not -- I have been in a Toys "R" Us; I
17 don't think I have been in the bicycle section. I
18 don't know exactly how it was presented. The record
19 certainly indicates that it was presented as a
20 mountain type bicycle.
21  Q. Is there anything in the literature

Page 29

1 produced by Pacific with the sale of the bicycle --
2 which could include the manual or anything else that
3 you understand came with it -- that would indicate
4 that they were marketing this bike as a mountain
5 bike?
6    A. Yes, there is.
7    Q. And were they marketing it as a mountain
8 bike or as a mountain-like bike? Which I don't know
9 what a mountain-like bike is, but that seems to be
10 what you're saying.
11   A. I'm not sure I understand your question.
12 I'm sorry, I --
13   Q. Is it your understanding that Pacific was
14 marketing this bike as a mountain bike, based on the
15 materials that it wrote and had with the bike?
16   A. It's my understanding that their agreement
17 with Toys "R" Us was that it would look, smell, taste
18 and feel like a mountain bicycle.
19   Q. So that someone who saw it would think it
20 was a mountain bike.                --
21   A. Yes.

Page 30

1    Q. Okay. What is your understanding of the
2 purpose of a front fork in a mountain bike?
3    A. Well, the fork itself is what connects the
4 front wheel to the steering mechanism and through the
5 steering mechanism to the frame of the bicycle.
6    Q. Is there any portion of the front fork
7 assembly that's considered to be a critical component
8 of the bicycle?
9    A. Well, the whole thing is a critical
10 component, in the sense that component failure at any
11 point is likely to render the bicycle not only not
12 useful, but quite dangerous if somebody is riding it
13 at the moment of failure.
14   Q. What understanding do you have of the
15 industry requirements for the bond between the steer
16 tube and the fork crown?
17   A. There don't seem to be specific
18 requirements that say, "The bond shall meet this
19 particular numerical specification," or something.
20 The overall component of the fork assembly is
21 supposed to withstand certain force tests at the time

Page 31

1 of manufacture, which are spelled out by the Consumer
2 Product Safety Commission.
3    Q. What is your understanding of the forces
4 experienced by the fork of a mountain bike under
5 normal and expected use?
6    A. Well, it carries the front half of the
7 load, which at any particular point may be a small or
8 a large portion of the weight of the rider of the
9 bicycle, plus any downforce generated by coming
10 downhill as opposed to uphill; in engineering terms,
11 any acceleration. So if you hit a sudden uphill,
12 then there's a lot more weight on the front fork.
13 But it's a load-bearing component.
14   Q. During normal and expected use, when,
15 typically, does a front fork experience its greatest
16 force?
17   A. I'm a material scientist. I am not a
18 bicycle engineer. I don't think I know the specific
19 answer to the question.
20   Q. Okay. Do you have any understanding of the
21 force that's needed to separate a steer tube from a

Page 32

1 fork crown?
2    A. It should be substantial. I don't have a
3 number.
4    Q. Would it be your opinion that if a steer
5 tube separated from a fork crown under normal and
6 expected use of a bicycle, that the bond between the
7 steer tube and the fork crown was defective?
8    A. No.
9    Q. Is it your opinion that a steer tube and a
10 fork crown can separate in normal and expected use in
11 the absence of a defect?
12   A. Define defect, please. Defect as you would
13 use the term or defect as it is generally thrown
14 about?
15   Q. What do you understand defect to be?
16   A. In your term, when used in a legal arena, a
17 defect means something that is the proximate cause of
18 failure. When it generally thrown around, it refers
19 to any discontinuity, and the discontinuity is not
20 necessarily a defect in the legal sense.
21   Q. Would you consider a bicycle to be

Page 33

1 unreasonably dangerous if the steer tube and the fork
2 crown separate under the normal and expected use of
3 the bicycle?
4    MR. LOPATA: Objection to the question. Go
5 ahead and answer the question.
6    Are you asking him at a time the bicycle
7 was sold, at the time of the separation, or what?
8    MR. SMITH: It has to be at the time of
9 separation, because the question says is it
10 unreasonably dangerous if the steer tube and the fork
11 crown separated under normal and expected use.
12   A. In the present case, we are looking at a
13 failure which has been ongoing for some unknown
14 period of time. We don't have any way of
15 reconstructing that time line at this point.
16   Q. We will get to this case. I'm going to
17 zero back to that. But my question to you is, if a
18 steer tube separates from a fork crown under normal
19 and expected use of the bicycle -- I mean the bicycle
20 has always been used for normal and expected use --
21 would you consider the bicycle in that case to be

