IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

WILLIAM LOCKWOOD,

    Plaintiff

    v.

PACIFIC USA, LTD., PACIFIC CYCLE, LLC
and TOYS "R" US – DELAWARE, INC.

    Defendants.

Civil Action No.

WMN-02-CV-2068

## AFFIDAVIT OF _NAOJI TANAKA_

I, _NAOJI TANAKA_, the undersigned, do solemnly affirm that:

1. I am over 18 years of age, fully competent to testify as a witness, and have first-hand knowledge of the matters set forth in this affidavit.

2. I currently am employed by SR Suntour, Inc. (SR Suntour) in the position of _engineering development_, which I have held since _1995_;

3. As _engineering development_ I am responsible for _production_ of the various bicycle forks manufactured by SR Suntour.

4. The SR Suntour Duo Track 7006 model fork used in the Pacific Cycle Strike Mountain Bike that is the subject of this litigation was designed and manufactured using a mechanical bond fit to secure the steel steerer tube to the aluminum alloy fork crown.

5. At the relevant time it was, and it still is within the industry standard to design a fork using a mechanical bond fit to secure a steel steerer tube into a aluminum alloy fork crown. This is one of multiple acceptable designs for a bicycle fork component.

1



6. SR Suntour has manufactured  *8,000,000*  forks using the same mechanical bond fit as that
used for the SR Suntour Duo Track 7006 model, and none have been the subject of safety recall
or demonstrated a history of fork failure or fork crown/steerer tube joint separations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  __Mar 14 - 2003__          _____
                 [date]                        [name]

2



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM LOCKWOOD,                    :
                                     :
        Plaintiff,                   :
                                     :
            vs.                      :
                                     :
PACIFIC CYCLE, LLC and               : Civil Action
TOYS "R" US-DELAWARE, INC.,          : No. WMN-02-CV-2068
                                     :
        Defendants/                  :
        Third-Party Plaintiffs,      :
                                     :
            vs.                      :
                                     :
SR SUNTOUR, INC. and                 :
SR SUNTOUR, USA,                     :
                                     :
        Third-Party Defendants.      :
_____ :

        Deposition of **ANDREW W. BLACKWOOD, Ph.D.**, taken on Wednesday, April 16, 2003, commencing at the hour of 9:00 a.m. at 100 East Pratt Street, 26th Floor, Baltimore, Maryland, before George W. Tudor, Notary Public.

APPEARANCES:

        **MICHAEL P. SMITH, ESQUIRE**
        Salsbury Clements Bekman Marder & Adkins, LLC
        300 West Pratt Street, Suite 450
        Baltimore, Maryland 21201
          On behalf of the Plaintiff

        **EDWARD J. LOPATA, ESQUIRE**
        Tydings and Rosenberg, LLP
        100 East Pratt Street, 26th Floor
        Baltimore, Maryland 21202
          On behalf of the Defendant/3rd-Party Plaintiff



DEFENDANT'S
EXHIBIT
B

1    place through the striations, and of course the force

2    of the two metals against one another.  Would that be

3    fair to say?

4        A.    Yes.

5        Q.    And is it your opinion -- I'm just trying

6    to understand it -- that movement back and forth

7    between the two components loosens the fit?

8        A.    I'm not sure you can put it in that

9    sequence.  The fit has to be loose and then the

10   components can move relative to each other.

11       Q.    What is it that loosened the fit?

12       A.    I presume repeated impacts of some sort

13   of -- whatever dinged the end of the handlebars.

14   Whatever bent the back wheel.  That sort of impact,

15   but I don't have any direct knowledge.  I don't think

16   we can reconstruct exactly what happened to this

17   bicycle.

18       Q.    Is there anything that you can point me to

19   in any of the deposition testimony -- for instance,

20   of Mr. Lockwood or Mr. Wolcott or Ms. Saunders --

21   that indicates any use of the bicycle that resulted

1    or could have caused the loosening of this

2    interference fit?

3        A.    Well, Mr. Wolcott certainly describes

4    attempts to use the bicycle for stunts for which it

5    was not designed.

6        Q.    Whose bicycle was used for stunts for which

7    it was not designed?

8        A.    He describes Mr. Lockwood as attempting to

9    perform stunts on this -- his bicycle.

