## Page 1

```
(1)         IN THE UNITED STATES DISTRICT COURT
(2)            FOR THE DISTRICT OF MARYLAND
(3)                   NORTHERN DIVISION
(4)
(5) WILLIAM LOCKWOOD,    : Civil Action No.: WMN-02-CV-2068
            Plaintiff   :
(6)                     :
            vs.         :
(7)                     :
    PACIFIC CYCLE, LLC  :
(8) and TOYS "R" US-    :
    DELAWARE, INC.,     :
(9)     Third-Party     :
        Defendants      :
(10)                    :
            vs.         :
(11)                    :
    SR SUNTOUR, INC. and :
(12) SR SUNTOUR, USA,   :
        Third-Party     :
(13)    Plaintiffs      :
(14)
(15)        DEPOSITION OF ROBERT W. HINTON
(16)
(17)        Taken in the offices of Gallagher
(18) Reporting & Video, LLC, 33 South Seventh Street, Suite
(19) 105, Allentown, Pennsylvania, on Friday, April 11,
(20) 2003, commencing at 4:22 p.m., before Steven R. Mack,
(21) Registered Merit Reporter.
(22)
(23)                    * * *
             GALLAGHER REPORTING & VIDEO, LLC.
(24)         33 South Seventh Street, Suite 105
             Allentown, Pennsylvania 18101
(25)         1-800-366-2980 -- (610) 439-0504
```

## Page 2

```
(1)
     APPEARANCES:
(2)
         SALSBURY, CLEMENTS, BEKMAN,
(3)      MARDER & ADKINS, L.L.C.
         By: MICHAEL P. SMITH, ESQ.
(4)      300 West Pratt Street
         Suite 450
(5)      Baltimore, MD 21201
         -- For the Plaintiff
(6)
         TYDINGS & ROSENBERG, LLP
(7)      By: EDWARD J. LOPATA, ESQ.
         100 East Pratt Street
(8)      26th Floor
         Baltimore, MD 21202
(9)      -- For Third-Party Defendants
(10)
...
(23)                  * * *
         GALLAGHER REPORTING & VIDEO, LLC.
(24)     33 South Seventh Street, Suite 105
         Allentown, Pennsylvania 18101
(25)     1-800-366-2980 -- (610) 439-0504
```

## Page 3

```
(1)
(2)
(3)              INDEX TO WITNESSES
(4)   Witness                              Page
(5)   R. Hinton
(6)      By Mr. Lopata                     4
         By Mr. Smith                      59
(7)      By Mr. Lopata                     62
         By Mr. Smith                      62
(8)
(9)              INDEX TO EXHIBITS
(10)  Hinton
      Exhibit   Description                Page
(11)
      1   Notice To Take Deposition Duces
(12)      Tecum of Robert Hinton           4
(13)  2   Mr. Hinton's report dated 8/20/02  27
```

PLAINTIFF'S EXHIBIT K

## Page 4

```
(1)         (Hinton Exhibit Numbers 1 and 2 were
(2) marked for identification.)
(3)                    * * *
(4)         ROBERT W. HINTON, having been duly
(5) sworn, was examined and testified as follows:
(6)                 EXAMINATION
(7) BY MR. LOPATA:
(8) Q.   Sir, my name is Ed Lopata, and I represent
(9) the Third-Party Defendants in this case, Suntours,
(10) USA, also known as USUL, and Suntour, Inc., from
(11) Taiwan. And we're here to take your deposition
(12) because you were lucky enough to be retained by
(13) Mr. Smith to give an opinion in the Lockwood
(14) litigation. And I'm going to ask you some questions
(15) regarding your report and regarding this case.
(16)        Any questions I ask you, if you
(17) could answer yes or no and verbalize your responses.
(18) Otherwise we'd appreciate it because the court
(19) reporter has to take down everything we say. So don't
(20) moan and groan, just say yes or no if you can or just
(21) respond to the question. We're going to assume if you
(22) respond to one of my questions you completely
(23) understood the question.
(24)        State your name, sir.
(25) A.   Robert W. Hinton.
```

