# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

NORTHERN DIVISION

| | |
|---|---|
| WILLIAM LOCKWOOD,<br>  Plaintiff | : Civil Action No.: WMN-02-CV-2068<br>:<br>: |
| vs. | :<br>: **ORIGINAL** |
| PACIFIC CYCLE, LLC<br>and TOYS "R" US-<br>DELAWARE, INC.,<br>  Third-Party<br>  Plaintiffs | :<br>:<br>:<br>:<br>: |
| vs. | :<br>: |
| SR SUNTOUR, INC. and<br>SR SUNTOUR, USA,<br>  Third-Party<br>  Defendants | :<br>:<br>:<br>: |

DEPOSITION OF ROBERT W. HINTON

Taken in the offices of Gallagher Reporting & Video, LLC, 33 South Seventh Street, Suite 105, Allentown, Pennsylvania, on Friday, April 11, 2003, commencing at 4:22 p.m., before Steven R. Mack, Registered Merit Reporter.

\* \* \*
GALLAGHER REPORTING & VIDEO, LLC.
33 South Seventh Street, Suite 105
Allentown, Pennsylvania  18101
1-800-366-2980  --  (610) 439-0504

1   A.          Right.  It would make it flow.
2   Q.          And that would cause for a tighter fit,
3   make it more difficult to become separated?
4   A.          That's correct.
5   Q.          And if you have a thermal bonding as
6   opposed to a mechanical fit, would that also be true,
7   too?  As far as the grooves are concerned.
8   A.          Well, the thermal bonding would increase
9   the interference.  In other words you could use a
10  smaller hole in the crown fork and then grow it
11  thermally by heating it up.
12              MR: SMITH:  I need you to stop for
13  just a minute.
14              (Discussion held off the record.)
15              MR. LOPATA:  Could you read back the
16  last question, if it makes sense.
17              (Thereupon the reporter read the
18  previous question and answer from the record.)
19              THE WITNESS:  And it would increase
20  the bond, the thermal expansion would increase the
21  bond strength of the joint.
22  BY MR. LOPATA:
23  Q.          Right.  And would you explain the
24  mechanics to me as to how once the fork has been
25  connected, what are the mechanics for loosening the

1   combination or the actual jointure?  That would cause
2   this to separate.  If you know.
3   A.          I would only make some assumptions as to
4   some possibilities.  But I really don't know in the
5   case of the failed bike what caused it to become
6   loose.
7   Q.          Okay. All right. So you can't give an
8   opinion on it one way or the other, you just don't
9   know?
10  A.          I don't know.  But if you overload this
11  joint, either in torsion or in tension, once it
12  becomes loose the joint is lost.  It's going to be
13  loose from that point on.
14  Q.          Where this joinder is, it's subject to
15  what kind of forces when someone's riding a bicycle or
16  using a bicycle?
17  A.          Well, it's subject to at least the
18  hand-held both torsion and tension in -- from the
19  handlebar use.  Those forces, again I don't know the
20  numbers, but I would not expect them to be very high.
21  Q.          What is not very high?  The numbers?
22  A.          The torsional force from normal use and
23  the tension from the handle -- you know, pulling on
24  the handlebar for example or pushing on it.  Those are
25  relatively small forces.

1  as we have established here through your testimony,
2  the fact that it's not steel to steel doesn't
3  necessarily mean that it violates any industry
4  standards?
5  A.         No. That's true.
6  Q.         Okay. And my question to you, we have
7  aluminum and we have steel, and you stick it together
8  as hard as you possibly can get it together. Okay.
9  What causes it to separate then? What happens to the
10 metal? Is it something that happens to the metals or?
11 Or you don't know?
12 A.         Yeah, I -- in the case of the failure, the
13 failed bike, I really don't know what happened. I can
14 speculate, but -- it obviously separated, so something
15 broke the bond. Whether it was normal use or some
16 overload condition, I really don't have the history
17 to -- but I can tell you that something, once the bond
18 is broken, it's only broken once.
19 Q.         All right. In Number 3, you're talking
20 about "Mechanical and physical properties of carbon
21 steel and aluminum alloys are attached." You haven't
22 made any determination that this was carbon steel that
23 was in this Duotrack?
24 A.         No. Again I'm quite sure it's steel,
25 because of its appearance. But I certainly don't know

