IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION
CIVIL ACTION NO.: WMN-02-CV-2068

WILLIAM LOCKWOOD,　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
PACIFIC CYCLE, LLC, AND TOYS "R"　　　)
US-DELAWARE, INC.,　　　　　　　　　　　)
　　　　Third-Party Plaintiffs,　　　　 )　　DEPOSITION OF:
　　　　　　　　　　　　　　　　　　　　　)　　JAMES M. GREEN
　　　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
SR SUNTOUR, INC., AND SR SUNTOUR,　　 )
USA,　　　　　　　　　　　　　　　　　　 )
　　　　Third-Party Defendants.　　　　 )
　　　　　　　　　　　　　　　　　　　　　)

On Monday, April, 14, 2003, commencing at 1:05 p.m.,

the deposition of JAMES M. GREEN was taken on behalf of the

Defendant at the offices of Asheville Reporting Service, 66 N.

Market Street, Asheville,, North Carolina, and was attended by

Counsel as follows:

APPEARANCES:

　　　　MICHAEL P. SMITH, ESQ.
　　　　Salsbury, Clements, Bekman,
　　　　Marder & Adkins, LLC
　　　　300 W. Pratt Street, Suite 450
　　　　Baltimore, Maryland　21201
　　　　on behalf of the Plaintiff,

　　　　EDWARD J. LOPATA, ESQ.
　　　　Tydings & Rosenberg, LLP
　　　　100 East Pratt Street
　　　　Baltimore, Maryland　21202
　　　　on behalf of the Defendants.
REPORTED BY:　Rebecca A. Geldres, CVR
　　　　　　　 ASHEVILLE REPORTING SERVICE


PLAINTIFF'S EXHIBIT
N

Page 2

1  (Document E1143)
2       Index
3  Stipulations . . . . . . . . . . . . . . . .  3
4  Signature (Reserved) . . . . . . . . . . . .  3
5  Direct Examination by Mr. Lopata . . . . . .  4
6  Cross-Examination by Mr. Smith . . . . . . .  64
7  Certificate of Notary Public . . . . . . . .  65
8  EXHIBITS
9  Defendant's Exhibit No. 1 Marked . . . . . .  5
10 Defendant's Exhibit No. 2 Marked . . . . . .  5
11 Defendant's Exhibit No. 3 Marked . . . . . .  5
12 Defendant's Exhibit No. 4 Marked . . . . . .  8
13 Defendant's Exhibit No. 5 Marked . . . . . .  8
14 Defendant's Exhibit No. 6 Marked . . . . . .  11
15 Defendant's Exhibit No. 7 Marked . . . . . .  25

Page 3

1  PURSUANT TO NOTICE and/or Agreement to Take
2  Depositions, the within Deposition was taken by me,
3  Rebecca A. Geldres, a Notary Public, as required in
4  Rules 26 and 30 of the North Carolina Rules of Civil
5  Procedure.
6  STIPULATIONS:
7      IT WAS STIPULATED AND AGREED by and between
8  Counsel for the Plaintiff and Counsel for the
9  Defendant that each question in this Deposition is
10 deemed to be followed by an objection and that each
11 answer or portion thereof is deemed to be followed by
12 a motion to strike; and that the objections and
13 motions to strike may be ruled upon by the presiding
14 Judge at any hearing or trial of this cause,
15 provided, however, that any objections as to the form
16 of the question must be made at the time the question
17 is propounded or else the same is waived.
18 SIGNATURE:
19     The Deponent did agree that both the reading
20 over and signing of the transcript are hereby
21 reserved.
22     JAMES M. GREEN, being duly sworn to tell the
23 truth, the whole truth, and nothing but the truth of
24 his own knowledge concerning the within matter,
25 testified as follows:

