## Page 1

(1)             IN THE UNITED STATES DISTRICT COURT
(2)                FOR THE DISTRICT OF MARYLAND
(3)                    NORTHERN DIVISION
(4)
(5)   WILLIAM LOCKWOOD,   : Civil Action No.: WMN-02-CV-2068
         Plaintiff       :
(6)                      :
         vs.             :
(7)                      :
      PACIFIC CYCLE, LLC  :
(8)   and TOYS "R" US-    :
      DELAWARE, INC.,     :
(9)        Third-Party    :
           Defendants     :
(10)                     :
         vs.             :
(11)                     :
      SR SUNTOUR, INC. and :
(12)  SR SUNTOUR, USA,   :
           Third-Party    :
(13)       Plaintiffs     :
(14)
(15)        DEPOSITION OF JOHN D. SCHUBERT
(16)
(17)         Taken in the offices of Gallagher
(18)  Reporting & Video, LLC, 33 South Seventh Street, Suite
(19)  105, Allentown, Pennsylvania, on Friday, April 11,
(20)  2003, commencing at 1:10 p.m., before Steven R. Mack,
(21)  Registered Merit Reporter.
(22)                            * * *
(23)
            GALLAGHER REPORTING & VIDEO, LLC.
(24)         33 South Seventh Street, Suite 105
               Allentown, Pennsylvania 18101
(25)          1-800-366-2980 -- (610) 439-0504

## Page 2

(1)
      APPEARANCES:
(2)
(3)      SALSBURY, CLEMENTS, BEKMAN,
            MARDER & ADKINS, L.L.C.
(4)      By:  MICHAEL P. SMITH, ESQ.        --
            300 West Pratt Street
(5)         Suite 450
            Baltimore, MD 21201
(6)         -- For the Plaintiff
(7)      TYDINGS & ROSENBERG, LLP
            By:  EDWARD J. LOPATA, ESQ.
(8)         100 East Pratt Street
            26th Floor
(9)         Baltimore, MD 21202
            -- For Third-Party Defendants
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)                     * * *
      GALLAGHER REPORTING & VIDEO, LLC.
(24)     33 South Seventh Street, Suite 105
            Allentown, Pennsylvania 18101
(25)     1-800-366-2980 -- (610) 439-0504

## Page 3

(1)
(2)
                      INDEX TO WITNESSES
(3)
      Witness                          Page

(4)
      J. Schubert
(5)
        By Mr. Lopata                    4
(6)     By Mr. Smith                    95
(7)
                      INDEX TO EXHIBITS
(8)
      Schubert
(9)   Exhibit      Description          Page

(10)    1    Notice To Take Deposition Duces
            Tecum of John Schubert      27
(11)
(12)    2    Mr. Schubert's report dated 8/28/02  59

(13)    3    Drawing of bike parts       8
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 4

(1)          (Schubert Exhibit Numbers 1 and 2
(2)   were marked for identification.)
(3)                         * * *
(4)          JOHN DERICK SCHUBERT, having been
(5)   duly sworn, was examined and testified as follows:
(6)                    EXAMINATION
(7)   BY MR. LOPATA:
(8)   Q.    Mr. Schubert, state your full name,
(9)   please.
(10)  A.    John Derick, that's spelled D-e-r-i-c-k,
(11)  Schubert, S-c-h-u-b-e-r-t.
(12)  Q.    Mr. Schubert, my name is Ed Lopata, and I
(13)  represent Suntour, Inc., and Suntour, USA involving a
(14)  lawsuit filed by Mr. Lockwood against Pacific Cycles,
(15)  Toys "R" Us, and those Defendants brought in the
(16)  Suntours Defendants as Third-Party Defendants, and
(17)  we're here to take your deposition today regarding
(18)  your opinions, and particularly with regard to your
(19)  report of August 28th, 2002.
(20)         A little ground rules.  If any
(21)  question I ask you, if you don't understand it, stop
(22)  me and I'll rephrase the question.  That's important
(23)  because if you respond to a question everybody's going
(24)  to assume that you understood the question.
(25)         And if any question you can answer