Page 34

1 unreasonably dangerous?
2    MR. LOPATA: Objection.
3   A. May I take a step backward?
4   Q. Sure.
5   A. I regard bicycles as being unreasonably
6 dangerous. I gave my bicycle away, finally, because
7 I don't think riding on a road on a bicycle is a safe
8 thing to do in 2003. And I like to ride a bicycle.
9   Q. Well, other than your own opinion, at least
10 for you, that any bicycle is unreasonably dangerous,
11 would you consider a bicycle to be unreasonably
12 dangerous for any rider if the steer tube separates
13 from the fork crown under normal and expected use?
14   MR. LOPATA: Same objection. Go ahead.
15   A. Under normal and expected use, it would be
16 unreasonably dangerous, yes.
17   Q. Do you have, based on your training,
18 education and experience and anything you have read
19 in this case, an understanding of what are the causes
20 of a separation of a steer tube from a fork crown of
21 a bicycle?

Page 35

1   A. We're talking about the general case, and
2 not this case.
3   Q. General case, that's right.
4   A. There is some kind of fracture or
5 discontinuity or failure or something that intervenes
6 in the structure. I'm not sure how to give a general
7 answer to that.
8   Q. Okay. Have you performed any tests to
9 determine what forces are applied to a front fork of
10 a mountain bike when a person performs a bunny hop?
11   A. Any tests? No, sir.
12   Q. Do you have any specific knowledge of
13 Suntour forks; in other words, forks manufactured by
14 Suntour?
15   A. Beyond the little bit I have learned in
16 this case, no, sir.
17   Q. You haven't seen any design specifications.
18   A. That's correct.
19   Q. You haven't seen any testing that the
20 manufacturer, Suntour, has put its forks through.
21   A. That's correct.

Page 36

1   Q. Are you aware of any quality assurance that
2 exists in the Suntour factory that manufactures the
3 forks?
4   A. Only through what's been read into the
5 record in this case.
6   Q. What has been read into the record in this
7 case as to what quality assurance there is in the
8 Suntour factory?
9   A. Very little, if anything.
10   Q. The fork in this case is something called
11 an SR Duo-Track 7006. Do you know what the number
12 7006 refers to?
13   A. No, sir.
14   Q. Do you know if there was a predecessor to
15 the 7006? In other words --
16   A. There is a whole history of predecessor
17 organizations and things like that. In terms of
18 genesis of the particular model number, I don't know.
19   Q. Do you know any changes that Suntour has
20 incorporated into its forks over the years?
21   A. Only what's in the record in this case.

Page 37

1  Q. And what is in the record in this case as
2 to what changes Suntour has incorporated into its
3 forks over the years?
4  A. Very little.
5  Q. I would be interested in anything.
6  A. I would, too.
7  Q. Do you know when the fork that was in the
8 subject bike in this case was manufactured?
9  A. I have presumed it was manufactured prior
10 to the middle of 1997. I don't know that. I have no
11 information.
12  Q. Okay. Do you know where it was
13 manufactured?
14  A. Other than what's been presented in this
15 case, I have no information.
16  Q. And we don't know how it was manufactured.
17 That's one of the questions that you have had, as to
18 the methodology of manufacture.
19  A. My understanding is that it is assembled by
20 a process called thermal bonding, and I'm trying to
21 find out what that means.

Page 38

1     (Discussion off the record.)
2     (Brief recess.)
3  Q. Do you know where Suntour sells its forks,
4 where in the world it sells its forks? Is it
5 marketed solely in the United States, is it marketed
6 solely in Alaska? Where is the market for Suntour's
7 forks?
8     MR. LOPATA: Objection. What do you mean
9 by sell?
10    MR. SMITH: Well, it sells forks. It has
11 to sell them to people. Where does it sell them?
12    MR. LOPATA: Are you talking about this
13 case?
14    MR. SMITH: No, I'm talking about Suntour
15 forks.
16    MR. LOPATA: All right.
17  A. My understanding is that they sell them to
18 people who manufacture bicycles, wherever they are.
19 I don't know anything about the geography of their
20 marketing effort.
21  Q. Do you know what type of bicycles have