10       Q.    You understand him as saying that

11   Mr. Lockwood attempted to perform stunts on

12   Mr. Lockwood's bicycle or on Mr. Wolcott's bicycle?

13       A.    I understand him to say that Mr. Lockwood

14   attempted to do it with Mr. Lockwood's bicycle.   I

15   also understand him to say that Mr. Lockwood

16   determined that the bicycle was not suitable for such

17   things, and that there was some frustration involved,

18   but that he couldn't do some of the things that he

19   tried to do on the bicycle.

20       Q.    Well, the record will be whatever the

21   record is.

1        A.    I think we can agree on that.

2        Q.    We can sit here and argue about that

3    forever.

4            Anything else that you see in the record

5    that would lead to this loosening of the interference

6    fit?

7            MR. LOPATA:  Mike, are you referring to

8    something other than his visual inspection of the

9    bicycle?  Does that include the record?

10           MR. SMITH:  Anything in the record.

11           MR. LOPATA:  Well, is his report considered

12   to be in the record now?

13           MR. SMITH:  We're talking about his report.

14   I'm trying to find support for his report.

15           MR. LOPATA:  But I just want to make it

16   clear.  Are you also referring to his report that

17   mentions the fact that he visually observed --

18           MR. SMITH:  We have already gone through

19   the visually part.  I understand that.

20           (Recess, 10:35 - 11:00 a.m.)

21       Q.    We were talking about what caused the

1    looseness in the interference fit, and I believe you

2    had pointed me to based on your observations and

3    things in the record from Mr. Wolcott's deposition,

4    and I had just finished asking you whether there is

5    anything else you can point me to as to what sort of

6    conduct caused the loosening of the interference fit.

7         A.   I think that the evidence of the record,

8    absent the bicycle, is a record of no abusive use of

9    the bicycle.  The evidence of the bicycle is that

10   there is evidence of abuse in the bicycle itself.  I

11   can't point to anything in the record beyond the

12   photographic documentation of some of that abuse that

13   would support the argument that there was abuse.

14        Q.   I believe I'm on the fourth page of your

15   letter.  It's the only part of the letter that

16   doesn't have the header in it.

17        A.   It should have a header.

18        Q.   Mine didn't, but it may have been the way

19   it came across in the Xeroxing.  I got it by fax.

20   Don't worry about it.

21        A.   No, you're missing part of page four.  Or

1          A.    Yes, sir.

2          Q.    And am I correct that it's a possibility

3    that that indicates a warning of the progressive

4    failure in process, but you can't tell because you

5    don't know enough as to what this looseness was.

6          A.    That's correct.

7          Q.    Okay.  Am I right that you have no

8    independent knowledge as to how fork crowns and steer

9    tubes are bonded in forks made by other

10   manufacturers?

11         A.    Beyond some anecdotal knowledge, no.

12         Q.    And you have no opinion, at least no

13   opinion that I see in your report, whether the design

14   of the fork in this case, as you understand it, this

15   thermal bonding, was a defective design or not a

16   defective design.  Would that be correct?

17         A.    My opinion is that it is not a defective

18   design.

19         Q.    Do you know how soon prior to the date of

20   the accident the joint between the steer tube and the

21   fork crown had failed to the point where the steerer

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

NORTHERN DIVISION


WILLIAM LOCKWOOD,  : Civil Action No.: WMN-02-CV-2068
   Plaintiff  :
       :
  vs.    : **ORIGINAL**
       :
PACIFIC CYCLE, LLC :
and TOYS "R" US-  :
DELAWARE, INC.,  :
   Third-Party :
   Plaintiffs :
       :
  vs.    :
       :
SR SUNTOUR, INC. and :
SR SUNTOUR, USA,  :
   Third-Party :
   Defendants :


DEPOSITION OF ROBERT W. HINTON


    Taken in the offices of Gallagher

Reporting & Video, LLC, 33 South Seventh Street, Suite

105, Allentown, Pennsylvania, on Friday, April 11,

2003, commencing at 4:22 p.m., before Steven R. Mack,

Registered Merit Reporter.


* * *

GALLAGHER REPORTING & VIDEO, LLC.
33 South Seventh Street, Suite 105
Allentown, Pennsylvania  18101
1-800-366-2980 -- (610) 439-0504

DEFENDANT'S
EXHIBIT
C

R. Hinton/Lopata

20

1   crown in this case, that would have made the bicycle

2   heavier I take it?

3   A.          Well, probably, yes.  Because the density

4   of steel is quite a bit higher than aluminum as you

5   know.

6   Q.          I believe you have a copy of Mr. Tanaka's

7   affidavit.