### Page 9

(1) date you went over and looked at it or?
(2) A. I'm not really sure of the date. It was
(3) obviously before August of 2002, but I'm not sure of
(4) when.
(5) Q. All right. Do you have any written
(6) materials at all concerning your investigation and
(7) inspection of this bicycle?
(8) A. I have -- let me just show you my file. I
(9) have a file which is mainly a record of my
(10) correspondence with Mr. Smith. And I have some
(11) additional information that he had sent to me. And
(12) then also some information such as my CV that
(13) Mr. Smith had asked for. I have an article that John
(14) Schubert wrote about why front forks bend. And I have
(15) a very recent entry concerning a statement.
(16) Q. The affidavit?
(17) A. Yeah, an affidavit by Tanaka. The only --
(18) the only engineering type thing that I might have in
(19) this whole thing would be just a few estimates that I
(20) made concerning the differences in elastic moduli of
(21) the two materials and also the thermal expansion
(22) coefficients of the two materials.
(23) Q. Okay. We'll look at that.
(24) A. And then I have a second file that's very
(25) recent of just depositions or transcripts that were

### Page 10

(1) submitted to me by Mr. Smith. And again that involves
(2) documents and deposition transcripts.
(3) Q. That material was provided to you
(4) subsequent to your August 20th, 2002, report?
(5) A. No. I first saw this just a few days ago
(6) I believe.
(7)     MR. SMITH: Yeah. After your report
(8) in other words.
(9) A. Oh, yes, after the report.
(10) Q. What precisely were you asked to do by
(11) either Mr. Schubert or by Plaintiff's counsel? As far
(12) as your involvement in this litigation is concerned.
(13) A. By Plaintiff's counsel I was asked to
(14) render an opinion concerning why the -- the mechanical
(15) contact fit between the steering tube and the crown
(16) fork separated.
(17) Q. And what was your response to their
(18) inquiry?
(19) A. Well, the report pretty much outlines my
(20) response to the -- to the reason, at least why I think
(21) there was a separation.
(22) Q. And precisely why was there a separation?
(23) A. Well, it's a mechanically -- it's a
(24) mechanical fit, which is in -- from my understanding a
(25) force fit, between the steering tube which is slightly

### Page 11

(1) oversize and the -- and that's a steel, thin-walled
(2) steel steering tube, and the -- the fork crown is
(3) actually an aluminum alloy. And that's undersize. In
(4) order to make the mechanical fit, the two are in
(5) manufacture pushed together to create a mechanical
(6) bond.
(7)     The reason I think that we had
(8) separation of those two components, in what appears to
(9) be normal service of the bicycle, normal use of the
(10) bicycle, was the steel tube has a fairly high elastic
(11) modulus, it's an elastic stretching condition, and the
(12) aluminum alloy has a relatively low elastic modulus.
(13)     When you're trying to create a
(14) mechanical interference fit, the actual stretching,
(15) elasticity of the material is very important. The
(16) fact that the aluminum has such a low, relatively low
(17) elastic modulus, it's about one-third that of steel,
(18) would allow already a loss of about two-thirds of the
(19) normal bond strength that you would get with a
(20) steel-to-steel interference mechanical fit.
(21)     There are other conditions -- and it
(22) depends a great deal on the strength of the wall. And
(23) this was a relatively thin wall, for the steering
(24) tube.
(25)     And also there's some influence of

### Page 12

(1) temperature. In other words if you put -- if you
(2) force this together at let's say 65 degrees in a shop
(3) and you may be using the bicycle at let's say an
(4) 85-degree day, or the sun shines on it and makes it
(5) even hotter, then you lose even some of that
(6) mechanical interference fit because the aluminum
(7) thermal expansion is actually about three times higher
(8) than the steel thermal expansion.
(9)     So there's a number of reasons that
(10) from an engineering point of view I feel this was a
(11) relatively weak mechanical fit, that was also subject
(12) to deterioration during normal use.
(13) Q. So that mechanical fit with a steel
(14) steerer tube going into an aluminum fork crown, crown
(15) fork, whatever you want to call it, you're saying that
(16) would be a defective design to do it that way?
(17) A. Yeah. The choice of the material
(18) certainly would be a very poor choice. The
(19) interference fit by itself is also not a good choice
(20) simply because in making an interference fit the
(21) machine difference between the smaller internal size
(22) and the large -- and the oversize steering tube is
(23) only on the order of probably one-thousandths of an
(24) inch. Maybe slightly more than that.
(25)     But that means that your accuracy in