1  A.         To me the bunny hop, which is a slight
2  hop, only puts you up a small amount in height.  Now,
3  I actually made a calculation a long time ago on a
4  bike pedal?  And the man was 265 pounds, a policeman,
5  in which the bike failed, and he was injured.  And
6  there he jumped from 2 feet.  And I was able to
7  calculate the actual force on the pedal because it was
8  bent.  And there I did hardness and destructive
9  testing and so forth.
10              But 2 feet and a few inches for a
11 bunny hop are far different in terms of the amount of
12 force coming back down.  It's probably a lot more
13 force if you hit a curb because -- and again it
14 depends now on your weight, speed, and other factors,
15 compared to jumping over something.
16 Q.         So your opinions on -- concerning this
17 accident depends on the fact that the bike was not
18 abused in any way that would have affected the bonding
19 of the fork?  Prior to the date of the accident, June
20 9th, 1999.  Correct?
21 A.         Well, again I don't have the numbers to
22 back up an opinion on that.  But I think the -- one of
23 two things could be occurring here.  One is you have a
24 joint that's right on the borderline of normal use
25 breakage.  That would be one possibility.

1         The other possibility is you have a
2    joint much stronger than anything that you can do to
3    it in normal use and you had an event somewhere along
4    the way that may have broken that joint. And it could
5    have been an event that nobody really noticed or knew
6    about. And once the joint is broken, then normal use
7    can really make that wear slightly and separation
8    would occur.
9    Q.        So either one of those possibilities are
10   equally possible?
11   A.        Yes. I don't have a firm opinion because
12   I don't have the -- either the background or the
13   measurements.
14   Q.        So it could be either way, you just can't
15   tell?
16   A.        Yes.
17   Q.        So then as far as your summary is
18   concerned on page 2, "The press-fit and/or the thermal
19   interference fit between the thin-walled hollow
20   steerer tube and the nonferrous fork crown of the
21   bicycle in question is inadequate, unsafe;" you can't
22   really say that, can you, because you don't have the
23   facts, because you don't know what the strength was?
24   A.        Let's see. Where is that.
25   Q.        In summary.

1   to Pacific Cycle that I didn't want to do it until
2   they agreed we would do it together; and they agreed,
3   but then nothing ever happened with that with this guy
4   Mitchell. I mean I'm happy to do destructive testing
5   now. I think I lost the question there, but that's
6   the way things go.
7              MR. LOPATA: I thought you were
8   finished.
9              MR. SMITH: No, I wasn't finished.
10  BY MR. SMITH:
11  Q.         And you're also saying that something
12  broke the bond, but you cannot at this point point to
13  anything in particular and say this is what broke it?
14  A.         That's correct.
15  Q.         But you're aware of no evidence based on
16  the depositions you've read, materials that have been
17  provided to you, or actually anything that Mr. Lopata
18  has provided to you that indicates that the bond was
19  broken through any sort of misuse?
20  A.         That's correct. I was specifically
21  looking for that in the depositions and didn't find
22  any evidence.
23             MR. SMITH: Thank you.
24                       * * *
25                  RE-EXAMINATION

1  BY MR. LOPATA:

2  Q.          Well, let me ask you this question. Would it be unusual for a plaintiff who's seeking monetary damages to come out and say that he specifically abused a bicycle? Wouldn't that be unusual for somebody to admit that?

7  A.          Yes, it would be unusual.

            MR. LOPATA:  Okay.  Thank you.

                        * * *

                     RE-EXAMINATION

BY MR. SMITH:

Q.          And would it be unusual for an individual who was under oath being -- testifying and not a plaintiff in the case but an independent party who rode with him on a daily basis not to be -- when asked about misuse said there was no misuse, not aware of any misuse?

A.          Yeah. I really felt Jesse was very believable in his description. But he didn't indicate abuse either.

            MR. LOPATA:  Thank you.  I have no other questions.

            MR. SMITH:  You have another question?