Page 4

1  DIRECT EXAMINATION BY MR. LOPATA:
2  Q  Mr. Green, my name is Ed Lopata and I
3     represent Suntour, Inc., or USA, also known as
4     USUL Corporation, in a lawsuit filed by Mr.
5     Lockwood versus Pacific Cycle, Toys "R" Us,
6     and they've brought us in as a third-party
7     defendant. And you've been designated as an
8     expert and I've got your expert report. We're
9     here to take your deposition today. Just a
10    little ground rules, any question I ask, if
11    you don't understand it, stop me. I'll
12    rephrase the question. And then, as you know,
13    if you answer the question, I'm going to
14    assume that you understood the question. Any
15    questions you can answer yes or no, please say
16    yes or no, rather than nod or grown. Okay?
17 A  Yes.
18 Q  And you realize that you've just taken the
19    same oath you take before a judge and a jury,
20    if we were in trial?
21 A  Yes.
22 Q  State your name, sir?
23 A  James Marley Green.
24 Q  Mr. Green, I've been advised by counsel that
25    you expect to get paid before we start the

Page 5

1     deposition, so I've got a check for you for
2     $900.
3  A  Yes.
4  Q  I also understand that you charge $200 an hour
5     for deposition?
6  A  Two-twenty-five.
7  Q  If, in fact, we don't spend all the money, I
8     assume that you'll refund me some of the
9     money?
10 A  Yes.
11 Q  Also, I want to mark the deposition notice.
12 BY THE COURT REPORTER:
13     Do you want that to be one?
14 BY MR. LOPATA:
15     Yes, mark it as one. And mark two as his
16     report. And three is basically his history of
17     all the cases he testified to.
18 (DEFENDANT'S DEPOSITION EXHIBIT NOS. 1 THROUGH 3
19 MARKED)
20 DIRECT EXAMINATION RESUMED BY MR. LOPATA:
21 Q  Let me show you what's been marked as
22    Deposition Exhibit No. 1, which is the notice
23    of your deposition. I take it you've seen
24    that before? Mr. Smith has provided it to you
25    or discussed it with you?

**\* \* \***

10

1  the past on other issues. I don't have access
2  to that and I don't keep a file of that, for
3  No. 20. That's all that's on there.
4  DIRECT EXAMINATION RESUMED BY MR. LOPATA:
5  Q  With regard to Exhibit 5, which is your
6     billing statement ---
7  A  Yes.
8  Q  --- how do your time?
9  A  As in what -- we use time slips.
10 Q  And then you use the time slips to type up the
11    bill that I'm looking at?
12 A  Yes. That's from the time slips.
13 Q  At the time you received the bicycle from the
14    client -- you have a note on 06-21 you
15    received the bicycle from the client. What
16    condition was the bicycle in? Was it all
17    taken apart or ---
18 A  Well, it came shipped in a bike box in the
19    condition that's noted in the photos. No --
20    nothing has been -- was done to it. And we
21    downloaded all the photographs that were taken
22    at the time that I looked at the bicycle, and
23    you can see the condition it was in. And that
24    was the condition when it was sent back. Are
25    you going to mark those or -- I might add that

11

1  I separated out for clarity in handwritten --
2  figures that are in the engineering report,
3  just because they're easier to see.
4  BY MR. LOPATA:
5  We'll mark these. These seven photographs are
6  Exhibit No. 6.
7  (DEFENDANT'S DEPOSITION EXHIBIT NO. 6 MARKED)
8  DIRECT EXAMINATION RESUMED BY MR. LOPATA:
9  Q  With regard to Exhibit No. 5, your bill, how
10    many hours did it take to formulate your
11    opinions that are set forth in the August 19,
12    2002, report?
13 A  Okay. Eighteen point five hours was spent on
14    the project, prior to writing the engineering
15    report. And your question was how many hours
16    of those 18.5 did it take to formulate the
17    opinion, and I don't know if I can answer
18    that. Certainly a certain number of those
19    hours were used formulating my opinion.
20 Q  In looking at Deposition Exhibit No. 2, which
21    is your August 19, 2002, report, it appears to
22    me that your opinion in this case really goes
23    to the fact that you believe, from a design
24    standpoint, that there should have been
25    welding in place to actually connect the steer