PLAINTIFF'S
EXHIBIT
5

4

### Page 69

(1) sufficient expertise to testify on it or give an
(2) opinion or don't you?
(3) A.   Again, this get -- this gets into some
(4) areas that I haven't had the opportunity to research
(5) at great length. I'll only say that the failure of
(6) the Lockwood bike would make me quite nervous about
(7) this particular style of fitting these two pieces
(8) together. And I think the other designs that are
(9) available are attractive, they can be made quite
(10) economical, and I'd take a hard look at them if I were
(11) in Mr. Tanaka's position.
(12) Q.   But prior to June 7th, 1999, which was the
(13) day of the accident, there wouldn't have been anything
(14) for you to be nervous about, right? Based on your
(15) knowledge of the Duotrack 7007.
(16) A.   If you told me that was a press fit? I'd
(17) be -- I'd be concerned, just on a gut level.
(18) Q.   But just on a gut level?
(19) A.   On a gut level.
(20) Q.   And that would be your personal concern?
(21) A.   Yeah.
(22) Q.   This wouldn't be a concern as far as
(23) industry standards are concerned? It would just be
(24) your personal opinion on that matter?
(25) A.   I'm not sure I understand quite the

### Page 70

(1) distinction in that -- as one who doesn't want to see
(2) people get hurt.
(3) Q.   We could stipulate that anybody involved
(4) in this case, including Mr. Smith --
(5) A.   Yeah.
(6) Q.   -- as well as the Defendants, nobody wants
(7) to see anyone get hurt.
(8) A.   Sure. I'd be concerned about that. The
(9) press fit is subject to a variety of stresses in
(10) various directions. It gets -- it gets a bending
(11) stress, it gets a rotational stress. It gets a
(12) compressive stress. And the combined effect of all of
(13) those on a press fit is an area that would bear
(14) further scrutiny. And I haven't studied it enough to
(15) say more than that.
(16) Q.   Aren't press fits tested? Not all
(17) bicycles, but don't they go through a test?
(18) A.   I don't know what test these went through.
(19) Q.   Okay. Page 3 of your report, at the top
(20) of the page. You indicated about the separation of
(21) the crown, fork crown from the steerer tube, the
(22) pieces were separated -- that "the pieces that were
(23) separated show no signs of bending or scrape marks
(24) that would have resulted from an impact strong enough
(25) to destroy this joint." What do you mean by that?

### Page 71

(1) A.   I apologize, because that might not be
(2) clearly worded. Remember earlier I think I said what
(3) would you look for -- you asked what I would be
(4) looking for when one of these separated. And I said
(5) only half-jokingly I'd be looking for the train, you
(6) know, did it run over the bike.
(7)             And this is my attempt in this
(8) report to basically say the same thing. I'm looking
(9) for evidence that a really massive force would have
(10) been in place to destroy the joint, to pull it apart.
(11) And there was no sign of anything on the bike that
(12) would indicate such a massive force.
(13) Q.   You mean you need a massive force to
(14) destroy the joint fit?
(15) A.   Correct.
(16) Q.   Now, you also indicate in the next
(17) paragraph that "While Mr. Johnson's," I assume
(18) Mr. Lockwood's, "bicycle showed signs that it was well
(19) used, it was not abused or kept in an unsafe
(20) condition." How could you reach that conclusion?
(21) A.   The -- because I've seen a lot of bikes
(22) that have been badly abused and hammered to
(23) smithereens. And this wasn't one of them. It
(24) showed -- it showed that he rode it a lot because the
(25) tires had a lot of wear on them, the pedals had a lot

### Page 72

(1) of wear on them. The braking surface in the front rim
(2) showed that he actually used the front brake, which
(3) you don't always see novice riders doing.
(4)             The -- but you can tell when
(5) somebody treats his bike carelessly and throws it
(6) around a lot and smashes it around a lot. This showed
(7) that the bike was used a lot but didn't show that what
(8) I would call carrying over into abuse.
(9) Q.   You note from his deposition that he
(10) indicated that the kickstand didn't work, so on
(11) occasions the bicycle would fall over on its side,
(12) things of that nature. Would that be an abuse of a
(13) bicycle, to allow the bicycle to fall over on the
(14) side?
(15) A.   No, I don't think so. The -- first of
(16) all, I don't own a bike with a kickstand.
(17) Q.   Well, he did apparently.
(18) A.   Yeah. I mean I got a lot of bikes. None
(19) of them have kickstands. So absence of a kickstand
(20) doesn't impress me. More than once I have leaned a
(21) bike up against a tree or a wall or something and it's
(22) slid and fallen down.
(23)             The reason that doesn't particularly
(24) upset -- I mean I don't like it when the bike falls
(25) down. And once in a while you'll get some cosmetic