Page 39

1 Suntour forks in them, other than the subject
2 bicycle?
3  A. No, I don't.
4  Q. I have some questions about your report
5 that was sent to us yesterday, probably because it
6 was written by you yesterday, a five-page report, and
7 if you don't have a copy, you can just look right on
8 Exhibit 1.
9  A. I have several copies.
10  Q. Your first line of your letter indicates
11 that this is a preliminary report. What else do you
12 expect to do?
13  A. I don't know. I presume that after we're
14 done today, Mr. Lopata and I will have a discussion
15 about what happens next, and I don't know what that
16 discussion will include, so that I don't know what
17 other things might be done, what other information
18 might be provided, what I might be requested to do,
19 but everybody else in this matter seemed to be
20 delivering preliminary reports, so I thought that
21 would be a good idea.

Page 40

1  Q. In the last sentence on the first page, you
2 say that the alleged cause of the accident was the
3 separation of the steering tube from the fork crown
4 while Mr. Lockwood was executing a bunny hop maneuver
5 over a manhole cover. And when you use the word
6 "cause," you're saying that's what led to his injury,
7 as opposed to not what caused the fork tube to
8 separate. Or is that what you mean? I'm trying to
9 understand, when you say cause of the accident, what
10 do you mean.
11  A. Cause of the injury. Yes.
12  Q. Okay. I'm on the second page of your
13 report, in the section called Examination.
14    How long did your visual examination last?
15  A. Two pokes of a head in the door to see if
16 we were done yet.
17    I didn't time it.
18  Q. Well, I mean, are you able to estimate it
19 in any fashion? Were you there for an hour, were you
20 there for five minutes, were you there for three
21 days?

### Page 41

1  A. Approximately an hour.
2  Q. I'm not trying to be funny, I'm just trying
3  to get --
4  A. No, no, I understand. I did not time it.
5  Q. Okay. In the second sentence, you say the
6  appearance of the bicycle is consistent with the
7  photographs that have been obtained by others. What
8  photographs are you talking about?
9  A. I have seen two sets of photographs. One
10 is the electronic set that we have talked about. You
11 referred to them as the CD ROM; I referred to them as
12 the e-mail photographs.
13     The other is that there were a set of
14 photographs which we saw very briefly in the office
15 with the bicycle.
16 Q. Okay. Were those these photographs?
17 (Proffers photographs to the witness.)
18 A. They may well have been. They're very
19 similar, if not.
20 Q. In your report, where you say, "The bicycle
21 is obviously not in the same condition as it was

### Page 42

1  immediately following the accident," what do you
2  mean?
3  A. For starters, the rear wheel isn't
4  attached. That's the most obvious thing, but the
5  fork is not on the front wheel. There has been some
6  disassembly.
7  Q. Okay. And is that disassembly consistent
8  with a disassembly that would have to be done in
9  order to ship it in the crate in which the bike was
10 contained?
11 A. Part of it is. The thing that concerns me
12 is that the -- as we looked at it, the steerer tube
13 is loose in the frame.
14 Q. Okay. Let me show you -- I'll show you
15 this one picture, which -- of course they all say the
16 same thing, "Photograph by Mike Bodiker, 7/1999."
17 It's more of a vertical view of the steer tube. Is
18 that the steer tube you said that's loose in the
19 frame?
20 A. Yes. If you wiggle it --
21 Q. Wiggle it, it will wiggle back and forth?

### Page 43

1  A. It wiggles. Or if you wiggle it up and
2  down, it wiggles. It's loose. There's a nut that's
3  not tight. Or at least I presume that's why. But I
4  don't know why that is.
5  Q. Do you know how the steer tube is held
6  secure within the upper part of the frame, which is
7  called the head tube?
8  A. I do not have any design information on
9  this specific bicycle and I did not take it apart to
10 find out.
11 Q. I'm now on the second paragraph of your
12 examination, in which you say "Several areas of the
13 bicycle show evidence of very heavy use and repeated
14 contact with pavement or other hard, abrasive
15 materials."
16     Could you tell me what areas of the bicycle
17 show evidence of very heavy use? And I'll list them
18 and then I'll ask you particular questions about each
19 of those areas.
20 A. Well, the particular point is the end of
21 the handlebars.