8   A.          Yes.

9   Q.          Could you take a look at paragraph 5 of

10  the affidavit?

11                  MR. SMITH:  Do you want a copy?

12  A.          I have it in here.  I must have rearranged

13  it.

14  Q.          First of all, Mr. Tanaka's affidavit

15  indicates that he has experience in the production,

16  does he not?  That apparently you do not have, is that

17  correct?

18                  MR. SMITH:  Objection.

19                  MR. LOPATA:  I don't have it in

20  front of me.  What does it say in the beginning?

21                  MR. SMITH:  Here.  Do you want a

22  copy?

23                  MR. LOPATA:  Yeah.

24  BY MR. LOPATA:

25  Q.          Paragraph 3 says he as engineering -- "As

1    engineering development I am responsible for

2    production of the various bicycle forks manufactured

3    by SR Suntour." You just testified you don't have any

4    such familiarity with the production of bicycle forks.

5    Correct?

6    A.          That's correct.

7    Q.          Whether manufactured by SR Suntour or

8    anybody else.

9    A.          That's correct.

10   Q.          Correct? And in paragraph 4, he indicates

11   that the Duo Track 7006 model fork was designed and

12   manufactured using a mechanical bond fit to secure the

13   steel steerer tube to the aluminum alloy fork crown.

14   That's your understanding as to what happened in this

15   case?

16   A.          Yes.

17   Q.          Okay. I mean did you make a determination

18   that the alloy used in the fork crown was in fact that

19   metal that he indicates in there?

20   A.          Well, just from visually looking at it, it

21   looked like an aluminum alloy.

22   Q.          But you didn't do any further testing

23   other --

24   A.          No, I did not.

25   Q.          -- than eyeballing it? Okay. And then

R. Hinton/Lopata                                                22

1    paragraph Number 5, he talks about the industry

2    standards there.  It's -- my understanding is you

3    don't have knowledge of the industry standards one way

4    or the other to indicate whether or not Mr. Tanaka's

5    statement is true or not true, is that correct?

6    A.          Number 5?

7    Q.          Yeah, Number 5.

8    A.          He's saying "and it still is within the

9    industry standard to design a fork using a mechanical

10   bond fit to secure a steel steerer tube into a

11   aluminum alloy fork crown.  This is one of multiple

12   acceptable designs for a bicycle fork component."

13                No, I don't have the background to

14   say whether that's normally done or whether this is an

15   unusual case.

16   Q.          And Number 6, paragraph Number 6 of his

17   affidavit.  He's indicating that Suntours manufactured

18   8,000,000 forks using the same mechanical bond fit as

19   that used for the Duo Track 7006 model, and none have

20   been the subject of safety recall or demonstrated a

21   history of fork failure or fork crown/steerer tube

22   separations.

23                Do you have any knowledge at all

24   that would refute that statement he's making in that

25   affidavit?

1    A.          No, I do not.

2    Q.          Are you aware of any other Duo Track 7006

3    model becoming separated as you allege happened in

4    this case?

5    A.          No.

6    Q.          Sir, with regard to your opinions in this

7    case, if in fact you are correct that putting a steel

8    steering tube into an aluminum fork crown would not

9    make a good fit because of the various problems that

10   you just indicated, wouldn't there have been numerous

11   other failures?

12   A.          That I don't know.  I've not done any

13   testing as to the actual strength of the fit, neither

14   in torsion or tension.  So I really don't have direct

15   knowledge from testing the joint as to what the real

16   joint strength is.

17   Q.          Wouldn't you as a scientist want to have

18   that information before you criticize this particular

19   combination of steel and aluminum the way it was done?

20   A.          One of the reasons I would not think a ---

21   number one, there's no way you can test the failed

22   bicycle strength because that is loose to touch and to

23   the hand.  So that's certainly out of the question to

24   reconstruct the conditions before the steerer tube

25   came off its surface.

1   from -- from Jesse in the deposition.  He described

2   what he saw.  I think he was --

3   Q.          When he was doing the bunny hop, when

4   Mr. Lockwood was doing the bunny hop he pulled up on

5   the handlebars?

6   A.          Yeah.  I believe Jesse's deposition

7   indicated, you know, it just came up.  I mean that's a

8   straight pull-out, from that description.  Which

9   shouldn't leave you with any major -- you know, unless

10  this was loose to begin with.