### Page 13

(1) machining, if you're off by two-ten-thousandths of an
(2) inch in either one, you can actually greatly influence
(3) the mechanical bond. Because you're losing --
(4) especially if for example the interior is slightly
(5) over the specification size or the steering tube is
(6) slightly undersize.
(7) You're only dealing with on the
(8) order of about a thousandth of an inch. An
(9) interference fit normally is made to about
(10) one-thousandth per inch of diameter. That's the
(11) normal engineering rule.
(12) Q. Well, are you questioning the diameter of
(13) the steering tube and the crown fork?
(14) A. Well, all I'm saying is --
(15) Q. Or also are you questioning the fact that
(16) they're using dissimilar metals?
(17) A. Well, two problems. The dissimilar metal
(18) reduces your mechanical bond strength by about
(19) two-thirds of what it may be with a steel-to-steel
(20) interference fit. So there's a great loss just in the
(21) choice of the metal, in the fact that you have an
(22) aluminum alloy on the outside and a steel on the
(23) inside.
(24) The thin-wall tube actually further
(25) reduces the ability to get a mechanical fit because of

### Page 14

(1) the -- you're losing some stiffness of the tube, in
(2) addition to the modulus.
(3) And all I'm saying is that in a
(4) purely interference fit, you can only work with about
(5) one-thousandths of an inch difference between the
(6) undersize aluminum and the oversize tube. And if
(7) there's a slight error in machining that diameter,
(8) such as two-ten-thousandths, you lose a substantial
(9) amount of your strength.
(10) Q. All right. But you're not aware of
(11) anything in this case that there was an error as far
(12) as the diameter?
(13) A. No. There's no way at this point to
(14) measure the diameters because again there's a great
(15) deal of wear, slippage, metal smear. And so a
(16) measurement at this point would not be very
(17) significant. The measurement would have to be taken
(18) prior to the interference fit when -- during
(19) manufacture.
(20) Q. So if that's true, how could you say with
(21) a reasonable degree of engineering certainty that the
(22) separation occurred as a result of an error being made
(23) as far as the diameter of the materials used?
(24) A. Well, I'm saying there are two things that
(25) are add -- that are additive. One is the choice of

### Page 15

(1) materials reduces your bond strength by a factor of
(2) two-thirds. And that's a major factor. In other
(3) words you're not dealing with a great deal of extra
(4) strength to begin with of this press fit or mechanical
(5) fit condition. And a very slight machining error
(6) would actually reduce that strength even further.
(7) Q. But you don't have any evidence of a
(8) machining error?
(9) A. No. I can't really measure -- that's
(10) true. I can't make a measurement on what's left
(11) because the actual fit now is loose. It's -- you can
(12) take it apart, put it together and -- which indicates
(13) to me that the small amount of interference that was
(14) in the material, when it actually broke the bond and
(15) came apart, is gone. There's really nothing left to
(16) that interference, because it's now a loose fit -- a
(17) loose fit.
(18) Q. Okay. But I was just going to your
(19) testimony that it could have been because of some
(20) error being made as far as the diameter in like the
(21) milling process or whatever you want to call it.
(22) A. In the machining. Yeah. It's very
(23) difficult to maintain two-ten-thousandths of an inch
(24) in machining tolerance.
(25) Q. Yeah. But in this case you don't know