            MR. LOPATA:  No.  I said I have no

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

NORTHERN DIVISION

| | |
|---|---|
| WILLIAM LOCKWOOD,<br>    Plaintiff | : Civil Action No.: WMN-02-CV-2068 |
| vs. | **ORIGINAL** |
| PACIFIC CYCLE, LLC<br>and TOYS "R" US-<br>DELAWARE, INC.,<br>    Third-Party<br>    Plaintiffs | |
| vs. | |
| SR SUNTOUR, INC. and<br>SR SUNTOUR, USA,<br>    Third-Party<br>    Defendants | |

<u>DEPOSITION OF JOHN D. SCHUBERT</u>

Taken in the offices of Gallagher Reporting & Video, LLC, 33 South Seventh Street, Suite 105, Allentown, Pennsylvania, on Friday, April 11, 2003, commencing at 1:10 p.m., before Steven R. Mack, Registered Merit Reporter.

\* \* \*
GALLAGHER REPORTING & VIDEO, LLC.
33 South Seventh Street, Suite 105
Allentown, Pennsylvania  18101
1-800-366-2980 -- (610) 439-0504

1   the fact that the separation occurred?

2   A.          That's right.

3   Q.          Solely on the fact that the separation
4   occurred and nothing else?

5   A.          Smoke's pouring out of the gun barrel.
6   The gun was fired. Like that.

7   Q.          So the fact that the accident occurred --
8   I mean the fact that the separation occurred and an
9   accident happened, that's all you need for your
10  opinion to say that it was a mechanical failure and
11  not abuse?

12  A.          No. And I believe we covered that
13  earlier, sir. The rest of the bike does not show any
14  evidence of abuse or any extraordinary stress or
15  force; the proverbial looking for the train, that
16  would have been an alternate explanation for the
17  separation.

18  Q.          Do you believe that other experts with
19  similar experience as you have could disagree with you
20  on whether the bicycle evidenced abuse?

21  A.          Different people are going to have a
22  different threshold for what they call abuse. And,
23  you know, Mr. Lockwood did not take as good a care of
24  his bicycle as I take care of mine. But then again
25  I'm not 15 or 16 years old. And when I was that age

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION
CIVIL ACTION NO.: WMN-02-CV-2068

WILLIAM LOCKWOOD,
    Plaintiff,
    v.

PACIFIC CYCLE, LLC, AND TOYS "R"
US-DELAWARE, INC.,
    Third-Party Plaintiffs,
    v.

SR SUNTOUR, INC., AND SR SUNTOUR,
USA,
    Third-Party Defendants.

**ORIGINAL**

DEPOSITION OF:
JAMES M. GREEN

On Monday, April, 14, 2003, commencing at 1:05 p.m., the deposition of JAMES M. GREEN was taken on behalf of the Defendant at the offices of Asheville Reporting Service, 66 N. Market Street, Asheville,, North Carolina, and was attended by Counsel as follows:

APPEARANCES:

    MICHAEL P. SMITH, ESQ.
    Salsbury, Clements, Bekman,
    Marder & Adkins, LLC
    300 W. Pratt Street, Suite 450
    Baltimore, Maryland 21201
    on behalf of the Plaintiff,

RECEIVED APR 28 2003
TYDINGS & ROSENBERG LLP

    EDWARD J. LOPATA, ESQ.
    Tydings & Rosenberg, LLP
    100 East Pratt Street
    Baltimore, Maryland 21202
    on behalf of the Defendants.

REPORTED BY:  Rebecca A. Geldres, CVR
              ASHEVILLE REPORTING SERVICE

13

```
1            not known it was there.
2      Q     Well, my question is whether that was an
3            issue, as opposed to ---
4      A     Okay, whether it was an issue.  Let me -- let
5            me answer your question by saying this is the
6            first mechanical bonded front fork that I've
7            seen separate.
8      Q     Have you ever read about any such situations?
9      A     No.
10     Q     With regard to the separation in this case and
11           your opinions, do you have any idea when the
12           bond was disconnected?
13     A     You're referring to the mechanical bond?
14     Q     Yes.
15     A     I don't think anybody can tell you
16           specifically -- can give a specific time line
17           on that.  It could have happened at the
18           factory.  It could have happened anytime up to
19           and including the point that it released.
20           There's no way you can look at the signature
21           on the two parts and get a time line on it.
22     Q     So it didn't necessarily disconnect at the
23           time of the accident?
24     A     Let's make sure we're talking about the same
25           thing.  When you say disconnect, I'm -- I'm
```

Asheville Reporting Service
66 N. Market Street, Asheville, North Carolina 28801
828-254-9230    800-357-5007