12

1  tube to the fork crown?
2  A  That or some other kind of redundancy. There
3     are other ways of keeping the two of these
4     together. You could have used a form of
5     glue/epoxy, which you see often, or you could
6     have braced them together. But certainly some
7     form of redundancy needed to be there.
8  Q  And that's basically the sole whole opinion
9     set forth in your report; correct?
10 BY MR. SMITH:
11    Objection.
12 BY THE DEPONENT:
13    Well, it's not the sole opinion.
14 DIRECT EXAMINATION RESUMED BY MR. LOPATA:
15 Q  I mean, I read it ---
16 A  It's the primary opinion certainly. It's the
17    -- I would agree with you it's the primary
18    opinion.
19 Q  With regard to the SR Duo Track 7006, have you
20    ever been involved in any other case dealing
21    with that component part?
22 A  Well, I mean, that I can't answer because I
23    don't separate out the component part, per se,
24    in a lot of cases I get. I mean, I may have
25    had that in the office or the laboratory and

13

1  not known it was there.
2  Q  Well, my question is whether that was an
3     issue, as opposed to ---
4  A  Okay, whether it was an issue. Let me -- let
5     me answer your question by saying this is the
6     first mechanical bonded front fork that I've
7     seen separate.
8  Q  Have you ever read about any such situations?
9  A  No.
10 Q  With regard to the separation in this case and
11    your opinions, do you have any idea when the
12    bond was disconnected?
13 A  You're referring to the mechanical bond?
14 Q  Yes.
15 A  I don't think anybody can tell you
16    specifically -- can give a specific time line
17    on that. It could have happened at the
18    factory. It could have happened anytime up to
19    and including the point that it released.
20    There's no way you can look at the signature
21    on the two parts and get a time line on it.
22 Q  So it didn't necessarily disconnect at the
23    time of the accident?
24 A  Let's make sure we're talking about the same
25    thing. When you say disconnect, I'm -- I'm

4 (Pages 10 to 13)

### Page 14

1  assuming that the bond -- the mechanical bond
2  has lost its integrity.
3  Q  Correct.
4  A  It could still be in place. In other words,
5     the steer tube could still be all the way down
6     into the fork, but it no longer has integrity.
7     So you could be in that situation for an
8     extended period of time, and there's no way of
9     telling how long that would be.
10 Q  With regard to the strength of the bond, of
11    the mechanical bond, do you know what the
12    strength was of that mechanical bond?
13 A  Do you mean to say in your question how much
14    force would it take to release the -- the
15    front fork from the steer tube?
16 Q  Yes.
17 A  I know what it should be. I don't know what
18    this particular one was because it's after the
19    fact. There's no way of testing it. But from
20    my previous testing I can tell you that it
21    would take at least two or three thousand
22    pounds to get release, if the bond was proper.
23    That is to say, if it had an epoxy or welding,
24    or something. You would get failure of the
25    front fork before you get release.

### Page 15

1  Q  This bicycle was apparently sold in May of
2     1997; is that correct?
3  A  Correct.
4  Q  Were there any standards in the industry
5     regarding what the strength of that bond ---
6  A  There are no -- there are no published
7     standards in the industry on the strength of
8     the bond at that time, or now, for that
9     matter. What you have is the CPSC standards
10    and the ongoing work through the ASTM fork
11    committee.
12 Q  As far as the CPSC standards, talking about
13    the Consumer Product Safety Commission, what
14    standards were you referring to? I've got
15    Deposition Exhibit No. 4, which I understand
16    are the standards.
17 A  Go to four and then go to the drop test. Bear
18    with me while I find it, please. Page --
19    let's go to the reference number. It's
20    Reference 1512.13(1), fork test procedure.
21    Excuse me, let me see if counsel needs -- do
22    we all have copies of the regulations?
23 Q  We have our copy. That's all right.
24 A  I'm referring to Exhibit 4. It says, to
25    summarize it, there's a load applied to the

### Page 16

1     axle attachment in a direction perpendicular
2     to the center line of the stem and against the
3     direction of the rake, which is a deflection
4     and loading test, not a bond or movement test.
5     So it's as close as you're going to get, to --
6     to answer your question.
7  Q  In your opinion, is that applicable to this
8     situation here?
9  A  Well, no. That's not the situation here.
10    Your question to me was what written standards
11    are out there, and I attempted to answer it by
12    saying this is the best that's there, and it's
13    not in any way, shape or form supposed to be a
14    steer tube from the fork removal test, because
15    it's not. And there's also, of course, the
16    second part of that, which is the loading of
17    890 newtons. That's 200 pounds force in a
18    direction against the direction of the rake,
19    which is toward the rear of the bike
20    basically.
21 Q  What is that test?
22 A  That really is a fork deflection test.
23 Q  But that wouldn't be applicable in this
24    situation either?
25 A  No. No. But that goes back to the original