BSA    𝐴    𝐴    ⟶    LOCKWOOD VS. PACIFIC CYCLE, LLC, ET AL.    XMAX(24/24)

## Page 93

(1) the next photo does show matching striations or
(2) whatever we call them on the inside of the fork crown.
(3) Q.    And that again would be for purposes of
(4) getting a firmer or else tighter grip?
(5) A.    I believe so.
(6) Q.    The fact that the crown fork and the
(7) steerer tube were separated when you examined the
(8) bike, did that inhibit you in any way in coming up
(9) with any conclusions as to just exactly how the
(10) accident happened?
(11) A.    Well -- no.  First of all, I did rely on
(12) the representation that Mr. Peltz provided to me as to
(13) how the accident occurred.  And that's been since
(14) confirmed by deposition testimony that we've all seen;
(15) that Mr. Lockwood pulled up on the handlebars and most
(16) of the bike came up with him but not the -- not the
(17) fork and not the front wheels.  They separated from the
(18) bike at that point.
(19) Q.    When you and Mr. Hinton observed the bike,
(20) inspected the bike in March 2002, did you or Mr.
(21) Hinton or Mr. Peltz do anything to disconnect any
(22) additional parts of the bicycle?
(23) A.    I don't believe we --
(24) Q.    In other words you described what the
(25) bicycle looked like in one of your exhibits that you

## Page 94

(1) drew for us.  I believe that we have to make this an
(2) exhibit if we haven't done so.
(3) A.    This one.
(4)        MR. SMITH:    I might add that his
(5) photographs which were produced to you will show you
(6) the condition of the bike, how it was at the time that
(7) he produced to you that may be better than what his
(8) recall is.
(9) Q.    Yeah.  Do you recall taking the bike apart
(10) any further than --
(11) A.    I don't believe we did that, no.
(12) Q.    Okay.
(13) A.    No.  And in fact I'll go ahead and say no,
(14) I didn't, because any -- anytime I do more than look
(15) at or photograph a bike or measure it, I have to keep
(16) a very good written record so there's no question
(17) about altering of it.  And we didn't do any of that,
(18) so we didn't keep a record.  All I did was look,
(19) observe, and photograph.  And frankly it wasn't until
(20) today that I learned that the -- that the steerer tube
(21) had been reinserted into the fork crown.
(22)        MR. LOPATA:    I'm finished.  Thanks.
(23)        THE WITNESS:    Terrific.
(24)        MR. LOPATA:    I don't know if Mike
(25) has any questions.  He probably doesn't.  But I'd like

## Page 95

(1) to make some copies of these things that you brought
(2) with you.  You want to advise him, Mike, or ask him
(3) any questions?
(4)                * * *
(5)              EXAMINATION
(6) BY MR. SMITH:
(7) Q.    I want to ask you one question, and that
(8) is whether you have any opinion whether any
(9) maintenance that was done at Bike Line that was
(10) described by William in his deposition would in any
(11) way affect, in other words your opinion whether that
(12) maintenance would have in any way affected the bond
(13) between the steerer tube and the fork crown.
(14) A.    I don't see how it could have or should
(15) have.
(16) Q.    And in terms of --
(17) A.    In other words no.
(18) Q.    And in terms of your testimony dealing
(19) with the fact of the separation itself, if a
(20) separation occurs solely through normal and expected
(21) use, it's your opinion then that's evidence of a
(22) defect?
(23) A.    That's right.
(24) Q.    But if a separation occurs through an
(25) accident, the fork being bent, or some other thing

## Page 96

(1) that falls outside of normal and expected use, that
(2) then may -- that separation may, in your opinion may
(3) not be attributable to a defect?
(4) A.    Emphasis on the may.
(5) Q.    Yeah.
(6) A.    Again I'm looking for the train.  It has
(7) to be a pretty strong force.
(8) Q.    And when you examined the fork itself, was
(9) there any evidence that the fork had been bent or
(10) damaged in any fashion?
(11) A.    No.
(12)        MR. SMITH:    We'll waive reading and
(13) signing.
(14)     (Deposition concluded at 4:05 p.m.)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Gallagher Reporting & Video, LLC