### Page 44

1  Q. Okay. Anything else?
2  A. There is a mark in the inside of the frame
3  where the rear wheel would travel which indicates
4  prolonged contact, probably with the tire.
5  Q. Where would that be?
6  A. On the inside of -- I forget which side it
7  is, but on the inside here.
8  Q. So the inside of the tire where the tire
9  meets the spokes, the part that's holding the spokes?
10 I probably know as much about a bicycle as you do.
11 A. Well, where the tire rubs on the frame if
12 it isn't properly aligned.
13 Q. Okay.
14 A. And there are just bangs and dings all
15 over.
16 Q. Are there bangs and dings in the frame?
17 A. There is -- we don't have a set of the
18 electronic pictures, do we? I had assumed they would
19 be here. I'm sorry.
20     There is one -- I'm trying to remember
21 where it is. Somewhere around the crank, but

Page 45

1 overall, there is evidence of repeated contact with
2 this and that.
3   Q. And do you have anything that you can point
4 me to to indicate what was the cause of the markings,
5 other than repeated contact with pavement and other
6 hard, abrasive materials?
7   A. Could you read the question again, please?
8   Q. Let me say it in a different way.
9       Do you have any evidence that the heavy use
10 markings that you have told us about occurred through
11 other than normal and expected use of the bicycle?
12   A. I think there is a question as to what is
13 normal and expected use, especially in terms of how
14 often is a bicycle expected to hit the ground
15 violently in normal and expected use.
16   Q. When you say hit the ground violently, what
17 do you mean?
18   A. If you look at the handlebars, they have
19 repeatedly moved against something hard and
20 abrasive -- perhaps pavement, perhaps not, but
21 something like pavement -- in a manner that indicates

Page 46

1 that the bicycle was traveling when the contact was
2 made, that there was some weight involved in the
3 contact. In other words, these are not the marks of
4 simply falling over; they're scored and abraded as if
5 there has been repeated contact, and it's both ends,
6 it's not just one end.
7   Q. When you say the end, I'm looking at the
8 handlebars here. Are you referring to the part after
9 the angle, where I guess someone would put their
10 hands, or are you talking more about the straight
11 part of the handlebar?
12   A. The straight part is where that comment
13 focuses.
14   Q. And is it the metal material that has the
15 evidence of heavy use or is it the -- whatever the
16 black material is made of?
17   A. Well, both do, but the metal is where the
18 observation seems most important.
19   Q. Based on your review of the entire record
20 in this case -- again, independent of your
21 observations -- do you have any information as to

Page 47

1 what caused those markings on the handlebars?
2   A. In the sense of --
3   Q. The bike hitting something, somebody
4 throwing the bike --
5   A. I don't know.
6   Q. Anything other than the ends of the
7 handlebars and the few dings that you talked about
8 and the back wheel?
9   A. Those are the things that particularly
10 struck me.
11   Q. Do you know what caused any the dings to
12 the frame?
13   A. No.
14   Q. Do you know what caused the bending and the
15 misalignment of the rear wheel?
16   A. No.
17   Q. You examined the joint area of the steer
18 tube and the fork crown.
19   A. Yes, sir.
20   Q. And based on your observations, it's your
21 opinion that the separation is not something that

Page 48

1 occurred all at once, but took place over time.
2   A. That's correct.
3   Q. So that the bond more likely than not, in
4 your opinion, failed prior to the day of the
5 accident.
6   A. Yes.
7   Q. What, in the record, indicates to you that
8 this bicycle was designed to appeal to the customer
9 as a mountain bike type of bicycle?
10   A. Well, the particular point of the record
11 is, I believe it's Ms. Van Amber, the representative
12 of Pacific Cycle, who described the design process
13 from the perspective of Pacific Cycle as they would
14 negotiate with the retailer as to what the bicycle
15 was supposed to look, smell, taste and feel like.
16   Q. What is it in the record that this bike was
17 designed to meet all the applicable regulations?
18   A. I think it's, again, in the representations
19 of Pacific Cycle that they were trying to make a
20 bicycle that could be sold in the United States that
21 is a -- a set of rules, that if you sell it in the

Page 53

✗ ✗ ✗

1 in order to get it over an obstacle.
2   Q. And how high, generally, do you get the
3 bicycle off the ground?
4   A. Well, hopefully as high as whatever you
5 you're trying to get over, but beyond that, I don't
6 think there is a technical definition that has
7 precise dimensions.
8   Q. We can agree if you had to go, like, five
9 feet, it wouldn't be a bunny hop.
10  A. I might be a bunny jump, but...
11  Q. Who designed the bicycle?
12      MR. LOPATA: Now, the bicycle you're
13 talking about --
14      MR. SMITH: The bike.
15      MR. LOPATA: The whole bicycle?
16      MR. SMITH: The whole bicycle.
17  A. The bicycle evolved over a long -- well,
18 over a period of time since -- approximately since
19 the Civil War.
20  Q. No, I mean who designed this bicycle.
21  A. Based on the record?