11  Q.          So what you're indicating, if I understand

12  what you're saying, is that this joining of these two

13  component parts had been loosened or disjointed before

14  he actually pulled up on the bicycle on the day of the

15  accident?

16  A.          That would be my guess.

17  Q.          We don't want you to guess.

18  A.          That something would have broken -- that's

19  only a guess.  Yeah.  It's not based on -- again you'd

20  have to do a lot of testing in order to really come to

21  the final conditions of whether or not normal use

22  would break this joint apart.

23  Q.          Or any abuse to the bicycle between the

24  time he purchased the bicycle in May 7th -- or May

25  1997 up until June '99?

R. Hinton/Lopata

56

1    A.        To me the bunny hop, which is a slight

2    hop, only puts you up a small amount in height.  Now,

3    I actually made a calculation a long time ago on a

4    bike pedal?  And the man was 265 pounds, a policeman,

5    in which the bike failed, and he was injured.  And

6    there he jumped from 2 feet.  And I was able to

7    calculate the actual force on the pedal because it was

8    bent.  And there I did hardness and destructive

9    testing and so forth.

10              But 2 feet and a few inches for a

11   bunny hop are far different in terms of the amount of

12   force coming back down.  It's probably a lot more

13   force if you hit a curb because -- and again it

14   depends now on your weight, speed, and other factors,

15   compared to jumping over something.

16   Q.        So your opinions on -- concerning this

17   accident depends on the fact that the bike was not

18   abused in any way that would have affected the bonding

19   of the fork?  Prior to the date of the accident, June

20   9th, 1999.  Correct?

21   A.        Well, again I don't have the numbers to

22   back up an opinion on that.  But I think the -- one of

23   two things could be occurring here.  One is you have a

24   joint that's right on the borderline of normal use

25   breakage.  That would be one possibility.

1          The other possibility is you have a

2   joint much stronger than anything that you can do to

3   it in normal use and you had an event somewhere along

4   the way that may have broken that joint.  And it could

5   have been an event that nobody really noticed or knew

6   about.  And once the joint is broken, then normal use

7   can really make that wear slightly and separation

8   would occur.

9   Q.          So either one of those possibilities are

10  equally possible?

11  A.          Yes.  I don't have a firm opinion because

12  I don't have the -- either the background or the

13  measurements.

14  Q.          So it could be either way, you just can't

15  tell?

16  A.          Yes.

17  Q.          So then as far as your summary is

18  concerned on page 2, "The press-fit and/or the thermal

19  interference fit between the thin-walled hollow

20  steerer tube and the nonferrous fork crown of the

21  bicycle in question is inadequate, unsafe;" you can't

22  really say that, can you, because you don't have the

23  facts, because you don't know what the strength was?

24  A.          Let's see.  Where is that.

25  Q.          In summary.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

NORTHERN DIVISION

WILLIAM LOCKWOOD,    : Civil Action No.: WMN-02-CV-2068
      Plaintiff    :
                :
    vs.        :
                :
PACIFIC CYCLE, LLC    :
and TOYS "R" US-    :
DELAWARE, INC.,    :
      Third-Party  :
      Plaintiffs    :
                :
    vs.        :
                :
SR SUNTOUR, INC. and :
SR SUNTOUR, USA,    :
      Third-Party  :
      Defendants    :

**ORIGINAL**

DEPOSITION OF JOHN D. SCHUBERT

      Taken in the offices of Gallagher

Reporting & Video, LLC, 33 South Seventh Street, Suite

105, Allentown, Pennsylvania, on Friday, April 11,

2003, commencing at 1:10 p.m., before Steven R. Mack,

Registered Merit Reporter.

* * *
GALLAGHER REPORTING & VIDEO, LLC.
33 South Seventh Street, Suite 105
Allentown, Pennsylvania 18101
1-800-366-2980 -- (610) 439-0504

DEFENDANT'S
EXHIBIT
D

1           And then when suspension forks came

2     along, all of a sudden there was a rash of recalls

3     which I would attribute to a severely shortened

4     product development cycle.  The bike companies have

5     imposed on themselves a mad rush to keep redesigning

6     things.  And occasionally problems slip between the

7     cracks, and the number of recalls is indicative of

8     that.

9     Q.         But you're not aware of any recalls

10    dealing with the fork in question, the Duo 7006?