### Page 16

(1) whether that's true or not?
(2) A. No. In just general terminology that in
(3) machining it is difficult to maintain a tolerance of
(4) two-ten-thousandths of an inch.
(5) Q. Now, you talked about a mechanical fit.
(6) Correct?
(7) A. Yes.
(8) Q. Okay. And do you know the methodology
(9) that was used to make the mechanical fit in this case?
(10) A. No. There are only two possible ways. I
(11) saw no evidence at all of any adhesive in the -- in
(12) the joint. So I'm assuming it's a mechanical fit that
(13) can either be a press fit, where you just mechanically
(14) press it together, or the alternative to that is a
(15) thermal expansion where you actually thermally expand
(16) the crown fork, by heating it.
(17) Q. Okay. Would you explain the difference
(18) between the two of what's trying to be achieved?
(19) A. Well, in a thermal fit you actually grow
(20) the diameter of -- the outside diameter through
(21) increase in temperature. Because steel or alloys,
(22) aluminum alloy in this case, would actually grow in
(23) size with temperature. Very slightly, but it's enough
(24) to make it another half-thousandths or even a
(25) thousandths if the temperature's high enough.

### Page 57

The other possibility is you have a joint much stronger than anything that you can do to it in normal use and you had an event somewhere along the way that may have broken that joint. And it could have been an event that nobody really noticed or knew about. And once the joint is broken, then normal use can really make that wear slightly and separation would occur.

Q. So either one of those possibilities are equally possible?

A. Yes. I don't have a firm opinion because I don't have the -- either the background or the measurements.

Q. So it could be either way, you just can't tell?

A. Yes.

Q. So then as far as your summary is concerned on page 2, "The press-fit and/or the thermal interference fit between the thin-walled hollow steerer tube and the nonferrous fork crown of the bicycle in question is inadequate, unsafe;" you can't really say that, can you, because you don't have the facts, because you don't know what the strength was?

A. Let's see. Where is that.

Q. In summary.

### Page 58

A. Summary. Oh, in summary. Well -- okay. It's certainly in question -- I strongly believe that type of mechanical joint could be inadequate.

Q. I understand.

A. So "is" probably is not the right word.

Q. So you're saying it's possible?

A. It's possible.

Q. But you can't say it's probable?

A. I think that type of joint is unsafe because there is no real safety. Once it's broken, it's really on the road to separation. And it cannot be retightened or inspected. And that's true probably of any joint that may be put there. But most joints, if they're welded, brazed, or even bonded with an adhesive, are probably a higher quality, higher strength joint than what we're dealing with here.

Q. But you're not aware of any industry standards in May of 1997 that called for if a fit has been broken, that it should be able to be retightened or inspected. You're not aware of any?

A. No. All the joints I'm aware of are once-and-done manufactured joints.

Q. And once --

A. So that's true. They cannot be retightened.

### Page 59

Q. And they can't be inspected because of where they are when you're looking at them?

A. That's correct, yes.

Q. The only way you can tell is if you actually did a test for that specific purpose?

A. Well, again the test would be a destructive pull test or a torque test. But it's not a functional test.

MR. LOPATA:   Thank you.

MR. SMITH:   I actually have some questions.

* * *

EXAMINATION

BY MR. SMITH:

Q. The bond in this case broke?

A. Yes.

Q. Now, if a bond in a bicycle like this which is hidden breaks through normal and expected use, that would be a defect?

A. Yes.

MR. LOPATA:   Objection.

Q. Now, what you're saying is because no information has been supplied to you by the manufacturer, who deals directly with the fork manufacturer so should be able to get the information,

### Page 60

they have been unable to get that to you, you have been unable to test any of your hypotheses but based on your knowledge of engineering principles and the attachments that you had, this particular bonding, it's a thermal -- if it's a --

A. Mechanical.

Q. -- mechanical fit of the aluminum alloy on the outside to the hollow metal steerer tube on the inside is not as strong as steel to steel?

A. Yes.

Q. And based on everyday and normal use in changing weather patterns, the aluminum can expand in such a way that it would lead to an increased likelihood of the bond becoming loosened and therefore damaged?

MR. LOPATA:   Objection. No evidence in this case. But go ahead.

A. Yeah. It's certainly -- in hotter weather it's going to be -- the bond strength is going to be lower.

Q. And the only reason you haven't been able to test anything is because the materials haven't been supplied.

MR. SMITH:   I will represent that we didn't do the destructive testing because I had said