14

```
 1        assuming that the bond -- the mechanical bond
 2        has lost its integrity.
 3    Q   Correct.
 4    A   It could still be in place.  In other words,
 5        the steer tube could still be all the way down
 6        into the fork, but it no longer has integrity.
 7        So you could be in that situation for an
 8        extended period of time, and there's no way of
 9        telling how long that would be.
10    Q   With regard to the strength of the bond, of
11        the mechanical bond, do you know what the
12        strength was of that mechanical bond?
13    A   Do you mean to say in your question how much
14        force would it take to release the -- the
15        front fork from the steer tube?
16    Q   Yes.
17    A   I know what it should be.  I don't know what
18        this particular one was because it's after the
19        fact.  There's no way of testing it.  But from
20        my previous testing I can tell you that it
21        would take at least two or three thousand
22        pounds to get release, if the bond was proper.
23        That is to say, if it had an epoxy or welding,
24        or something.  You would get failure of the
25        front fork before you get release.
```

42

```
 1            saying?  Of course I'm not saying that.  What
 2            I'm saying is, if you get the conditions such
 3            that you get enough expansion of the aluminum
 4            fork and the rider raises the front fork up,
 5            then you very probably can get failure because
 6            the potential is there.  There's no redundancy
 7            built in.
 8     Q      In this case dealing with Mr. Lockwood and his
 9            bicycle, you don't know what caused the
10            failure?
11     A      Do I know the exact thing that caused it?  No,
12            I don't.
13     Q      Could it have been abuse of the bicycle?
14     A      No, I don't think so because our tests show
15            clearly -- I have done a lot of testing on
16            front forks, a lot; not just for this case but
17            prior to this case.  Our testing has clearly
18            shown that the rest of the bike will come
19            completely apart before a front fork crown and
20            steer tube will, if it's properly assembled.
21     Q      When you say come completely apart ---
22     A      We're talking about ---
23     Q      --- you mean separated; not breaking or
24            fracturing?
25     A      No.  No, I'm saying that the fork blades will
```

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM LOCKWOOD, *

    Plaintiff *

v. * Civil Action No. WMN-02-2068

PACIFIC USA, LTD., et al., *

    Defendants *

\* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF ANDREW BLACKWOOD, Ph.D.

I, Andrew W. Blackwood, Ph.D., hereby give this Affidavit which is based on personal knowledge of the facts contained in this Affidavit. I have reviewed plaintiff's motion to preclude proposed expert testimony of Andrew Blackwood, Ph.D. Plaintiff's counsel on page 12 of the motion wrongly interprets my testimony by stating that I am "unable to say that the abuse predated the failure."

Contrary to plaintiff's counsel's assertion, it is my opinion based on a reasonable degree of scientific certainty that the "abuse" and "misuse" of the bicycle caused the bonding of the steer tube to the fork crown to loosen and to eventually separate the steer tube from the fork crown and that said abuse and misuse occurred sometime between the sale of the bicycle and the accident which resulted in injuries to the plaintiff. Plaintiff's counsel's question on page 66 of my deposition pertained directly to whether the joint loosen before or after (1) the damages to the end of the handle bars or, (2) the bend of the wheel, or (3) the dings on the frame. My response to the question was "No, I don't know" because although abuse or misuse caused the bonding to loosen, no one can ascertain the exact timing of the loosening of the bond and whether it occurred before or

after the specific or particular damages limited to the handle bars, or the bend of the wheel, or the dings in the frame became evident as opposed to the overall extensive damages caused by the abuse or misuse of the bicycle. I responded to the question as it was asked. My opinion that the bonding came loose due to abuse or misuse of the bicycle prior to the date of the accident in question is based on the obvious misuse and abuse I observed when I inspected the bicycle, the Tanaka Affidavit, the depositions taken, and the rest of the record. The sum total of all the damages to the bicycle leads me to the conclusion that abuse and misuse of the bicycle caused the bond to loosen which occurred sometime between the sale of the bicycle and the accident in question.

_____
Andrew W. Blackwood, Ph.D.

STATE OF Pennsylvania  )
                       ) ss.:
COUNTY OF Chester      )

Subscribed and sworn to before me on this 30th day of MAY, 2003.

_____
Notary Public

My commission expires: 1/19/2004

NOTARIAL SEAL
NANCY K. BLACKWOOD, Notary Public
West Chester Boro, Chester County
My Commission Expires Jan. 19, 2004

2