### Page 17

1     question.
2  Q  So as far as any industry standards or rules
3     or regulations, statutes, etcetera, are there
4     any as to what the strength of the mechanical
5     bond should have been ---
6  A  No.
7  Q  --- in this bicycle in question?
8  A  No, other than what I read. That's the
9     closest you're going to get to it in the CPSC
10    regulations and the rough draft ASTM
11    standards, for want of a better word, for the
12    Fork Committee, which your expert Dave
13    Mitchell is on, or I guess specific cycles.
14    Expert Dave Mitchell and I are both on that
15    committee. And there was a rough draft.
16    They're not in -- they're not promulgated into
17    final draft yet.
18 Q  And so they're not applicable standards, as
19    far as this case is concerned?
20 A  Well, they're applicable in that the industry
21    knows that they're there because the industry
22    sits on a committee. Representatives from the
23    industry sit on the committee. I believe your
24    question was industry standards.
25 Q  Right. But those standards didn't govern the

## Page 18

1  manufacture of SR Duo Track 7006 in 1995 or
2  1996, when they were manufactured?
3  A  Not at that time when this was manufactured.
4  The only written -- well, there are two
5  written standards. One is the CPSC standards
6  and the other is the ISO standards.
7  International Safety Organization standards
8  are fork deflection standards also. They're
9  not mechanical bond or front fork standards.
10 Q  Are there any standards in the industry or
11    statutes, regulations, whatever, concerning
12    how the fit occurs? Can it be thermal bond?
13    Can it be like a mechanical press-fit bond?
14    Does it have to be welded? Does it have to
15    have epoxy or something in there?
16 A  No. There's no standard -- there's no written
17    standards in the industry on that.
18 Q  Are there any ---
19 A  In 1995 or today, for that matter.
20 Q  Are there any statutes, rules or regulations,
21    anything like this?
22 A  No.
23 Q  In your report, you indicate that this Duo
24    Track 7006 was defective because it didn't
25    have a weld to connect the steering tube into

## Page 19

1  the fork crown?
2  A  Yes.
3  Q  And you said that was a manufacturing defect?
4  A  Correct.
5  Q  What facts are you relying on to support your
6     conclusion that this should have had a weld?
7  A  What facts am I relying on?
8  Q  Yes.
9  A  Well, I'm not relying on facts as much as I am
10    engineering standards, in that when you design
11    anything, whether it's a front fork and a
12    steer tube or a bridge, you should have -- you
13    need to have redundancy built into the system
14    so that you don't have failure. You can't
15    rely on one -- one system or one design. You
16    need to have -- you need to have redundancy
17    built into the design to protect the public,
18    regardless of what you're designing.
19 Q  So it being your opinion in your letter here,
20    when you indicate that there should have been
21    a weld in place and you didn't see any, are
22    you aware of any bicycle standards that would
23    require a mechanical fit to be welded?
24 A  Oh, there are none, as I said earlier. I'm
25    speaking as a -- as an engineer basically

## Page 20

1  agreeing, I think, with what Dave Mitchell's
2  saying, the other engineer that's involved in
3  this matter, that there should have been --
4  the fork shouldn't fail, but that -- that is
5  not what you're asking me. What you're asking
6  me is are there any standards there.
7  Q  Correct.
8  A  And to answer your question, I'm saying that
9     there are no standards there, but any
10    professional engineer who does any design,
11    whether it's this design or any other design,
12    would have redundancy built into the system.
13    And in that respect, that standard is being
14    violated, which is a design standard that any
15    design engineer can give you; not just me, but
16    any design engineer.
17 Q  So the simple fact that this Duo Track 7006
18    was designed without taking into consideration
19    a weld, you're saying that fact alone makes it
20    a design defect?
21 A  Well, I'm saying a weld or equivalent. You
22    could use epoxy. You know, that is done in
23    the industry. You could use -- you could
24    braze it. Welding is, by far, better when
25    you're putting aluminum and -- and metal