Page 54

1   Q. Yes.
2   A. I don't know.
3   Q. And why don't you know?
4   A. I could give you a long answer to that
5 question, but the short answer is, I don't know.
6   Q. Why is it difficult for you to tell in this
7 record?
8   A. Because when somebody has asked that
9 question repeatedly, it hasn't been answered.
10  Q. Okay. Based on your review of the records
11 and documents produced by Pacific Cycle in this case,
12 where at least they decided what components went into
13 the bicycle, would you consider that to be at least
14 part of the design process?
15  A. The selection of components certainly is
16 part of the design process.
17  Q. Okay. With respect to the fork and the
18 fork assembly in this case, do you have any
19 understanding as to what the fork looks like at the
20 time it left Suntour and went to China Bicycle
21 Company?

Page 55

1 And by that I mean, there are parts to the
2 fork. In other words, who assembled them? Were they
3 assembled by China Bicycle Company, were they
4 assembled by Suntour, or you don't know?
5       MR. LOPATA: Are you asking about his
6 personal knowledge?
7       MR. SMITH: Yes, with respect to this case.
8   A. At this point, I don't know.
9   Q. Who created the bond between the steer tube
10 and the fork crown? Was that done by Suntour or was
11 that done by China Bicycle Company?
12      MR. LOPATA: Again, you're asking his
13 personal knowledge?
14      MR. SMITH: Yes.
15  A. My personal knowledge is, I don't know.
16  Q. So based on what you have seen in this
17 record, it could have occurred at Suntour or it could
18 have occurred at China Bicycle Company?
19  A. From the information I have today, it could
20 have occurred at either place.
21  Q. We can agree that it probably didn't occur

Page 56

1 anywhere else.
2       MR. LOPATA: Objection. If he knows.
3   A. I have no knowledge of any intermediary
4 that may have been part of this process.
5   Q. Do you have any understanding generally in
6 the manufacture of bikes who is the entity that
7 creates the bond between the steer tube and the fork
8 crown?
9       MR. LOPATA: Objection. Go ahead and
10 answer the question.
11  A. The record certainly suggests that that
12 would be done by the fork manufacturer and not by the
13 bicycle manufacturer. But I have no specific
14 knowledge in this case.
15  Q. In your report, you indicate that the steer
16 tube and the non-ferrous fork crown were joined
17 together by a process described as thermal bonding.
18 Where did you get that information in the record?
19  A. What I'm looking for is Mr. Tanaka's
20 affidavit.
21  Q. Well, you don't have to look for it. It's

Case 1:02-cv-02068-WMN   Document 61-3   Filed 05/15/2003   Page 15 of 17

Lockwood vs. Pacific Cycle — CondenseIt™ — Andrew W. Blackwood, Ph.D.

### Page 57

1 your understanding from Mr. Tanaka's affidavit that
2 it was thermal bond.
3   A. I'm trying to refresh my recollection as to
4 whether that is Mr. Tanaka's term or Mr. Lopata's
5 description of Mr. Tanaka's term, and I don't recall
6 without looking at the piece of paper which I'm
7 looking for.
8      MR. LOPATA: If I may add, I think it's
9 included in --
10     MR. SMITH: Here's a copy of
11 Mr. Tanaka's --
12     MR. LOPATA: He has it now, but I think
13 it's included in Pacific Cycle's opposition to your
14 motion on thermal bonding, but I'm not sure.
15     THE WITNESS: I don't recall where I got
16 the term. Somewhere in the record there's a
17 description of how the assembly was done. It's not
18 in Mr. Tanaka's affidavit, which is what I was trying
19 to check.
20   Q. But sitting here right now, you can't point
21 me to anything in the factual record that indicates

### Page 58

1 that these things were put together by something
2 called thermal bonding.
3   A. The term is used somewhere in the record,
4 and I don't recall who used it and with how much
5 authority.
6   Q. Do you have any experience yourself in
7 obtaining mechanical bond between components?
8   A. Could you be a little more specific?
9   Q. Sure. Is it your understanding that in
10 this case the mechanical bond, which may be thermal
11 bonding, was created by placing the steel hollow
12 steer tube into the non-ferrous fork crown, and once
13 they are inside, the bond is created by the forces
14 between the two metals?
15   A. My understanding of the bond is that it's
16 created by heating one component and/or cooling the
17 other, putting them together, and then when they come
18 to the same temperature, there is an interference
19 fit.
20   Q. Do you have any experience in interference
21 fits?