11    A.         That's correct, I am not.

12    Q.         And you don't -- you don't have any facts

13    to refute the affidavit submitted in this case by

14    Mr. Tanaka?

15    A.         That's correct, I do not.

16    Q.         So in paragraph 6 of his affidavit,

17    Mr. Tanaka says, states under oath, "SR Suntour has

18    manufactured 8,000,000 forks using the same mechanical

19    bond fit as that used for the SR Suntour Duo Track

20    7006 model, and none have been the subject of safety

21    recall or demonstrated a history of fork failure or

22    fork crown/steerer tube joint separations."

23           You don't have any information that

24    would refute that, do you?

25    A.         Well, they've got a history now, with this

1    one instance.  But other than that, no, I don't.

2    Q.           No.  But at the time the bicycle was put

3    in the stream of commerce back in May of 1997, based

4    on the history as indicated by Mr. Tanaka, there isn't

5    any way that he or you or anybody else could have

6    foreseen that a separation such as you indicated

7    occurred in this case could occur?

8                      MR. SMITH:  Well, objection.

9    Q.           Is that correct?

10                     MR. SMITH:  Go ahead.

11                     THE WITNESS:  I'm sorry.  What's the

12   objection?

13                     MR. SMITH:  I just made an

14   objection.  It contains an assumption.  But you don't

15   have to worry about it.

16                     THE WITNESS:  I'm sorry.  Can you

17   read back the question?

18                     (Thereupon the reporter read the

19   previous question from the record.)

20                     THE WITNESS:  The answer to that

21   would again depend on a more thorough review of that

22   joining method.  I'm not privy to Suntour's testing.

23   And I'm certainly not privy to the company's field

24   experience with this product.

25                     But other than the -- than those

J. Schubert/Lopata                                66

1    comments I've just raised, no, I don't have any such

2    information.

3    BY MR. LOPATA:

4    Q.          Now, you also indicate in the top of page

5    2 "Alternative designs for steerer tube/fork crown

6    junction with a far superior safety record" existed?

7    Where are you getting your in -- what's the source of

8    your information?  We're going back to May of 1997.

9    What information do you have that there were far

10   superior safety records?

11   A.          The fact that we don't see any failures,

12   not even rare failures, in the standard brazed and

13   welded configurations, or I've never seen any I should

14   say.

15   Q.          Are you finished?

16   A.          Yeah.

17   Q.          Oh, okay.

18   A.          Sorry.

19   Q.          In this case Mr. Tanaka indicates that

20   they manufactured 8 million forks using the same

21   mechanical bond fit, and they never had a failure on

22   a --

23                    MR. SMITH:  Objection.  He doesn't

24   say that.

25                    MR. LOPATA:  He does.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION
CIVIL ACTION NO.:  WMN-02-CV-2068

WILLIAM LOCKWOOD,                    )
          Plaintiff,                 )
               v.                    )
                                     )
PACIFIC CYCLE, LLC, AND TOYS "R"     )
US-DELAWARE, INC.,                   )
          Third-Party Plaintiffs,    )     DEPOSITION OF:
                                     )     JAMES M. GREEN
               v.                    )
                                     )
SR SUNTOUR, INC., AND SR SUNTOUR,    )
USA,                                 )
          Third-Party Defendants.    )
                                     )

**COPY**

On Monday, April, 14, 2003, commencing at 1:05 p.m.,

the deposition of JAMES M. GREEN was taken on behalf of the

Defendant at the offices of Asheville Reporting Service, 66 N.

Market Street, Asheville, North Carolina, and was attended by

Counsel as follows:


APPEARANCES:


          MICHAEL P. SMITH, ESQ.
          Salsbury, Clements, Bekman,
          Marder & Adkins, LLC
          300 W. Pratt Street, Suite 450
          Baltimore, Maryland  21201
          on behalf of the Plaintiff,


          EDWARD J. LOPATA, ESQ.
          Tydings & Rosenberg, LLP
          100 East Pratt Street
          Baltimore, Maryland  21202
          on behalf of the Defendants.


REPORTED BY:  Rebecca A. Geldres, CVR
              ASHEVILLE REPORTING SERVICE



DEFENDANT'S
EXHIBIT
E

19

1           the fork crown?

2    A     Yes.

3    Q     And you said that was a manufacturing defect?

4    A     Correct.

5    Q     What facts are you relying on to support your

6           conclusion that this should have had a weld?