## Page 21

1  together like this -- aluminum and steel, I
2  should say, together like this. And when it's
3  going to be subjected to the type of stresses
4  we're looking at here, welding is the best.
5  But you could still get by -- by getting by I
6  mean prevent failure, premature failure -- by
7  using some type of epoxy or gluing method, or
8  by brazing it. Welding is certainly easier
9  and certainly preferred. If you look at all
10 the forks in the industry, that's what you'll
11 see is you'll see a weld there. And -- but
12 any one of those three methods.
13 Q  Going back on your knowledge, as far as
14    bicycles are concerning ---
15 A  Right.
16 Q  --- are you aware of any other bicycle
17    manufacturer in 1995, 1996 or 1997 who
18    manufactured a bike with a mechanical press
19    fit, without an epoxy, without any welding,
20    anything else that would provide a redundancy?
21 A  The word you used was "without"? Is that ---
22 Q  Exactly.
23 A  I'm not aware of any -- I'm not aware of any
24    that do it without some type of redundancy.
25    This is the first time I have seen this

6 (Pages 18 to 21)

✳ ✳ ✳

**38**

1  as a result, if you get temperature variation
2  at all -- for example, if you go into a
3  factory that's, say, 60 degrees and put --
4  degrees F, and you put these two entities
5  together mechanically. And then you take and
6  go out into 100 degree weather, your aluminum
7  is going to expand at a greater capacity than
8  your steel, and you're -- you're going to have
9  a loosened system. Your fork's going to tend
10 to want to come off of the -- of the steer
11 tube.
12 Q  Just because of change in temperature?
13 A  Well, because of the expansion of the
14 different metal. The two different metals
15 expand a greater rate. That's why you need a
16 sense of redundancy. I mean, excuse me,
17 you're not -- you need redundancy, not a sense
18 of redundancy.
19 Q  So it wouldn't make any difference how tight
20 the fit is or how strong the fit is, that
21 sooner or later it's going to become
22 separated?
23 A  No, I didn't say that. I said sooner or later
24 you're going to be at risk. Not every one of
25 these eight million forks is going to fail.

**39**

1  But your probability is pretty high that
2  you're going to get failures with this design
3  without a sense of redundancy built in. And I
4  don't care how strong the bond is under this
5  design configuration where you've got the
6  striated edges pushing into the aluminum,
7  causing grooves, and that is what's going to
8  hold your system in. Sooner or later you're
9  going to get failure in those eight million
10 forks. Mr. Tanaka may not be aware of
11 failure, but you're going to get them because
12 of this design. You don't have any redundancy
13 built in. It's a bad design.
14 Q  Even though you recognize this, it's your
15 opinion that this is a bad design, there
16 aren't any rules or regulations saying you
17 can't have two dissimilar metals mechanically
18 fit?
19 A  There are no rules or regulations in the
20 standards for bicycles. That is true. But
21 any engineer, any professional engineer is
22 going to tell you this is a bad design and
23 more probably than not, it's the reason that
24 this -- well, it's the reason -- it's not more
25 probably than not. It's the reason this

**40**

1  failure occurred here. It's just a bad
2  design.
3  Q  It's your opinion, again, it's more likely
4  than not that because of the design of the SR
5  Duo Track 7006, it's more likely than not that
6  there would be a separation on all these
7  bicycles?
8  A  No, that's not what I'm saying. I said more
9  likely than not that all eight million of
10 these forks is at risk of failure. Will every
11 fork fail? No. But they're all at risk of
12 failure, and if you get conditions -- the
13 right kind of conditions, you will get
14 failure.
15 Q  When you say they're at risk, you're saying
16 that there's a possibility that there will be
17 a failure, there will be a separation?
18 A  I'm saying that every -- if every one of these
19 eight million forks has a mechanical bond like
20 we see here in this fork and nothing else has
21 been done, I'm saying that every one of those
22 eight million forks carries with it a very
23 high risk of failure, under the right
24 conditions. Will every eight -- one of the
25 eight million forks fail? Of course not. But