### Page 59

1   A. Only in the sense that if you try to put a
2 large object into a small hole, it doesn't work very
3 well, and it creates -- yeah, it creates
4 interference. But in terms of executing them in
5 practice or something of the sort, no.
6   Q. Or designing them for any of your
7 customers.
8   A. We actually have a couple of interference
9 fits on products that we build for the electron
10 microscopy market. The assembly is generally done
11 with a hammer. Tap, tap, tap, but it's generally
12 done with a hammer.
13   Q. Have you in the past ever performed a
14 failure analysis on an interference fit that failed?
15   A. "Ever" is a long time. I do not recall
16 such a case.
17   Q. Based on your analysis and your visual
18 examination, it's your opinion that the bond loosened
19 over time. Would that be fair?
20   A. Yes.
21   Q. And I guess the bond is originally held in

### Page 60

1 place through the striations, and of course the force
2 of the two metals against one another. Would that be
3 fair to say?
4   A. Yes.
5   Q. And is it your opinion -- I'm just trying
6 to understand it -- that movement back and forth
7 between the two components loosens the fit?
8   A. I'm not sure you can put it in that
9 sequence. The fit has to be loose and then the
10 components can move relative to each other.
11   Q. What is it that loosened the fit?
12   A. I presume repeated impacts of some sort
13 of -- whatever dinged the end of the handlebars.
14 Whatever bent the back wheel. That sort of impact,
15 but I don't have any direct knowledge. I don't think
16 we can reconstruct exactly what happened to this
17 bicycle.
18   Q. Is there anything that you can point me to
19 in any of the deposition testimony -- for instance,
20 of Mr. Lockwood or Mr. Wolcott or Ms. Saunders --
21 that indicates any use of the bicycle that resulted

Page 61

1 or could have caused the loosening of this
2 interference fit?
3     A. Well, Mr. Wolcott certainly describes
4 attempts to use the bicycle for stunts for which it
5 was not designed.
6     Q. Whose bicycle was used for stunts for which
7 it was not designed?
8     A. He describes Mr. Lockwood as attempting to
9 perform stunts on this -- his bicycle.
10    Q. You understand him as saying that
11 Mr. Lockwood attempted to perform stunts on
12 Mr. Lockwood's bicycle or on Mr. Wolcott's bicycle?
13    A. I understand him to say that Mr. Lockwood
14 attempted to do it with Mr. Lockwood's bicycle. I
15 also understand him to say that Mr. Lockwood
16 determined that the bicycle was not suitable for such
17 things, and that there was some frustration involved,
18 but that he couldn't do some of the things that he
19 tried to do on the bicycle.
20    Q. Well, the record will be whatever the
21 record is.

Page 62

1     A. I think we can agree on that.
2     Q. We can sit here and argue about that
3 forever.
4        Anything else that you see in the record
5 that would lead to this loosening of the interference
6 fit?
7        MR. LOPATA: Mike, are you referring to
8 something other than his visual inspection of the
9 bicycle? Does that include the record?
10       MR. SMITH: Anything in the record.
11       MR. LOPATA: Well, is his report considered
12 to be in the record now?
13       MR. SMITH: We're talking about his report.
14 I'm trying to find support for his report.
15       MR. LOPATA: But I just want to make it
16 clear. Are you also referring to his report that
17 mentions the fact that he visually observed --
18       MR. SMITH: We have already gone through
19 the visually part. I understand that.
20       (Recess, 10:35 - 11:00 a.m.)
21    Q. We were talking about what caused the

Page 63

1 looseness in the interference fit, and I believe you
2 had pointed me to based on your observations and
3 things in the record from Mr. Wolcott's deposition,
4 and I had just finished asking you whether there is
5 anything else you can point me to as to what sort of
6 conduct caused the loosening of the interference fit.
7     A. I think that the evidence of the record,
8 absent the bicycle, is a record of no abusive use of
9 the bicycle. The evidence of the bicycle is that
10 there is evidence of abuse in the bicycle itself. I
11 can't point to anything in the record beyond the
12 photographic documentation of some of that abuse that
13 would support the argument that there was abuse.
14    Q. I believe I'm on the fourth page of your
15 letter. It's the only part of the letter that
16 doesn't have the header in it.
17    A. It should have a header.
18    Q. Mine didn't, but it may have been the way
19 it came across in the Xeroxing. I got it by fax.
20 Don't worry about it.
21    A. No, you're missing part of page four. Or