7    A     What facts am I relying on?

8    Q     Yes.

9    A     Well, I'm not relying on facts as much as I am

10          engineering standards, in that when you design

11          anything, whether it's a front fork and a

12          steer tube or a bridge, you should have -- you

13          need to have redundancy built into the system

14          so that you don't have failure.  You can't

15          rely on one -- one system or one design.  You

16          need to have -- you need to have redundancy

17          built into the design to protect the public,

18          regardless of what you're designing.

19   Q     So it being your opinion in your letter here,

20          when you indicate that there should have been

21          a weld in place and you didn't see any, are

22          you aware of any bicycle standards that would

23          require a mechanical fit to be welded?

24   A     Oh, there are none, as I said earlier.  I'm

25          speaking as a -- as an engineer basically

24

1        has never had a recall on this front fork?

2    A   Well, I don't know if they have or haven't.

3        If you're telling me that they haven't, I'll

4        assume they haven't.

5    Q   But you don't have any knowledge whether they

6        have or have not?

7    A   I don't have any knowledge that they have or

8        have not had a recall.  I mean, if you're

9        telling me that they haven't, I'll assume

10       you're an honorable man; I'll assume they

11       haven't.

12    Q   Well, I have an affidavit here from Mr.

13       Tanaka, which I assume you've seen; haven't

14       you?

15    A   Yes.

16    Q   And he indicates that SR Suntour has

17       manufactured like eight million of these forks

18       using the same mechanical bond fit, and it has

19       not been the subject of a safety recall nor

20       has it demonstrated a history of fork failure

21       or fork crown-steer tube joint separations.

22       Do you have any knowledge, any facts from

23       anything that would refute Mr. Tanaka's, as

24       far as Paragraph No. 6 is concerned in his

25       affidavit?

25

1    A    Okay.  For the record here, is it Defendant's

2         Exhibit 7 in the record here today?

3    BY MR. LOPATA:

4         No, it was ---

5    BY MR. SMITH:

6         I thought No. 7 was Pacific Cycle's Opposition

7         to Motion for Summary Judgment.

8    BY MR. LOPATA:

9         Everybody knows what it is, I guess.

10   BY THE DEPONENT:

11        Well, I don't want to -- I don't want to

12        be ---

13   BY MR. LOPATA:

14        All right.  Then we'll make that Exhibit 7.

15        How's that?

16   BY THE DEPONENT:

17        All right.  Can we get a stamp?

18   BY MR. LOPATA:

19        Yes, we'll put Exhibit 7.

20   (DEFENDANT'S DEPOSITION EXHIBIT NO. 7 MARKED)

21   BY THE DEPONENT:

22        Because when I read the depo, I'll never find

23        an exhibit to go with it.  Okay.  I know your

24        question.  Okay.  My answer to you, looking at

25        Defendant's Exhibit 7, and it was number ---

26

| 1 | DIRECT EXAMINATION RESUMED BY MR. LOPATA: |
|---|---|
| 2 | Q    Paragraph 6. |
| 3 | A    Paragraph 6, thank you, of that exhibit.  I |
| 4 |      don't believe him.  I don't believe that if |
| 5 |      you have eight million forks using the bond |
| 6 |      fit, mechanical bond fit that we're looking at |
| 7 |      in this project, that you've never had a |
| 8 |      failure.  I think this is an unsafe design. |
| 9 |      It's an unsafe fit.  I don't believe Mr. |
| 10 |      Tanaka.  if there has been eight million of |
| 11 |      these forks out there and none of them have |
| 12 |      failed, I would be astounded, as an engineer |
| 13 |      sitting here today.  So I don't think what |
| 14 |      he's saying is correct.  He may not personally |
| 15 |      be aware of a failure, but I guarantee you, as |
| 16 |      an engineer, as a professional engineer that's |
| 17 |      been dealing in these issues for years, if you |
| 18 |      have eight million of these things out there |
| 19 |      with a mechanical bond fit, no redundancy, and |
| 20 |      that there hasn't been a failure, I can't |
| 21 |      believe it. |
| 22 | Q    I assume that you will admit that you could be |
| 23 |      wrong about things? |
| 24 | A    Well, nobody's perfect.  Nobody's perfect. |
| 25 | Q    And so my question to you, do you have any |

27

1   information, any facts, other than a belief

2   that you may hold, to refute Paragraph 6 of

3   the affidavit?

4   A   No.

5   Q   Now with regard to, I believe it's Paragraph 5

6   -- let me see it for just a second.