**41**

1  if you get the conditions right, you'll get
2  failure because you don't have a sense of
3  redundancy built in. You've got two different
4  metals being used in the mechanical bonding
5  process and you're going to get very good
6  potential for failure. Not every one of these
7  forks is going to fail, but you're going to
8  get failure.
9  Q  Can you quantify the risk when you say a very
10 high risk of failure?
11 A  If you get a condition where you can get
12 enough expansion of that outer part of the
13 bond, which is the part that is met by the
14 aluminum fork, you get enough expansion of
15 that so that the two entities are sliding
16 around, that is, the fork and the fork -- and
17 the steer tube are sliding around and are
18 going to become loosened, then all it takes is
19 for the rider to raise that -- raise that
20 front fork up and the fork crown can come off
21 of the steer tube. Does every rider that
22 rides a bike do that? Of course not. This
23 probably very rarely happens. Will every
24 rider that raises the front fork up have the
25 front wheel fall off? Is that what Green is

11 (Pages 38 to 41)

Asheville Reporting Service
66 N. Market Street, Asheville, North Carolina 28801

## Page 42

1. saying? Of course I'm not saying that. What
2. I'm saying is, if you get the conditions such
3. that you get enough expansion of the aluminum
4. fork and the rider raises the front fork up,
5. then you very probably can get failure because
6. the potential is there. There's no redundancy
7. built in.
8. Q  In this case dealing with Mr. Lockwood and his
9. bicycle, you don't know what caused the
10. failure?
11. A  Do I know the exact thing that caused it? No,
12. I don't.
13. Q  Could it have been abuse of the bicycle?
14. A  No, I don't think so because our tests show
15. clearly -- I have done a lot of testing on
16. front forks, a lot; not just for this case but
17. prior to this case. Our testing has clearly
18. shown that the rest of the bike will come
19. completely apart before a front fork crown and
20. steer tube will, if it's properly assembled.
21. Q  When you say come completely apart ---
22. A  We're talking about ---
23. Q  --- you mean separated; not breaking or
24. fracturing?
25. A  No. No, I'm saying that the fork blades will

## Page 43

1. fail; that the -- that the fork itself will
2. fail long before -- and the wheel will fail
3. long before the front fork and -- excuse me,
4. front fork and steer will fail, if it's
5. properly designed and manufactured. I've got
6. the testator right there that I can show you.
7. I have hung up to 1,500 pounds from the front
8. fork dropouts and had the wheel fail. I've
9. had the fork blades fail, and the fork crown
10. and steer tube have remained in place.
11. Q  Is that because they didn't have a mechanical
12. fit like we have in this case? They all have
13. built in redundancies like epoxy or welding?
14. A  Yes.
15. Q  So every one of the fork crowns that you've
16. tested have all had a built in redundancy of
17. some kind?
18. A  Correct, the ones that I've tested in my
19. testing.
20. Q  How many of those have you tested?
21. A  Probably several hundred; probably 300.
22. Q  And these are all different bike
23. manufacturers?
24. A  Different manufacturers. The data's in there.
25. I'll be ---

## Page 44

1. Q  Could you show it to me?
2. A  Yeah, sure. The testing apparatus is here,
3. and -- I'm referring to Chapter 15,
4. "Structural Integrity of Bike Frames Subjected
5. to Frontal Static Force."
6. Q  Is there any specific section dealing with the
7. fork crowns that the steering tubes went into?
8. A  Well, it deals with the whole frame. I mean,
9. I didn't -- I haven't taken out the fork -- I
10. haven't taken out the front fork and steer
11. tube and tested it separately because it's a
12. meaningless test because I tested it in the
13. frame. It tells you nothing if you take it
14. separately because that's not what we're
15. dealing with here.
16. Q  Well, wouldn't it tell you how much force
17. would be necessary to get the two to separate?
18. A  Well, it would if that's what you're totally
19. interested in studying.
20. Q  I'm interested in that because I have this
21. case.
22. A  Well, but -- yeah, but you -- you didn't have
23. a failure here where you had that happen.
24. This was in the bike frame when it happened.
25. Q  I understand that.