Page 64

1 page three, maybe. Page four is short.
2     Q. Page four begins, "The record indicates..."
3     A. That's correct. You're just missing the
4 header.
5     Q. I have it all; I'm just missing the header.
6        Based on your reading of the record, what
7 is your understanding of the looseness that
8 Mr. Lockwood experienced in the steering mechanism of
9 the bicycle?
10    A. My understanding is that I don't understand
11 it. The record, unfortunately, is that Mr. Lockwood
12 was asked questions that appeared to put words into
13 his mouth -- at least appeared to me to put words in
14 his mouth which he then used. He described it as a
15 shimmying, and I didn't feel that I could use that
16 indication as a description from which I could draw a
17 conclusion, but he did indicate that he took the
18 bicycle to a bicycle mechanic because he noticed this
19 looseness.
20    Q. That's the Bike Line, where you have the
21 invoice from?

Case 1:02-cv-02068-WMN   Document 61-3   Filed 05/15/2003   Page 17 of 17

Lockwood vs. Pacific Cycle     CondenseIt™     Andrew W. Blackwood, Ph.D.

Page 65

A. Yes, sir.

Q. And am I correct that it's a possibility that that indicates a warning of the progressive failure in process, but you can't tell because you don't know enough as to what this looseness was.

A. That's correct.

Q. Okay. Am I right that you have no independent knowledge as to how fork crowns and steer tubes are bonded in forks made by other manufacturers?

A. Beyond some anecdotal knowledge, no.

Q. And you have no opinion, at least no opinion that I see in your report, whether the design of the fork in this case, as you understand it, this thermal bonding, was a defective design or not a defective design. Would that be correct?

A. My opinion is that it is not a defective design.

Q. Do you know how soon prior to the date of the accident the joint between the steer tube and the fork crown had failed to the point where the steerer

Page 66

tube was able to move within the fork crown?

A. No, I do not.

Q. Do you know if that joint failed before or after any of the abuse -- your word -- of the bicycle as evidenced by the end of the handlebars or the bend on the wheel or the dings on the frame?

A. Is that a question at this point?

Q. Yes.

A. Could you please read the question?

(The record was read by the reporter.)

A. No, I don't know.

Q. Would you agree with me that if the joint failed before those other matters, then the bicycle was unreasonably dangerous for riders thereof?

MR. LOPATA: Objection. You are asking him for a legal conclusion. You can answer the question, though.

A. I don't think I agree with you, but --

Q. Let me ask a different question. Can you agree with me that if you don't know when the joint failed, you don't know what the cause of the joint

Page 67

failure was?

A. I don't think you can draw that as a general conclusion, no. No. The difficulty is reconstructing the time line, and it is a difficult time line to reconstruct. It is a particularly difficult time line to reconstruct because the evidence of the bicycle is at variance with the evidence of the deposition record. We just don't know exactly what happened when.

Q. And in the last paragraph on that page, you indicate "The design of the fork crown assembly probably met the established objectives of the price, appearance and performance at the time that the fork crown assembly left the control of SR Suntour." What do you mean by that?

A. In your terms and to a reasonable degree of scientific certainty, if you will give me the price and appearance are pretty much given, it met Toys "R" Us objectives for price, or they wouldn't have sold it. It looked like a mountain bike. And the question is whether it met applicable performance

Page 68

regulations, and I don't think there is any credible evidence that it didn't meet those objectives at the time it left the control of those parties.

Q. Is there any evidence that it did?

A. Beyond the fact that there is nothing in the record that indicates that it did not meet those specifications at the time it left their control.

Q. What evidence do you have that anyone did anything to determine whether it met their specifications?

A. We can only draw a conclusion about the population of bicycles in general. There are many bicycles. Insofar as we know, there is this one allegation that the bicycle was defective.

Mr. Tanaka says that they have shipped eight million of these fork assemblies and there is this one record of failure.

If you purchase an automobile, you assume that it meets certain regulations, although your automobile has never been driven into a wall with a test dummy in the seat. You assume it because there