7   A   Make sure you're right because ---

8   Q   I'm just relying on his affidavit.

9   A   No, I mean on the defendant's exhibit because

10  -- the number.  I'm pressuring about that

11  because I can never follow stuff, you know,

12  two weeks from now, if I can't get back to the

13  exhibit number.

14  Q   Okay.  In dealing with Defendant's Exhibit No.

15  7, which is the affidavit in question, with

16  regard to Paragraphs 4 and 5, this says that

17  as far as manufacturing these component parts,

18  it was within the industry standards to have a

19  mechanical fit, such as they used on Duo Track

20  7006.

21  A   I don't think it's within industry standards

22  to have a mechanical bond such as we're

23  dealing with here, without something to back

24  it up like a weld or some type of glue/epoxy,

25  at a minimum.

30

1       without an epoxy, without a weld.

2   A   And he's saying that's an industry standard?

3   Q   And he's saying that's an industry standard.

4       That's what I was asking about, whether or not

5       you have any experience in the industry.  Are

6       you involved and have you ever been involved

7       in the manufacturing of these types of

8       components?

9   A   No.  I don't -- I'm not involved in the

10      manufacturing end.  I get hired as a

11      consultant a lot, but I don't -- or a

12      consultant engineer, but I'm not involved as a

13      manufacturer.  I'm not a manufacturer.

14  Q   What about designing crown forks and steering

15      tubes going into crown forks?

16  A   Have I ever designed any?  I'm sure that I

17      have.  I can't -- I can't sit here today and

18      tell you specifically a design that I could

19      hand you, you know, when you get back to your

20      office.  I've been involved in these issues

21      for a lot of years.  In terms of design, the

22      integrity of front forks has been a concern of

23      mine for a number of years and I've done a lot

24      of testing in that area and I'll be glad to

25      share that with you today.  Have I sat down

# STRUCTURE PROBE®

### SPECIALISTS IN MATERIALS RESEARCH

569 East Gay Street, P.O. Box 656, West Chester, PA 19381-0656 USA
1-610-436-5400 • FAX: 1-610-436-5755 • E-mail: spi2spi@2spi.com
Website: www.2spi.com

15 April 2003

Mr. Edward J. Lopata, Esq.
Tydings & Rosenberg LLP
100 East Pratt Street
Baltimore, MD 21202

Re: Lockwood v. Pacific Cycle, et al.

Dear Mr. Lopata:

This letter will constitute my preliminary report in this matter. At your request I have examined the bicycle at issue and reviewed documents including expert reports, expert credentials, bicycle owner's manuals, deposition transcripts, pleadings, photographs of the bicycle and a bicycle repair invoice.

Background:

According to the available materials, the bicycle at issue was produced by Pacific Cycle, purchased at Toys R Us in 1997, repaired in 1998 and involved in an accident in which William Lockwood was injured in 1999. The alleged cause of the accident was the separation of the steering tube from the fork crown while Mr. Lockwood was executing a "bunny hop" maneuver over a manhole cover.


In Canada:
Box 187, Postal Station "T", Toronto, Ontario, M6B 4A1 • 1-800-668-2028 • Fax 1-416-781-0249

STRUCTURE PROBE is a registered trademark of Structure Probe, Inc.


DEFENDANT'S
EXHIBIT
F

Mr. Edward J. Lopata, Esq.                              Page 2
Tydings & Rosenberg LLP                          15 April 2003

Examination:

The bicycle was examined visually under room lighting
conditions in Baltimore, MD on 10 April 2003. The
appearance of the bicycle is consistent with the
photographs which have been obtained by others. The bicycle
has been disassembled, and it is obviously not in the same
condition as it was immediately following the accident. In
particular, the steerer tube is loose in the frame,
suggesting that someone has removed the steerer tube for
inspection and not retightened the connection. The record
indicates that the bicycle has been shipped at least once
in the box in which it was being stored at the time of the
examination.

Several areas of the bicycle show evidence of very heavy
use and repeated contact with pavement or other hard,
abrasive materials. The ends of the handlebars are deformed
in a manner which is consistent with many such impacts.
Some components, such as the seat and the rear wheel,
appear to be relatively recent replacements. The fork crown
has separated from the steerer tube. The steerer tube has
striations in the joint area, and there is very little
evidence of deformation on the steerer tube; there is one
area which may represent some deformation during final
separation and/or impact with a hard surface following the
final separation. There are indications that the bicycle
saw considerable use with the rear wheel either bent or
misaligned so that it rubbed on the frame.