## Page 45

1. A  So to take the two of them out -- to take it
2. out and to test it separately in the lab to
3. get your failure is not a meaningful test at
4. all. It means nothing. For one thing, it
5. doesn't take into effect the expansion of the
6. aluminum front fork as a function of
7. temperature at all when you do that, so it
8. doesn't mean anything. You -- I'm sure if you
9. took this subject front fork out and put it in
10. a lab and tried to break it apart, the
11. mechanical bond would hold extremely well. It
12. would be very hard to get it to separate. But
13. that's not what happens in the real world. In
14. the real world, what happens is these -- you
15. take that out and you have the -- you have the
16. aluminum front fork and you have the steer --
17. steer tube, and that's subjected to
18. temperature variations and use variations.
19. And that's when you have to be concerned about
20. your failure mode because you've got these two
21. different metals and it's in a bike frame.
22. It's not separate.
23. Q  You're an engineer. You're not an
24. metallurgist?
25. A  No, I'm not a metallurgist. I'm a

**Page 46**

1  professional engineer.
2  Q  I take it you don't claim to have any
3     expertise, as far as metallurgy is concerned?
4  A  Well, there is an overlap between the two --
5     between the two fields in this particular part
6     of engineering. I don't pretend to be a
7     metallurgist, but I've used a lot of data from
8     metallurgists and have worked with a lot of
9     them through the years. But I'm not a
10    metallurgist and I'm not holding myself out as
11    a metallurgist.
12 Q  So if I understand what you're saying,
13    regardless of how strong the fit is in the
14    fork crown assembly, it's your opinion,
15    regardless of what the strength is of that
16    bond, that it's still at a high degree of risk
17    to become separated, due to temperature
18    changes and the effect of the temperature
19    changes on the steel and the aluminum because
20    you have dissimilar ---
21 A  You summarized that very well. Yes.
22 Q  Is that your opinion?
23 A  Yes.
24 Q  Is there anything else that could cause
25    separation, other than what we've just gone

**Page 47**

1     through, absent, as one of the experts said
2     the other day, a train running over the thing?
3  A  Oh, yeah, any of those collateral issues.
4     That's what you guys do when you get to trial.
5     Well, I think you have an idea of what my
6     opinion is pretty good so I'm not going to
7     keep beating on that. There are some other
8     issues here that I'm going to -- I'm going to
9     mention for the sake of completeness. And I'm
10    not -- I'm not saying that I have any -- any
11    data to suggest that this did or did not --
12    these -- this list did or did not occur, but I
13    think it needs to be read into the record, to
14    answer your question. No. 1 is that it very
15    well may have been that the steer tube and the
16    front fork may have been mis-sized during the
17    manufacturing process. I can't rule that out.
18 Q  That's a possibility but you don't have any
19    facts one way or the other?
20 A  Right. In all of these I'm listing I don't
21    have -- they are possibilities and I have no
22    facts to back them up; okay? But I think for
23    the sake of completeness they should be
24    listed. No. 2, there may very well be in the
25    procedure and epoxy type of bonding process

**Page 48**

1     and it was just missed on this front fork.
2     They may very well do that, they being
3     Suntour, at their plant and they just didn't
4     do it on this one. They missed it. You may
5     have a bad lot out there because of that.
6     Although I don't recommend the bonding process
7     such as we're dealing here, it may very well
8     have been that during the mechanical bonding
9     process in the lab -- excuse me, at the
10    manufacturing site, that there was a
11    misalignment here when the two were joined.
12    So as a result, since steel is stronger than
13    aluminum, that if there was a misalignment
14    when they were pressed together, you would get
15    larger striations in there than you would get
16    normally, "in there" being on the front fork.
17    You now would cause the bonding not to be very
18    well done. Again, it's a possibility. I have
19    nothing to back that up. I'm just listing
20    things that could have happened.
21 Q  With regard to your CV, I want to ask you a
22    question. You're on an ethics committee?
23 A  I'm not on it anymore. I was.
24 Q  You talk about miscellaneous memberships,
25    2002, you've got on here fellow of the