The joint area of the fork crown exhibits two different
appearances. In the lower portion, there are essentially
undisturbed striations which would appear to correspond
with the striations on the steerer tube. On the upper
portion, the metal is smeared, consistent with repeated
motion of the fork crown relative to the steerer tube. This
damage is not consistent with a single, final separation
event; rather, it is consistent with continued looseness of
the joint between the steerer tube and the fork crown over
a long period of use.

Mr. Edward J. Lopata, Esq.                              Page 3
Tydings & Rosenberg LLP                            15 April 2003

Analysis:

The record indicates that the bicycle at issue was designed
with three major objectives in mind:

1. To appeal to the customer as a "mountain bike" type
   bicycle.

2. To sell at Toys R Us for approximately $150.00.

3. To meet all applicable regulations.

The record also indicates that the bicycle at issue was not
designed for aggressive off-road riding and that it was not
designed for stunt riding. The record is not clear whether
the bicycle at issue was designed to "bunny hop" over a
manhole cover when ridden by a person weighing 180 pounds.

The design process which was used included several parties:
Toys R Us set the overall objectives; Pacific Cycle turned
those objectives into design specifics; China Bicycle
Company designed a bicycle to meet all of the applicable
objectives, selecting from among off-the-shelf components
manufactured by several companies, including SR Suntour.
The crown fork assembly which was selected by Pacific Cycle
was produced by SR Suntour.

The design used by SR Suntour for this particular crown
fork assembly uses a steel steerer tube and a nonferrous
fork crown; these components are joined together by a
process described as thermal bonding. The record does not
indicate precisely how this thermal bonding is accomplished
in practice; it is assumed that the aluminum is heated
and/or that the steel is cooled, but details are not
available at this time. The resistance to relative motion
between the steerer tube and the fork crown is aided by the
presence of striations on the steerer tube which
effectively lock the steerer tube into place in the fork
crown. The condition of the joint portion of the fork crown
is consistent with loosening of the joint and repeated
rotary motion of the steerer tube in the fork crown. By all
indications, the separation of the steerer tube and the
fork crown was a progressive event and not a sudden
failure.

Mr. Edward J. Lopata, Esq.                                    Page 4
Tydings & Rosenberg LLP                                  15 April 2003

The record indicates that Mr. Lockwood noticed a looseness
somewhere in the steering mechanism of the bicycle during
1998, the bicycle was taken to a bicycle mechanic and
repairs were made to the bicycle at that time. The record
does not indicate whether this looseness was the observed
looseness of the steerer tube in the frame, a warning of
the progressive failure in process or the often experienced
looseness of the joint between the steerer tube and the
handlebars.

It has been suggested that the integrity of the joint
between the steerer tube and the fork crown would be
improved by the use of welding and/or adhesive bonding. In
practice the welding of steel to nonferrous metals is
difficult to accomplish. Adhesive bonding might have added
a small amount to the mechanical strength provided by the
striations and the thermal bonding process, but at the time
of the accident the joint had clearly failed to the point
where the steerer tube was able to move within the fork
crown; even in this failed condition, the bicycle continued
to function until Mr. Lockwood's "bunny hop" maneuver.

The record indicates that the design of the crown fork
assembly probably met the established objectives of price,
appearance and performance at the time that the crown fork
assembly left the control of SR Suntour and, indeed, the
control of China Bicycle Company, Pacific Cycle and/or Toys
R Us. After the bicycle left the control of these parties,
it was subjected to considerable abuse, and as a result of
that abuse, the connection between the steerer tube and the
fork crown was separated, ultimately leading to the
accident.

Mr. Edward J. Lopata, Esq.                                    Page 5
Tydings & Rosenberg LLP                                  15 April 2003

Conclusions:

1. The crown fork assembly was designed and manufactured to
   meet the established objectives for the bicycle of
   price, appearance and performance.

2. The crown fork assembly failed as the result of abuse of
   the bicycle.

3. Despite the separation of the joint of the crown fork
   assembly, the joint continued to provide support and
   steering control of the bicycle until the "bunny hop"
   maneuver was attempted.

Obviously, as discovery continues in this matter, it may be
necessary to modify or expand on these conclusions. Please
let us know if we may be of further assistance with this or
any other materials problem.

                              Sincerely,

                              Andrew W. Blackwood, Ph.D.
                              Vice President, Technical

AWB:fo

Work No.: B1387
Inv. No.: 35681