**Page 49**

1     National Academy of Forensic Engineers, and
2     the goal of the National Academy of Forensic
3     Engineers is to promote the ethical practice
4     of forensic engineering. When you say
5     "ethical practice," what do you mean?
6  A  Well, the -- the Academy was formed in the
7     early '80's through the National Society of
8     Professional Engineers to ensure that
9     testimony that was given in court or work that
10    was done after-the-fact adhered to the
11    principles and practices of engineering. There
12    are approximately 500 members in that academy
13    and we think of ourselves as kind of the
14    pathologists of the engineering community. We
15    come in after the fact and try and reconstruct
16    things and determine what causes things to
17    fail, and then give that information to the
18    design community where possible. And your
19    question was ethical -- the ethical end of it.
20    The paramount thing really in the
21    investigation should be what can be done to
22    best protect the safety and health of the
23    general public, both in the investigation
24    we're conducting and in what the results may
25    show and do later one. And that covers the

13 (Pages 46 to 49)

✳ ✳ ✳   62

1  Q  This is not a redundancy with the striations
2     in there?
3  A  No.
4  Q  As far as the fork crown is concerned being
5     made out of aluminum ---
6  A  Right.
7  Q  --- did they have striations before or were
8     they made because of the steel?
9  A  They were made because of the steel.
10 Q  Going into the fork crown?
11 A  Correct.
12 Q  Are they interlocking in nature?
13 A  Yes.
14 Q  As far as the length of the steel tube, was
15    that within industry guidelines, standards?
16 A  I didn't measure it, but it appeared to be,
17    from visual inspection. I didn't consider it
18    to be an issue.
19 Q  And I asked this before, I think. You don't
20    know what the amount of force would be to
21    cause the bond to become undone between the
22    steering tube and ---
23 A  No.
24 Q  And you don't know what the bond strength
25    would be to be sufficient under industry

63

1     guidelines for that to be together, the bond
2     strength, what it should have been?
3  A  Well, what it should have been ---
4  Q  Other than the redundancy that you've
5     mentioned?
6  A  Well, yeah, the bond needs to be different.
7  Q  So you're saying that that's ---
8  A  I'm not trying to confuse this issue but let's
9     make sure we understand ---
10 Q  You're saying that that's irrelevant, what the
11    bond strength was, because you didn't have the
12    redundancy built in?
13 A  I'm saying that, but your question wasn't
14    that. Your question was what is the bond
15    strength, and then 'You don't know what it
16    was?' I think, is what you asked me.
17 Q  Right. You don't know what it was?
18 A  Well, I know what it should be. Does that
19    help answer the question?
20 Q  Okay.
21 A  Okay. It should be capable of withstanding at
22    least 1,000 pounds of static force.
23 Q  Where do you get that from?
24 A  Measurements -- or, excuse me, testing I've
25    done on other forks where I've applied at

64

1     least that amount, or more, to them statically
2     now -- not dynamically but statically -- and
3     did not get failure.
4  Q  Again, you're not aware of any industry
5     standards as to what the strength should have
6     been?
7  A  Correct.
8  BY MR. LOPATA:
9     I think I'm finished.
10 BY MR. SMITH:
11    I just have one question.
12 CROSS-EXAMINATION BY MR. SMITH:
13 Q  Is it standard in the industry for a fork to
14    be designed such that the steel tube does not
15    separate from the fork crown through normal
16    and expected use?
17 A  Yes, the -- the standards are that no
18    separation occur.
19 BY MR. LOPATA:
20    Thank you.
21 (PROCEEDINGS IN THE ABOVE-ENTITLED MATTER WERE
22 ADJOURNED AT APPROXIMATELY 2:30 P.M.)
23
24
25

65

CERTIFICATE

STATE OF NORTH CAROLINA  )
                         )
COUNTY OF BUNCOMBE       )

I, REBECCA GELDRES, Court Reporter and Notary Public, do hereby certify that the foregoing 64 pages are an accurate transcript of the deposition of JAMES M. GREEN, taken by me and transcribed under my supervision.
   I further certify that the deponent was first duly sworn by me to tell the truth.
   I further certify that I am not financially interested in the outcome of this action, a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel.
   This is the 15th day of April 2003.

_____
REBECCA GELDRES, CVR
Notary Public for North Carolina

(Seal)

Asheville Reporting Service
66 N. Market Street, Asheville, North Carolina 28801
828-254-9230   800-357-5007

17 (Pages 62 to 65)